## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,

v.

Nos. 25-3573, 26-1122

LaMONICA McIVER,

*Appellant.*

## OPPOSITION TO MOTION TO DISMISS PART OF THIS APPEAL

Ordinarily, pre-trial rulings on motions to dismiss based on selective or vindictive prosecution are not immediately appealable. But this case is not ordinary. It involves the prosecution of a sitting Congresswoman, LaMonica McIver, for assault of federal officers based on events that occurred during her statutorily authorized oversight inspection of a privately run immigration detention facility that Immigration and Customs Enforcement (ICE) had recently reopened in her district. The physical contact alleged in the indictment occurred only after ICE officials and Homeland Security Investigations (HSI) agents, at the direction of the Deputy Attorney General of the United States, surged into a crowd of protestors outside the facility's gate to arrest the Mayor of Newark for supposedly trespassing on federal land—an entirely unfounded charge that the Department of Justice (DOJ) quickly dismissed because the Mayor had been invited onto the premises and the facility is not a federal enclave.

Not surprisingly, the attempt to arrest the mayor in that setting precipitated chaos. Fortunately, no one experienced any injury and the ICE officials ultimately provided Congresswoman McIver and her two colleagues with the inspection tour to which they were entitled. Nevertheless, the Justice Department pressed ahead, charging Congresswoman McIver with assault under 18 U.S.C. § 111.

Congresswoman McIver moved to dismiss the indictment as a violation of several foundational constitutional protections. In particular, she argued that the charges rest on legislative acts protected by the Speech or Debate Clause and related separation-of-powers principles. She also moved to dismiss based on selective prosecution, vindictive prosecution, and selective enforcement in violation of her First and Fifth Amendment rights. The district court denied the motions, and Congresswoman McIver timely appealed. The government does not dispute that the court's orders denying legislative immunity are immediately appealable.

But the government *does* seek to foreclose appellate review of Congresswoman McIver's claim that the prosecution is selective and vindictive, notwithstanding her argument that the decision to charge is transparently related to her political affiliation, her policy views, and her lawful oversight of the Executive Branch. In particular, that motion rests on the fact that no legitimate prosecutorial interest explains, on one hand, DOJ's indictment of a sitting Congresswoman for allegedly assaulting a federal officer based on a fleeting encounter that caused no

injuries during a concededly lawful oversight visit, and, on the other hand, DOJ's contemporaneous dismissal of far more serious charges against scores of defendants for violating the same statute by viciously assaulting law enforcement officers at the U.S. Capitol on January 6, 2021. The only possible explanation for this differential treatment is viewpoint-based discrimination and retaliation, as the Administration's own statements about this prosecution confirm.

Accordingly, in this highly unusual case, there is a pressing need and justification for review of these weighty constitutional issues now. Jurisdiction exists on two independent grounds.

*First,* the district court's denial of Congresswoman McIver's selective-and-vindictive motion satisfies the collateral order doctrine. The motion asserts her constitutional right not merely against conviction, but against being subjected to a prosecution brought for viewpoint-based and retaliatory reasons that chill protected speech and legislative oversight. Permitting a prosecution to proceed in the face of those violations would "further harm" the constitutional interests at stake, deterring Congresswoman McIver and her colleagues in the House and Senate from undertaking the independent expression and vigorous oversight the Constitution protects. *Cox Broadcasting Corporation v. Cohn*, 420 U.S. 469, 485 (1975). That harm cannot be remedied after the fact—regardless of whether Congresswoman McIver is ultimately acquitted.

3

**Second,** even if the order were not independently appealable, this Court would still have pendent appellate jurisdiction to review it. The selective and vindictive prosecution claims raise the same structural constitutional concerns that drive the immunity appeal. And based on the government's inadequate document preservation efforts in this case and related changes in Department of Homeland Security (DHS) policy, there is strong reason to believe that awaiting final judgment would make further discovery in support of the Congresswoman's claim impossible, as relevant evidence that may be necessary to prove these claims will likely have evaporated. The Court should deny the government's motion.

## BACKGROUND

### A.    Congresswoman McIver's Congressional Oversight of DHS Operations

Congresswoman McIver was elected in 2024 to represent New Jersey's 10th Congressional District. A Democrat, Congresswoman McIver serves on the Committee on Homeland Security and has been an outspoken critic of the Trump Administration's immigration policy through public statements, correspondence with agency leadership, and legislative initiatives. D.Ct.Dkt.20-1 at 7. As part of her work, the Congresswoman has prioritized oversight of DHS immigration detention facilities in New Jersey. She has done so relying on a federal appropriations statute that makes it unlawful "to prevent" a "Member of Congress" "from entering, for the purpose of conducting oversight, any" DHS detention center—whether or not the

Member "provide[s] prior notice." Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 527, 138 Stat. 460, 619.

Congresswoman McIver conducted such an oversight inspection on May 9, 2025 at Newark's Delaney Hall, accompanied by fellow New Jersey Representatives Bonnie Watson Coleman and Rob Menendez, Jr. Although the indictment concedes, and the District Court found, D.Ct.Dkt.44 at 2-3, that the three Members were on site in their official capacity and for a legitimate legislative purpose, their inspection was delayed for approximately two hours while ICE and HSI officials first stalled, and then ultimately interfered with the inspection by arresting Mayor Baraka on the unsupportable charge that he had trespassed on federal land. The indictment in this case—which charges the Congresswoman with three counts of assaulting, resisting, or impeding federal law enforcement officers in violation of 18 U.S.C. § 111(a)(1)— stems entirely from her interactions with ICE and HSI agents during the melee that resulted from their ill-conceived operation.

The Executive Branch has not been shy about the partisan and retaliatory underpinnings of this prosecution. The charges were brought by a since-ousted Interim U.S. Attorney who had pledged to use her post to "turn New Jersey red." D.Ct.Dkt.20-1 at 3. Even before Congresswoman McIver's oversight inspection had concluded, DHS issued a press release falsely describing her as having "stormed" the Delaney Hall "gate and broke[n] into the detention facility" in "a bizarre political

stunt." *Id.* at 22. DHS then publicly declared her actions "another case of Democratic lawmakers labeling political stunts as oversight while they endanger the safety of ICE personnel," and claimed that "Democratic members of Congress," including "Representative LaMonica McIver (D-NJ)," have "been caught red-handed doxing and even physically assaulting ICE officials." *Id.* at 13. President Trump himself has applauded the prosecution as putting an end to the "days of woke." *Id.* at 24. DHS has coupled its rhetoric with multiple agency policies—since enjoined by a federal court—attempting to stifle authorized oversight visits and evade the statutory requirements. *See Neguse v. ICE*, 2026 WL 265647, at *1 (D.D.C. Feb. 2, 2026).

### B.    The Justice Department's Dismissal of Assault Charges Against January 6 Defendants

This prosecution stands in stark contrast to the Administration's treatment of other defendants charged with assault under § 111. On January 6, 2021, thousands of President Trump's supporters descended on the U.S. Capitol to prevent Congress from certifying the results of the 2020 presidential election. During the attack, "over 140 police officers were assaulted," "the Capitol was damaged, government property was destroyed, and other government property was stolen." U.S. Atty's Off., Dist. of Columbia, *48 Months Since the Jan. 6 Attack on U.S. Capitol* (Jan. 6, 2025), https://perma.cc/S9EF-ZK43. The Justice Department charged over 1,500 individuals with federal crimes; over 600 of those were charged with assaulting,

resisting, or impeding law enforcement officers, including more than 170 who did so using a dangerous weapon or causing serious bodily injury. *Id.*

As of President Trump's inauguration in January 2025, hundreds of cases remained pending. *Id.* But the Justice Department has since moved to dismiss every single one of them—including approximately 160 charged under § 111(a), the same offense charged here. D.Ct.Dkt.20-1 at 6, 19.[1] Those defendants include one with a "lengthy and violent criminal history" who used "a metal bike rack to push against law enforcement officers and repeatedly spray them" with a "chemical spray," and another who "assaulted multiple police officers for hours, at times deploying a baseball bat or a riot shield as a weapon and causing serious injury." *Id.* at 5, 18.

The Justice Department made these widespread dismissals following a presidential proclamation on Inauguration Day that characterized the January 6 prosecutions as a "grave national injustice that has been perpetrated upon the American people over the last four years." Proc. No. 10887, 90 Fed. Reg. 8331 (Jan. 29, 2025). In addition to directing dismissals of pending cases, the proclamation pardoned and granted commutations to the approximately 1,200 individuals who had already been convicted and sentenced. *Id.* During a news conference the next day,

---

[1] *See Jan. 6 Archive: The Capitol Charges* (last visited Feb. 19, 2026), https://apps.npr.org/jan-6-archive/database.html.

the President crystallized the ideological basis for the actions: "these were people that actually love our country." D.Ct.Dkt.20-1 at 2.

### C.     Procedural History

In her motion to dismiss based on selective and vindictive prosecution, the Congresswoman argued that her indictment violated both the First and Fifth Amendments by singling her out based on her viewpoint, her party affiliation, and her exercise of protected oversight authority. She emphasized the dismissal of all prosecutions under § 111 arising from the January 6 attack—including cases involving far more serious, injurious conduct—and the numerous statements by Executive Branch officials painting this prosecution in partisan and retaliatory terms. She also argued that the prosecution was vindictive because it retaliated against, and sought to chill, her lawful oversight activity.

Congresswoman McIver alternatively sought targeted discovery of Executive Branch communications. Noting that such discovery requires only "some evidence" of unconstitutional conduct, she proposed cabining that discovery to tailored categories of communications among Executive Branch officials; she also suggested proceeding in incremental phases to mitigate any burden. D.Ct.Dkt.26-1 at 1.

The district court denied both motions to dismiss. D.Ct.Dkts.44, 64. With respect to the selective and vindictive prosecution motion, the court concluded as a matter of law that the January 6 defendants were not relevant or appropriate

comparators to show that Congresswoman McIver was being treated differently from others indicted for assaulting federal officers. The court specifically accepted the government's assertion that President Trump's decision to pardon many of those defendants meant that they were not "similarly situated" within the meaning of selective prosecution jurisprudence. The court found irrelevant that a number of the January 6 cases were pending—and that the President's proclamation distinguished between pardons of convicted defendants and dismissals of pending cases. It also ignored that several of the Justice Department's dismissals were *without* prejudice. D.Ct.Dkt.44 at 32-33. Finally, the court viewed the factual circumstances underlying the January 6 cases as "unambiguously distinct" because those defendants' conduct was so much *more* culpable than Congresswoman McIver's: they had "serious criminal records" and the Congresswoman's conduct was "manifestly less egregious." *Id.* at 33-34. The court denied discovery for similar reasons, finding that the record did not contain "some evidence" of unconstitutionally selective or vindictive action. *Id.* at 39.

## ARGUMENT

The district court's ruling on the Congresswoman's selective-and-vindictive motion is properly before this Court: It is an appealable collateral order and, independently, it properly lies within this Court's pendent appellate jurisdiction.

## I.   The Court Has Jurisdiction Under the Collateral Order Doctrine

An order is immediately appealable under 28 U.S.C. § 1291 when it is "collateral" and thus effectively final. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546-47 (1949). An order meets this test when it "(1) conclusively determines the disputed question, (2) resolves an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment." *Sell v. United States*, 539 U.S. 166, 176 (2003) (cleaned up).

For good reason, the government disputes only "the third part of the test." Mot. 5. There is no question that the district court "conclusively determine[d]" there was no constitutional violation based on the existing record and that the Congresswoman was not entitled to discovery to support her claims. *Sell*, 539 U.S. at 176. Further, those purely legal rulings are undeniably "important," and are "completely separate" from the merits questions that would be presented in any trial. *Id.* Thus, the only disputed question is whether Congresswoman McIver's constitutional claims are "effectively unreviewable on appeal from a final judgment." *Id.* They are.

### A.   The Selective-and-Vindictive Motion Asserts Constitutional Rights Against Prosecution

Courts have held that the collateral order doctrine permits pre-trial review of a claim that the prosecution *itself*—and not merely the potential conviction—is actively infringing on a defendant's First Amendment rights or on separation-of-

powers interests like legislative independence. The significance of both interests warrants immediate review.

**1.** The Supreme Court has long recognized that First Amendment rulings are unusually susceptible to early review as collateral orders because leaving the scope of First Amendment protections "unsettled" can "further harm" the exercise of those rights that the Amendment protects. *Cox*, 420 U.S. at 485. Thus, the Supreme Court has "often" permitted appeals of interlocutory orders to determine "the proper scope of First Amendment protections" before final adjudication of a case on the merits. *Fort Wayne Books v. Indiana*, 489 U.S. 46, 55 (1989). Other courts have followed suit, emphasizing that "interlocutory court orders bearing on First Amendment rights remain subject to appeal pursuant to the collateral order doctrine." *Whole Woman's Health v. Smith*, 896 F.3d 362, 368 (5th Cir. 2018).

These principles apply with equal force in the criminal context. For example, as the government concedes (at 5-6), the Tenth Circuit has allowed a defendant to appeal the denial of a pre-trial motion to dismiss on the ground that the prosecution was "motivated by the improper purpose of interfering with the defendant's constitutionally protected speech." *United States v. P.H.E., Inc.*, 965 F.2d 848, 849 (10th Cir. 1992). As that court explained, "the actual act of going to trial under a pretextual prosecution has a chilling effect on protected expression" that generates "a necessity for immediate relief because an appeal following a conviction would

not permit the plaintiffs to vindicate their First Amendment rights." *Id.* at 856. The court emphasized that "[e]ven the prospect of ultimate failure of such prosecutions by no means dispels their chilling effect on protected expression." *Id.* at 865 (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 494 (1965)); *see* 15C Wright & Miller, Federal Practice & Procedure § 3918.5 n.72 (2d ed.) (endorsing this rationale).

**2.** Courts have applied a similar rationale to rulings implicating critical interests under the constitutional separation of powers. The interest of a Member of Congress "in avoiding the strain, expense, and injury to reputation resulting from a trial" is "especially compelling" because their "ultimate vindication in an appeal after conviction will come long after serious, perhaps irreparable, political damage has been inflicted." *United States v. Myers*, 635 F.2d 932, 936 (2d Cir. 1980). Such prosecutions also "implicate aspects of our representative form of government" because they risk impairing the "Member's capacity to represent [] constituents" and "the same concerns that underlie the Speech or Debate Clause," namely, "prevent[ing] intimidation by the executive." *Id.* (quoting *United States v. Johnson*, 383 U.S. 169, 181 (1966)).

Related interests explain why the Supreme Court, with the Solicitor General's endorsement, granted interlocutory review of the denial of presidential immunity in *Trump v. United States*, 603 U.S. 593 (2024); *see* Reply Brief for United States at 5, *id.*, No. 23-624. As Justice Barrett's concurrence recognized, "the President's

Executive Branch authority would be significantly undermined if appellate review of the constitutional challenge were postponed until after conviction and sentence." *Trump*, 603 U.S. at 654 (Barrett, J., concurring) (cleaned up).

**3.** The district court's selective-and-vindictive ruling implicates these same First Amendment and separation-of-powers interests, warranting immediate review.

To start, the Congresswoman's claims are firmly rooted in the First Amendment. She established that the Justice Department is treating her differently from similarly situated defendants charged under § 111(a). And she showed that the most plausible explanation for that disparity is the ideological motivation of those whom the Administration treated more leniently. Giving those defendants a pass but prosecuting her thus violates the cardinal First Amendment principle that "the government may not enforce the laws in a manner that picks winners and losers in public debates." D.Ct.Dkt.20-1 at 3 (quoting *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1142 (D.C. Cir. 2023)). The Administration's own statements reinforced that theory. *Id.* at 15-22. And a litany of public statements from Executive Branch officers confirm it, starting with then-Interim U.S. Attorney Alina Habba's pledge to help "turn New Jersey red," continuing through DHS's statements characterizing "Democratic members of Congress" like Congresswoman McIver as the problem, and extending all the way to President Trump's endorsing

this prosecution as part of his Administration's broader effort to end the "days of woke." *Id.* at 22-24.

Congresswoman McIver also asserted that the prosecution was a retaliatory effort against her protected legislative oversight. She argued that the charges followed—and were intended to deter—her oversight under federal law in the midst of ongoing efforts by DHS to prevent Members of Congress from accessing immigration detention facilities. *Id.* at 26-28. In that regard, Congresswoman McIver's claim was not merely that the government misapplied § 111, but that *the prosecution itself* was "part of [a] project to chill … oversight" of the Administration's "immigration policies," *id.* at 4, along with core political speech and association, *id.* at 14-17.

Indeed, as in other cases permitting pre-trial appeals, there is strong evidence that Congresswoman McIver's prosecution is part of a "pattern" of hostility toward protected activity—and against Democratic officials who oppose the Administration's immigration policies in particular. *P.H.E.*, 965 F.2d at 857. The Administration has trumpeted this prosecution as part of a campaign against "Democratic lawmakers" who, in its view, are "labeling political stunts as oversight while they endanger the safety of ICE personnel." *Supra* p.5. And the events at Delaney Hall on May 9 complement broader DHS efforts to impede congressional oversight visits. *Id.*

This "campaign of harassment and intimidation" against political critics opposed to the Administration on a key policy issue underscores the core First Amendment rights that this prosecution imperils. *P.H.E.*, 965 F.2d at 856. Indeed, political expression and association—like that at issue here—"occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (cleaned up). "Delaying final decision of the First Amendment claim until after trial will leave unanswered ... an important question of" free expression, "an uneasy and unsettled constitutional posture that could only further harm" interests in free political expression and vigorous legislative oversight. *Cox Broadcasting*, 420 U.S. at 485-86 (cleaned up). That is an "intolerable" result. *Id.* at 485. The only way to preserve Congresswoman McIver's First Amendment right to avoid a trial that targets her First Amendment rights is for this Court to hear that argument now.

The connection between Congresswoman McIver's selective-and-vindictive motion and the separation of powers further cements that review is needed now. Though selective-and-vindictive prosecution is doctrinally distinct from legislative immunity and pure separation of powers claims, "the same concerns" apply to related "pre-trial review of legal defenses" raised by a Member of Congress. *Myers*, 635 F.2d at 936. There can be no doubt that the Congresswoman's Article I oversight authority—and that of her fellow Members—"would be significantly undermined if

appellate review of the constitutional challenge were postponed until after conviction and sentence." *Trump*, 603 U.S. at 654 (Barrett, J., concurring) (cleaned up).

### B.     The Government's Categorical Rule Against Review of Pre-Trial Selective-and-Vindictive Rulings Is Unsupportable

The government's primary response (at 5) is that the Supreme Court's decision in *Hollywood Motor Car* bars interlocutory review of *all* pre-trial selective-or-vindictive prosecution rulings. But *Hollywood Motor Car* does not stand for such a categorical rule.

As the Tenth Circuit recognized in *P.H.E.*, *Hollywood Motor Car* did "not implicate First Amendment concerns" and thus "is not relevant" when a motion asserts a First Amendment right to be free from prosecution. 965 F.2d at 855. Rather, that decision involved only the more common category of vindictive prosecution where a defendant asserts that the government has escalated charges following the assertion of a procedural right—in that case, a change of venue. *Id.* The harms asserted in such a situation can be vindicated after trial: even if the *escalation* was improper, the defendant lacked a right to be entirely free from prosecution. Here, by contrast, the prosecution *itself* imposes the relevant constitutional harm—chilling protected expression, association, and oversight—and the "obligation to protect" the right to free speech under the "First Amendment" is even more "pressing" than, as

in *Hollywood Motor Car*, protecting prerogatives under "the Federal Rules of Civil Procedure." *Id.*

Nor do *United States v. Biden*, 2024 WL 4541448 (3d Cir. May 9, 2024) (per curiam) or *Midland Asphalt Corp. v. United States*, 489 U.S. 794 (1989) counsel otherwise. *See* Mot. 5-6. In *Biden*, the defendant—who was not a Member of Congress—did *not* appeal the denial of his selective-and-vindictive prosecution claims. *See* 2024 WL 4541448, at *2. The Court's passing reference, in *dicta*, to the general appealability of selective-and-vindictive rulings thus cannot control the outcome here. And the court's short unpublished order in *Biden* did not address the particular First Amendment and separation of powers issues implicated by this prosecution, which are categorically distinct from typical selective-and-vindictive claims. *See Frederick Douglass*, 82 F.4th at 1144 (the "seminal selective enforcement cases have involved" the Fourteenth Amendment).

The government also overreads *Midland Asphalt*, claiming (at 6) that a pre-trial dismissal ruling is immediately appealable only if it involves an "explicit statutory or constitutional guarantee." But *Midland Asphalt* is not so restrictive: the word "explicit" "appears only once" there, and "did not perform any particular work" in that decision. *United States v. Trump*, 91 F.4th 1173, 1184-86 (D.C. Cir. 2024), *rev'd on other grounds,* 603 U.S. 593 (2024) (cleaned up). "[T]here is no apparent reason to treat an *implicit* constitutional immunity from trial differently

from an *explicit* one for interlocutory review." *Id*. at 1186. And whatever doubt *Midland Asphalt* left open, the Supreme Court closed it by exercising jurisdiction in *Trump v. United States*, resolving a presidential immunity claim that did not even arguably invoke an explicit constitutional basis. *See supra* p.12.

The government's only other response is a perplexing assertion that the First Amendment is not "a license for violence." Mot. 6. That is exactly backwards: bare allegations of violence are not a license to violate the First Amendment. Moreover, unlike the January 6 cases, this prosecution does not involve any assertion of injury. At any rate, the Constitution's prohibitions on selecting defendants for prosecution based on protected grounds applies to all charges, whether allegedly "violent" or not. And at bottom, the government's assertion has nothing to do with appellate jurisdiction.

While pre-trial appeals in criminal cases are the exception rather than the rule, prosecutions of sitting Members of Congress based on, and in retaliation for, their political speech, political affiliation, and legislative conduct are even rarer. The district court's denial of core constitutional protections against such prosecutions is appealable.

## II.    Pendent Appellate Jurisdiction Is Also Available

The order is independently reviewable under the doctrine of pendent appellate jurisdiction. That doctrine permits the Court to exercise jurisdiction in the presence

of "special circumstances" that bring the case "outside the general rule" against interlocutory appeals. *CTF Hotel Holdings, Inc. v. Marriott Int'l, Inc.*, 381 F.3d 131, 136 (3d Cir. 2004); *see United States v. Menendez*, 831 F.3d 155, 164 (3d Cir. 2016).

### A.    Special Circumstances Warrant Exercising Pendent Jurisdiction

Three sets of special circumstances warrant reviewing all of the Congresswoman's constitutional claims together.

**1.** First, the constitutional implications of the Congresswoman's claim alone warrant simultaneous review of her legislative immunity and selective-and-vindictive motions.

This Court recognized as much in *Menendez*. There, then-Senator Menendez moved to dismiss his indictment on the basis of legislative immunity and, separately, on the ground that the prosecution "raise[d] separation of powers issues." Reply Br. at 1 n.1, *Menendez*, No. 15-3459 (3d Cir. Nov. 2, 2015). The Senator explained that he had "secured the Court's jurisdiction through collateral orders on Speech or Debate Clause" grounds, and asked "the Court to take pendent jurisdiction over" a separate order—on a motion brought under the separation of powers—"given the inherent separation of powers issues that arise when the Executive Branch prosecutes a Member of the Legislative Branch" and the "judicial efficiency" that is "promoted by the Court addressing pendent issues when it already has to decide an interlocutory appeal." *Id.* at 3. This Court agreed that, under those "specific

circumstances," it had "pendent appellate jurisdiction over Senator Menendez's separation-of-powers claims." *Menendez*, 831 F.3d at 164 (citing *CTF Hotel*, 381 F.3d at 136).

The same rationale applies here. As explained, the selective and vindictive prosecution of a sitting Member of Congress for her protected speech, association, and oversight raises inherent and unusual constitutional concerns that risk chilling her legislative independence during the course of the prosecution, and the independence of likeminded legislators. *Supra* pp.10-15. Those harms are compounded by the inevitable "cost and inconvenience and distractions of a trial" that already warrant immediate appealability under the Speech or Debate Clause. *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951). And there is no risk that exercising jurisdiction in these unusual circumstances will incentivize other defendants to manufacture claims for the purpose of securing interlocutory review because Congresswoman McIver already had a right to an immediate appeal under the Speech or Debate Clause. *Myers*, 635 F.2d at 936.

**2.** Second, forcing the Congresswoman to await final judgment poses a substantial, concrete risk that critical evidence relevant to Congresswoman McIver's selective and vindictive prosecution claims will not survive through a post-trial appeal. While the public record amply supports dismissal in this case, Congresswoman McIver alternatively sought targeted discovery to bolster her claim,

including in the form of communications among DOJ and DHS officials. *Supra* p.8. Discovery for these claims is warranted if there is "some evidence" they are meritorious—a standard the district court here found was not met. *United States v. Washington*, 869 F.3d 193, 214 (3d Cir. 2017).

Yet if this Court were ultimately to agree only in a post-trial appeal that "some evidence" supported discovery, DHS's and ICE's conduct here and in other litigation suggests that such evidence likely will be long gone, making the prospect of post hoc discovery inefficient at best and "moot" at worst. *CTF Hotel*, 381 F.3d at 136.

In particular, as Congresswoman McIver explained in a detailed letter to the district court, the prosecution's disclosures in other discovery-related disputes reveal irregular and incomplete preservation efforts that show this claim will not be effectively reviewable post-trial. D.Ct.Dkt.57. For example, the government produced messages from on-scene personnel only after court intervention, in partial screenshot form, and without metadata. Communications on personal devices were not initially collected, despite long-standing protocols requiring such efforts. And at least one government-issued device associated with a relevant official was wiped following the custodian's departure from government service, notwithstanding the government's preservation obligations. *See Id.* at 1-9.

The problem is not confined to this prosecution. *Id.* at 9-10. In pending litigation seeking DHS records under the Freedom of Information Act, affidavits

filed by the United States have admitted that DHS has stopped using software that automatically captures text messages or saves trails of communication between and among its officials. Instead, the agency's current process for record preservation involves employees' "saving screenshots of messages, emailing them to a government account, and archiving them in a shared drive folder." Weissman Decl. ¶ 9, *American Oversight v. DHS*, 25-cv-03699 (D.D.C. Nov. 5, 2025), ECF No. 14-3.

DHS's policy of manual screenshotting by custodians—rather than systematic preservation of full electronic records as the Federal Records Act requires—seriously jeopardizes the agency's ability to comply with its discovery obligations in this case. D.Ct.Dkt.57 at 9-10. And it imperils Congresswoman McIver's ability to pursue meaningful discovery if she is forced to await post-trial review of the district court's discovery order—potentially making *all* her selective-and-vindictive claims effectively unreviewable.

**3.** Finally, considerations of "judicial economy" strongly support review now. *United States v. Spears*, 859 F.2d 284, 288 (3d Cir. 1988). The government's primary response to Congresswoman McIver's motion was not that the January 6 defendants who assaulted Capitol Police were somehow less culpable than she is. Nor did the government dispute the stunning seriousness of their conduct. Rather, the government asserted that those who received pardons cannot be appropriate

comparators, and the district court agreed. But if this Court were to reach a contrary conclusion, or hold that additional discovery is necessary to evaluate the government's conduct, the burdens of a trial and post-trial proceedings could be avoided altogether.

### B. The Government's Position Rests On an Overly Narrow Conception of Pendent Jurisdiction that This Court Has Rejected

The government's sole response starts from a mistaken premise. It claims that pendent jurisdiction is "*only*" available "for otherwise unappealable orders whose merits are 'inextricably intertwined' with the merits of the order the defendant is appealing, such that review of the former 'is necessary to ensure meaningful review of' the latter." Mot. at 6 (emphasis added) (quoting *Clinton v. Jones*, 520 U.S. 681, 707 n.41 (1995)).

The government ignores this Court's decisions making clear that "special circumstances" can warrant pendent jurisdiction, even where the otherwise unappealable issue involves a "distinct" doctrine. *CTF Hotel*, 381 F.3d at 136. That was the basis for exercising jurisdiction in *Menendez*, and it supports review here for similar reasons.

But jurisdiction is also appropriate under the cases the government invokes. Those cases make clear that pendent jurisdiction is available for orders that "*either* (1) are 'inextricably intertwined' with appealable ones *or* (2) must be reviewed with them to 'ensure meaningful review.'" *United States v. Brace*, 1 F.4th 137, 142 (3d

Cir. 2021) (emphasis added). The government ignores the disjunctive. Given the material risk of evidence loss, *supra* pp.21-22, review now is justified to "ensure meaningful review." *Id.* And although there are doctrinal differences between Congresswoman McIver's claims of selective and vindictive prosecution and those related to legislative immunity, they are "intertwined" in a critical respect: both contend that this prosecution targets Congresswoman McIver *for her constitutionally protected oversight activity*. This Court can and should decide now whether that critical circumstance, relevant to all issues presented in this appeal, forecloses this prosecution.

Finally, exercising jurisdiction in this exceptional case would not disturb the Court's general "aversion to piecemeal appeals." *CTF Hotel*, 381 F.3d at 136. Prosecutions of sitting Members of Congress are exceedingly rare, and a bona fide argument that a sitting Member is being selectively or vindictively prosecuted for her protected expression, association, and oversight is rarer still. Indeed, Congresswoman McIver is aware of no other case involving a Member of Congress raising such claims in this Circuit. Pendent jurisdiction is warranted in these unique circumstances. *Menendez*, 831 F.3d at 164.

## CONCLUSION

The government's motion should be denied.

Date: February 19, 2026

Respectfully submitted,

Paul J. Fishman
John M. Fietkiewicz
ARNOLD & PORTER
 KAYE SCHOLER LLP
One Gateway Center | Suite 1025
Newark, NJ 07102
Telephone: 973-776-1901
Paul.Fishman@arnoldporter.com
John.Fietkiewicz@arnoldporter.com

*Counsel for*
*Congresswoman LaMonica McIver*

## CERTIFICATE OF SERVICE

I certify that on February 19, 2026, I electronically filed the foregoing document with the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: February 19, 2026

_____

Paul J. Fishman

*Counsel for*
*Congresswoman LaMonica McIver*

## CERTIFICATE OF COMPLIANCE

1. The foregoing document complies with the type-volume limitations of Fed. R. App. P. 27(d) because, excluding the parts of the document exempted, it contains 5,200 words.

2. The document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office 365 in Times New Roman 14-point font.

3. In accordance with Third Circuit Local Appellate Rule 31.1(c), the document, as electronically filed on February 19, 2026, was scanned with a virus detection program, namely Microsoft Defender (Version 1.399.35.0), and no virus was detected.

Dated: February 19, 2026

_____
Paul J. Fishman

*Counsel for*
*Congresswoman LaMonica McIver*