Nos. 25-3573 & 26-1122

IN THE

# United States Court of Appeals
# for the Third Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

LAMONICA MCIVER

*Defendant-Appellant*

On Appeal from the United States District Court
for the District of New Jersey,
No. 25-cr-388 (Semper, J.)

**BRIEF FOR FORMER PROSECUTORS OF JANUARY 6, 2021
CAPITOL SIEGE CASES AS AMICI CURIAE IN SUPPORT OF
APPELLANT**

JAMES I. PEARCE
SAMANTHA P. BATEMAN
WASHINGTON LITIGATION GROUP
1717 K St NW, Suite 1120
Washington, D.C. 20006
202-521-8750
jpearce@washingtonlitigationgroup.org

April 6, 2026            *Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* are not corporate entities and are not owned in whole or in part by any corporate entity.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ................................................. i

TABLE OF AUTHORITIES ........................................................................ iv

INTERESTS OF *AMICI CURIAE* .............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 2

I.  Department Of Justice Policies Were Designed To Ensure That Criminal Prosecutions Are Impartial And Fundamentally Fair. ..................................................................5

Ii.  This Retaliatory Indictment Violates Vindictive Prosecution Principles. ..................................................14

   A.  Vindictively Motivated Prosecutions Violate the Department's Obligation to Pursue Justice and the Constitution's Guarantee of Due Process. ........................................14

      1.  The Due Process Clause forbids vindictive prosecutions motivated by retributive animus. ....................................15

      2.  The Due Process Clause requires an impartial prosecutor, free from bias or conflicts of interest. .............................18

   B.  As a product of retributive animus, rather than the fair-minded judgment of an impartial prosecutor, this indictment violates the Due Process Clause. .................................19

III.  The Indictment Also Violates Selective Prosecution Principles. ..................................................23

   A.  The Constitution Prohibits the Government from Selectively Prosecuting a Defendant for Arbitrary or Discriminatory Reasons. ..................................................24

   B.  The Executive Branch Has Directly Admitted that the Government is Prosecuting Congresswoman McIver For an Impermissible Discriminatory Purpose. ..............................26

C.   The Government's Disparate Treatment of McIver, Compared to Far More Culpable January 6, 2021 Defendants, Further Evinces Impermissible Bad Faith. ..............28

CONCLUSION ...................................................................... 32

APPENDIX: LIST OF *AMICI CURIAE* ....................................... 36

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Alabama v. Smith,*
    490 U.S. 794 (1989) ...................................................................15

*Berger v. United States,*
    295 U.S. 78 (1935)................................................................7, 18

*Blackledge v. Perry,*
    417 U.S. 21 (1974)....................................................................16

*Bordenkircher v. Hayes,*
    434 U.S. 357 (1978)................................................. 3, 15, 17, 20

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ................................................................ 26

*Ewing v. Mytinger & Casselberry,*
    339 U.S. 594 (1950) ................................................................. 6

*Frederick Douglass Found., Inc. v. D.C.,*
    82 F.4th 1122 (D.C. Cir. 2023)..............................................31, 32

*Ganger v. Peyton,*
    379 F.2d 709 (4th Cir. 1967)..................................................14, 23

*Goodfellas, Inc. v. Dunkel,*
    No. 3:15-CV-1633, 2016 WL 6599977 (M.D. Pa. Nov. 8, 2016).............. 26

*Morrison v. Olson,*
    487 U.S. 654 (1988) ................................................................. 6

*Nat'l Rifle Ass'n v. Vullo,*
    602 U.S. 175 (2024) ................................................................ 20

*North Carolina v. Pearce,*
    395 U.S. 711 (1969) ........................................................... 15, 17

*Thomas v. Chicago Park Dist.,*
    534 U.S. 316 (2002)..................................................................31

*United States v. Andrews,*
    633 F.2d 449 (6th Cir. 1980) .................................................... 20

# TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Armstrong,*
  517 U.S. 456 (1996) ......................................10, 24, 25, 26, 27

*United States v. Ball,*
  No. 23-cr-0160 (Apr. 27, 2023) .........................................30

*United States v. Baraka,*
  Case No. 25-mj-11131 (D.N.J.) (May 21, 2025) ........................ 22

*United States v. Batchelder,*
  442 U.S. 114 (1979) ................................................... 6

*United States v. Berrios,*
  501 F.2d 1207 (2d Cir. 1974)......................................... 27

*United States v. Bucci,*
  582 F.3d 108 (1st Cir. 2009)..........................................17

*United States v. Giraud,*
  160 F.4th 390 (3d Cir. 2025) .........................................21

*United States v. Goodwin,*
  457 U.S. 368 (1982) ............................................ 16, 18, 19, 20

*United States v. Johnson,*
  171 F.3d 139 (2d Cir. 1999) ...................................... 19, 20

*United States v. Koh,*
  199 F.3d 632 (2d Cir. 1999) ..........................................17, 20

*United States v. Lang,*
  No. 21-cr-0053 (Feb. 21, 2024) .......................................30

*United States v. Olvis,*
  97 F.3d 739 (4th Cir. 1996)........................................ 25, 26

*United States v. P.H.E., Inc.,*
  965 F.2d 848 (10th Cir. 1992) ........................................17

*United States v. Roberts,*
  280 F. Supp. 2d 325 (D. Del. 2003) ...................................20

# TABLE OF AUTHORITIES—Continued

Page(s)

*United States v. Sanders,*
  211 F.3d 711 (2d Cir. 2000) ........................................................... 15, 17

*United States v. Torquato,*
  602 F.2d 564 (3d Cir. 1979) ...................................................... 25, 26, 27

*United States v. Velsicol Chem. Corp.,*
  498 F. Supp. 1255 (D.D.C. 1980) ..............................................................21

*United States v. Villa,*
  70 F.4th 704 (4th Cir. 2023) ..............................................................20

*United States v. Washington,*
  869 F.3d 193 (3d Cir. 2017) .......................................................... 5, 32

*United States v. Wilson,*
  262 F.3d 305 (4th Cir. 2001) ..............................................................17

*Vill. of Willowbrook v. Olech,*
  528 U.S. 562 (2000) .......................................................................... 25

*Wayte v. United States,*
  470 U.S. 598 (1985) ......................................................... 5, 25, 26

*Young v. United States ex rel. Vuitton et Fils S.A.,*
  481 U.S. 787 (1987) ................................................................. 18, 22

## Statutes & Regulations

18 U.S.C. § 111 ..............................................................................1

18 U.S.C. § 111(a) ......................................................................... 3

18 U.S.C. § 202 .......................................................................... 11

18 U.S.C. § 203 .......................................................................... 11

18 U.S.C. § 204 .......................................................................... 11

18 U.S.C. § 205........................................................................... 11

18 U.S.C. § 206 .......................................................................... 11

# TABLE OF AUTHORITIES—Continued

Page(s)

18 U.S.C. § 207 .................................................................................. 11

18 U.S.C. § 208 ................................................................................. 11

18 U.S.C. § 209 ................................................................................. 11

5 U.S.C. §  735 .................................................................................. 11

5 C.F.R. § 2635.101(b)(8) ................................................................ 11

5 C.F.R. § 2635.101(b) ..................................................................... 11

5 C.F.R. Part 2635 ............................................................................ 11

5 C.F.R. Part 3801 ............................................................................ 11

**Miscellaneous Government Documents**

Dep't of Justice, Ethics Handbook for On and Off-Duty
   Conduct (Nov. 2024) ................................................................... 11

Dep't of Justice, Justice Manual,  § 1-1.100 .................................... 8

Dep't of Justice, Justice Manual,  § 1-1.200 ..................................... 9

Dep't of Justice, Justice Manual, § 1-1.300 ..................................... 9

Dep't of Justice, Justice Manual, § 9-27.000 ................................... 8

Dep't of Justice, Justice Manual § 9-27.001 ....................... 9, 13, 22

Dep't of Justice, Justice Manual, § 9-27.110 .................................... 9

Dep't of Justice, Justice Manual, § 9-27.150 ................................... 13

Dep't of Justice, Justice Manual, § 9-27.200 .................................... 9

Dep't of Justice, Justice Manual, § 9-27.220 ............................. 9, 10

Dep't of Justice, Justice Manual, § 9-27.260 ........................... 10, 23

Dep't of Justice, Justice Manual, § 9-27.260(1) ............................. 10

Dep't of Justice, Justice Manual, § 9-27.260(2) ............................. 10

# TABLE OF AUTHORITIES—Continued

Page(s)

Dep't of Justice, Justice Manual, § 9-27.260(3) ......................................... 10

Proc. No. 10887, 90 Fed. Reg. 8331 (Jan. 20, 2025)............................ 30, 31

*Removing Politics from the Administration of Justice:*
*Hearings on S. 2803 and S. 2978 Before the S. Comm.*
*on the Judiciary*, 93rd Cong. 202 (1974) .................................................. 7

Robert H. Jackson, U.S. Att'y Gen., Address Delivered at
the Second Annual Conference of United States Attorneys:
The Federal Prosecutor 1 (Apr. 1, 1940) ...................................... 7, 8, 12, 13

U.S. Atty's Off., Dist. of Columbia, *48 Months Since*
*the Jan. 6 Attack on U.S. Capitol* (Jan. 6, 2025)......................................... 28

**Other Publications**

Am. Bar Ass'n, Model Rules of Prof. Conduct, R. 3.8 ................................... 12

Andrew Kent, *Congress and the Independence of Federal Law*
*Enforcement*, 52 U.C. Davis L. Rev. 1927 (2019) ...................................... 7

Human Events Daily with Jack Posobiec, Newly Appointed
New Jersey DA Alina Habba—Live From the White House,
Human Events (Mar. 27, 2025).............................................................. 16

*Jan. 6 Archive: The Capitol Charges,*
NPR (last visited Apr. 6, 2026).............................................................. 29

Mary Clair Jalonick, *Officers who defended the Capitol on*
*Jan. 6 say their struggles linger,* Los Angeles Times (Jan. 4, 2026)...... 29

## INTERESTS OF *AMICI CURIAE*

*Amici curiae* ("Amici") are former federal prosecutors who collectively served for decades within the Department of Justice. [1]  Among other responsibilities, Amici each prosecuted criminal cases arising out of the events at the U.S. Capitol on January 6, 2021, when a crowd of thousands of people attempted to prevent Congress from certifying the results of the 2020 presidential election.  Many of those January 6 defendants engaged in egregiously violent attacks against law enforcement officers, including assaults charged under the same statute at issue here, 18 U.S.C. § 111.  But the government has now dismissed all the January 6 charges, including for defendants already convicted, while pressing full-steam-ahead with this indictment of Congresswoman LaMonica McIver.  Amici write to express their collective view that the McIver prosecution contravenes longstanding Justice Department policies, is unconstitutionally vindictive and selective, and should be dismissed.

---

[1] A complete list of Amici and their relevant experience appears in the Appendix to this brief.  No counsel for any party has authored this brief in whole or in part, and no entity or person, aside from Amici and their counsel, made any monetary contribution to fund the preparation or submission of this brief.  Both parties have consented to the filing of this brief.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The United States Department of Justice ("Department") wields formidable prosecutorial power within the federal system, ultimately encompassing the authority to deprive persons of liberty. That authority is appropriately entrusted not to partisans, but to stewards of justice who are bound by the Constitution and other legal and ethical guardrails. As alumni who collectively served within the Department for decades, Amici hold steadfast to the bedrock notion that it is the obligation of the federal prosecutor to seek justice, without fear or favor.

The circumstances surrounding this case reflect a disturbing departure from that venerable principle. In May 2025, Congresswoman LaMonica McIver and two other Representatives engaged in what the government acknowledged was a "congressional oversight inspection" of the Delaney Hall immigration detention facility in Newark, New Jersey. After the Newark Mayor arrived at the facility and was ushered through a security fence by a guard, Department of Homeland Security ("DHS") officials aggressively intervened and ultimately arrested the Mayor for trespassing—charges the government dismissed only 12 days later. In a scuffle arising out of those aggressive efforts to arrest the Mayor that lasted little more than a minute, McIver made brief physical contact with DHS officials, at least two of whom deployed significantly greater force against her. The DHS officials sustained

2

no injuries from the fleeting encounter. Shortly thereafter, McIver and the other Representatives were permitted to resume their inspection. Nonetheless, the government charged McIver with two felony counts of forcibly assaulting federal officials, in violation of 18 U.S.C. § 111(a)—a statute which, in Amici's experience, is typically used in far different circumstances, often involving violence or physical harm.

Taken together, the totality of circumstances demonstrates that the indictment of Congresswoman McIver was not an exercise of the evenhanded judgment of a disinterested prosecutor, as required by the Constitution and the Justice Department's formal policies. Instead, it represents a partisan prosecution of a perceived political adversary engaged in protected congressional oversight responsibilities. Such a vindictive and targeted prosecution, undertaken "[t]o punish a person" with criminal charges for doing something that "the law plainly allows [her] to do"—including fulfilling responsibilities as a public official—is "a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978).

Moreover, the unconstitutionally selective nature of this retaliatory prosecution is only heightened by the stark contrast between this case and the government's decisions to dismiss indictments against and pardon defendants prosecuted under Section 111 for their egregiously violent

3

conduct at the U.S. Capitol on January 6, 2021.  In comparison to the brief scuffle at issue here, Amici are personally aware that those January 6 cases often involved sustained and violent assaults, often with dangerous weapons, causing significant physical injuries to law enforcement officers.  And unlike the statutorily authorized congressional inspection here, the January 6 defendants breached the Capitol in an unlawful attempt to thwart the results of a valid presidential election.

The Constitution does not permit the Executive Branch to selectively wield its formidable prosecutorial power based on defendants' political views, partisan affiliation, or exercise of lawful rights.  Yet the record in this case—particularly when contrasted with those other Section 111 prosecutions—leads to the unmistakable conclusion that such impermissible considerations motivated the indictment here.  The Executive Branch plainly views the January 6 defendants as its supporters, and it accordingly engineered favorable outcomes for them.   Meanwhile, Congresswoman McIver challenged the Administration and was charged based on far less serious conduct.  To state the obvious, that is not how federal prosecutors—or the federal criminal justice system—are supposed to operate.

When a federal prosecution fails to abide by basic due process and equal protection principles, it falls to courts like this one to intervene.

4

Although Amici recognize that motions to dismiss on vindictive or selective prosecution grounds must appropriately clear a high bar, this case presents the extraordinary circumstance where unconstitutionally retributive animus and selectively targeted prosecution are apparent from the public record. Allowing this indictment to stand would undermine the values of fair-minded and equal justice under law that the Department of Justice is meant to protect. Amici therefore urge the Court to reverse and remand, with instructions to dismiss the indictment.

## ARGUMENT

### I.  DEPARTMENT OF JUSTICE POLICIES WERE DESIGNED TO ENSURE THAT CRIMINAL PROSECUTIONS ARE IMPARTIAL AND FUNDAMENTALLY FAIR.

Federal prosecutors have broad powers to investigate and prosecute crimes. Although they are appropriately entrusted with significant discretion in exercising their authority, that discretion is "not unfettered." *Wayte v. United States*, 470 U.S. 598, 608 (1985). Prosecutors must abide by fundamental constitutional principles, chief among them that no person be subject to biased, vindictive, or "selective prosecution." *United States v. Washington*, 869 F.3d 193, 214 (3d Cir. 2017).

Several resources assist prosecutors in their efforts to uphold those fundamental constitutional obligations, including written policies issued by

the Justice Department governing principles of federal prosecution and ethical considerations; professional conduct rules specific to prosecutors; longstanding Department norms concerning the role of the prosecutor; and established procedures designed to ensure fair and impartial prosecutions. Collectively, these safeguards protect the constitutional rights of defendants and promote public respect for the Department and the criminal justice system as a whole.

**A.** As former federal prosecutors with decades of collective experience, Amici "fully appreciate the vast power and immense discretion that are placed in the hands of a prosecutor." *Morrison v. Olson*, 487 U.S. 654, 727 (1988) (Scalia, J., dissenting). "Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion" alone. *United States v. Batchelder*, 442 U.S. 114, 124 (1979). And the prosecutor's "mere institution of proceedings" can carry profound consequences for the "reputation or liberty of a [defendant]." *Ewing v. Mytinger & Casselberry*, 339 U.S. 594, 599 (1950). More than 80 years ago, then-Attorney General Robert Jackson warned that "[t]he prosecutor has more control over life, liberty, and reputation than any other person in America." Robert H. Jackson, U.S. Att'y Gen., Address Delivered

at the Second Annual Conference of United States Attorneys: The Federal Prosecutor 1 (Apr. 1, 1940).

That power comes with attendant responsibilities for prosecutors to exercise their authority in a scrupulously fair manner. Indeed, federal prosecutors wield the powers that they possess not as "an ordinary party to a controversy," but instead as a "representative" of "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." *Berger v. United States*, 295 U.S. 78, 88 (1935). In that role, prosecutors seek not merely to "win a case"; their efforts aim foremost to ensure that "justice shall be done." *Id.*; *accord* Jackson, *supra*, at 3.

A critical component in seeking justice is the principle that prosecutions must always be based on "law and merit, and not on considerations of party affiliation, political image-making, or White House approval or influence." *Removing Politics from the Administration of Justice: Hearings on S. 2803 and S. 2978 Before the S. Comm. on the Judiciary*, 93rd Cong. 202, at 16 (1974) (statement of Hon. Theodore Sorenson); *see* Andrew Kent, *Congress and the Independence of Federal Law Enforcement*, 52 U.C. Davis L. Rev. 1927, 1934 (2019) ("Partisan political considerations, personal vendettas or favoritism, financial gain, or self-protection or self-dealing should play no role in investigating or

7

prosecuting cases."). That principle requires prosecutors, when assessing whether to pursue criminal charges, to maintain "a detached and impartial view of all groups in [their] community." Jackson, *supra*, at 4.

**B.** The Justice Department relies on formal policies, long-accepted norms, and established practices to ensure that federal prosecutors fulfill their obligations to seek justice and uphold the Constitution to which they each swore an oath. As Amici know firsthand from their time in public service, the Department's longstanding policies were designed to ensure that prosecutions are supported by the evidence and motivated by the unbiased pursuit of justice. Underlying those policies is the deeply rooted constitutional value that prosecutions must not be driven improperly by partisan, personal, or retributive animus toward any defendant. And well-established Department procedures and processes are intended to guard against improper prosecutions.

1. Start with the Department's policies governing federal prosecution. Any Department attorney's starting point when approaching a potential prosecution are the Principles of Federal Prosecution outlined in the Justice Manual. Dep't of Justice, Justice Manual, § 9-27.000 *et seq.* ("Principles").[2]

---

[2] The Justice Manual "publicly sets forth" the Department's "policies and procedures," Justice Manual, § 1-1.100, is "prepared under the

A statement of "prosecutorial policies and practices" grounded in the Constitution and "the fundamental interests of society," the Principles seek to "promote the reasoned exercise of prosecutorial authority and contribute to the fair, evenhanded administration of the federal criminal laws." *Id.* § 9-27.001. Recognizing that "federal prosecutors have great latitude in making crucial decisions concerning enforcement of a nationwide system of criminal justice," the Principles "summarize[] appropriate considerations to be weighed" and "desirable practices" that Department of Justice attorneys should follow when "discharging their prosecutorial responsibilities." *Id.* § 9-27.110, cmt.

Under the Principles, "[o]nce a federal prosecutor has concluded that there is probable cause that a person has committed a federal offense," the prosecutor must determine whether federal prosecution is warranted. *Id.* § 9-27.200. There is a "longstanding threshold requirement . . . that a prosecutor may commence or recommend federal prosecution only if he/she believes that the person will more likely than not be found guilty beyond a reasonable doubt by an unbiased trier of fact and that the conviction will be upheld on appeal." *Id.* § 9-27.220, cmt. A prosecutor also should not bring

---

supervision of the Attorney General and direction of the Deputy Attorney General," *id.* § 1-1.200, and "contains internal Department guidance that has been adopted through a policy-development process," *id.* § 1-1.300.

a case where: "(1) the prosecution would serve no substantial federal interest; (2) the person is subject to effective prosecution in another jurisdiction; or (3) there exists an adequate non-criminal alternative to prosecution." *Id.* § 9-27.220. Each of those factors, in turn, requires distinct analysis that the Principles discuss in detail.

Equally important is the Principles' directive regarding "[i]mpermissible [c]onsiderations" for a prosecutor. *Id.* § 9-27.260. A prosecutor "may not be influenced by," among other things, the person's "political association, activities, or beliefs," *id.* § 9-27.260(1), the prosecutor's "own personal feelings concerning the person," *id.* § 9-27.260(2), or "the possible effect of the decision" on the prosecutor's "own professional or personal circumstances," *id.* § 9-27.260(3). This crucial provision helps ensure that federal prosecution is not based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *Oyler v. Boles*, 368 U.S. 448, 456 (1962). And it ultimately undergirds the "presumption of regularity"—*i.e.*, that prosecutors "have properly discharged their official duties . . . in the absence of clear evidence to the contrary"—which is typically accorded to prosecutorial decisions. *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (internal quotations omitted).

In addition to the Principles, the Department also promulgates an Ethics Handbook that guides prosecutorial conduct and decision-making. *See* Dep't of Justice, Ethics Handbook for On and Off-Duty Conduct (Nov. 2024), https://perma.cc/J9W5-UHTE ("Handbook"). The Handbook calls attention to fourteen principles applicable to federal prosecutors (and all federal employees) to ensure that "their conduct is proper." 5 C.F.R. § 2635.101(b); *see id.* § 2635.101(b)(8) (mandating that all federal employees, including prosecutors, "act impartially"). It further summarizes the relevant conflict of interest statutes (18 U.S.C. §§ 202-209), the Uniform Standards of Ethical Conduct for Employees of the Executive Branch, (5 C.F.R. part 2635), supplemental Department of Justice-specific regulations (5 C.F.R. part 3801), and Executive Branch-wide standards of conduct (5 U.S.C. § 735). Taken together, these rules and regulations aim to safeguard against actual or apparent conflicts of interest and any appearance of impropriety by Department employees.

The ethical guidance issued through the Handbook stands alongside rules of professional conduct that further ensure the impartial administration of criminal justice. For example, the provision in the Model Rules of Professional Conduct focused on the "Special Responsibilities of a Prosecutor" directs prosecutors to refrain "from prosecuting a charge that

the prosecutor knows is not supported by probable cause" and "from making [or allowing others associated with the prosecutor to make] extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused." Am. Bar Ass'n, Model Rules of Prof. Conduct, R. 3.8(a), (f).

2. The policies announced in the Principles and Handbook rest on a deeper substrate of norms about federal prosecutors, articulated most powerfully by then-Attorney General Jackson in his famous speech to a gathering of United States Attorneys. Jackson recognized the "tremendous" power and discretion that prosecutors wield, observing that, in the wrong hands, abuses could follow: "He can have citizens investigated and, if he is that kind of person, he can have this done to the tune of public statements and veiled or unveiled intimation." Jackson, *supra*, at 1. Those abuses might culminate in "the most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather than pick cases that need to be prosecuted." *Id.* at 4. That concern was greatest, Jackson worried, "[i]n times of fear or hysteria," where a person may be targeted for "being unpopular with the predominant or governing group, being attached to the wrong political views, or being personally obnoxious to or in the way of the prosecutor himself." *Id.* at 5.

12

Wary of the grave dangers ill-used prosecutorial power could present, Jackson identified the "spirit of fair play and decency" that must "animate the federal prosecutor" and that safeguards against overzealous, selective, or retributive prosecutions. *Id.* at 3. At bottom, Jackson recognized, the "citizen's safety lies in the prosecutor who tempers zeal with human kindness, who seeks truth and not victims, who serves the law and not factional purposes, and who approaches his task with humility." *Id.* at 7.

**C.** Collectively, the Justice Department's policies and practices are aimed at ensuring the neutral, merits-based application of criminal law. *See* Justice Manual § 9-27.001 (noting that the Principles seek to "contribute to the fair, evenhanded administration of the federal criminal laws"). Although the Department's internal policies do not themselves create enforceable substantive rights for criminal defendants, *see id.* § 9-27.150, they reflect the Department's efforts to protect the underlying constitutional rights of defendants—including critical protections against vindictive, biased, or selective prosecutions, as further discussed below. Moreover, the Department has chosen to make the Principles, Handbook, and other internal policies public, to promote public respect and confidence in the Department's work, *see id.* § 9-27.001—a logic that holds only when the Department adheres to the guiding lights in those documents.

As former prosecutors in the Justice Department, Amici were bound by these prosecutorial principles and ethical rules during their public service. Amici continue to regard them as critical safeguards of democracy, due process, and the rule of law. As the representative of the People of the United States, the Department must take seriously its solemn responsibility to prosecute crimes in the public interest, not to selectively target for retribution individuals who happen to have incurred the personal wrath of the President, the prosecutor, or anyone else in the Executive Branch.

## II.   THIS RETALIATORY INDICTMENT VIOLATES VINDICTIVE PROSECUTION PRINCIPLES.

### A. Vindictively Motivated Prosecutions Violate the Department's Obligation to Pursue Justice and the Constitution's Guarantee of Due Process.

The Justice Department's policies and procedures are not simply a reflection of the Department's internal commitment to pursue justice. They are also a cornerstone of the agency's efforts to safeguard critical constitutional protections, including criminal defendants' rights to due process. The Constitution's protection against "depriv[ation] of life, liberty or property without due process of law," U.S. Const. amend. V, encompasses notions of "fundamental fairness" in criminal proceedings, including the "exercise [of] fairminded judgment" by prosecutors. *Ganger v. Peyton*, 379 F.2d 709, 713-14 (4th Cir. 1967). Several closely related lines of legal

14

authority thus collectively hold that vindictively motivated, personally targeted, or retributively biased prosecutions violate the Due Process Clause.

**1. The Due Process Clause forbids vindictive prosecutions motivated by retributive animus.**

First, courts have routinely recognized that vindictive prosecutions based on retributive animus—*i.e.*, prosecutions that are intended "[t]o punish a person because he has done what the law plainly allows him to do"—are "a due process violation of the most basic sort." *Bordenkircher*, 434 U.S. at 363. "[A] prosecution brought with vindictive motive . . . 'would be patently unconstitutional.'" *United States v. Sanders*, 211 F.3d 711, 716 (2d Cir. 2000) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 724 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989)).

To be sure, vindictive prosecution claims typically arise under a somewhat different factual scenario than the one presented here. In this case, the Executive Branch filed criminal charges against two elected representatives from the opposing political party. It continues to pursue those charges against Congresswoman McIver, who has been an outspoken critic of the Executive's immigration policy and who was engaged in congressional oversight activities during the incident giving rise to the indictment. And it initiated these charges under the leadership of a U.S.

Attorney who had vowed to use her role to "turn New Jersey red."[3]  That nakedly partisan approach to prosecution is—to put it mildly—highly unusual, and there is no precedent directly addressing it.  Instead, the vast majority of the prosecutorial vindictiveness cases arise out of the far more common fact pattern where, absent any direct proof of vindictive animus, a defendant asks a court to infer vindictiveness because he has been subjected to heightened charges or a harsher sentence after exercising a constitutionally protected right, such as the right to trial or to an appeal.  *See, e.g.*, *Blackledge v. Perry*, 417 U.S. 21, 28 (1974) (finding unconstitutional vindictiveness when a state prosecutor increased charges from a misdemeanor to a felony following defendant's exercise of statutory trial right).

But although the events here may be unprecedented, the relevant legal precedent supports the conclusion that a constitutional violation has occurred.  The vindictive prosecution case law collectively reflects a broad animating principle that it is unconstitutional for a defendant to be prosecuted solely in retaliation for the "exercise of a protected legal right," *United States v. Goodwin*, 457 U.S. 368, 380 n.11 (1982), or for doing

---

[3] Human Events Daily with Jack Posobiec, Newly Appointed New Jersey DA Alina Habba—Live From the White House (Mar. 27, 2025), at 8:41-9:00, https://perma.cc/2BEL-2QY4.

anything else (such as engaging in protected speech or carrying out one's duties as a public official) that "the law plainly allows him to do," *Bordenkircher*, 434 U.S. at 363. *Bordenkircher*'s broad language accords with that interpretation, as does language in other cases analyzing whether a defendant has adequately proven "genuine animus" on the part of the prosecutor, *see, e.g.*, *United States v. Wilson*, 262 F.3d 305, 314 (4th Cir. 2001); *United States v. Koh*, 199 F.3d 632, 640 (2d Cir. 1999). Moreover, many courts have entertained motions to dismiss indictments for alleged vindictiveness in retaliation for First Amendment-protected activity. *See, e.g.*, *United States v. Bucci*, 582 F.3d 108, 113-14 (1st Cir. 2009); *Sanders*, 211 F.3d at 718; *United States v. P.H.E., Inc.*, 965 F.2d 848, 860 (10th Cir. 1992). And the Supreme Court has extended the vindictiveness doctrine even to invocations of non-constitutional statutory rights. *See Pearce*, 395 U.S. at 724 ("[T]he imposition of a penalty upon the defendant for having successfully pursued a statutory right . . . would be no less a violation of due process of law.").

Taken as a whole, therefore, the overall thrust of this anti-vindictiveness doctrine is aimed at protecting defendants' rights by ensuring that criminal charges are brought as a reasoned exercise of prosecutorial power, based on a "normal assessment of the societal interest in prosecution,"

17

*Goodwin*, 457 U.S. at n.11, and are not motivated by the government's improper desire for retribution against a perceived political foe.

### 2. The Due Process Clause requires an impartial prosecutor, free from bias or conflicts of interest.

Another longstanding line of authorities similarly holds that due process requires prosecutors to be impartial, and to operate free from bias or conflicts of interest. "It is a fundamental premise of our society that the state wield its formidable criminal enforcement powers in a rigorously disinterested fashion." *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810 (1987). The Supreme Court in *Young* recognized the "distinctive role" and unique responsibilities of the federal prosecutor, who must act as "'the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all.'" *Id.* at 802-03 (quoting *Berger*, 295 U.S. at 88); *see also id.* (citing ethical rules for prosecutors providing that "[t]he responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict"). *Young* therefore held that an attorney with a conflict of interest could not serve as a criminal prosecutor, reasoning that the attorney would be "serv[ing] two masters" and thus could not "be guided solely by their sense of public responsibility for the attainment of justice." *Id.* at 814. When a prosecutor is "subject to influences that

undermine confidence that a prosecution can be conducted in [a] disinterested fashion," the Court explained, "we cannot have confidence in a proceeding in which this officer plays the critical role of preparing and presenting the case for the defendant's guilt." *Id.* at 811.

### B. As a product of retributive animus, rather than the fair-minded judgment of an impartial prosecutor, this indictment violates the Due Process Clause.

Judged against those standards, the vindictive indictment in this case runs afoul of fundamental due process protections.

1.   This is not the typical context in which a vindictiveness claim arises—an already charged defendant faces additional or more punitive charges after invoking a legal right—for which a defendant relies on indirect circumstantial evidence and asks the court "to 'presume' an improper vindictive motive" to overcome the otherwise-applicable presumption of regularity in criminal indictments. *Goodwin*, 457 U.S. at 373.  Those dueling presumptions exist because courts have recognized that in the mine run of criminal cases, prosecutorial "[m]otives are complex and difficult to prove," *id.*, such that inferential methods of discerning motivations are required.

But not so here.  Instead, this is the extraordinarily "rare case" where there is direct, objective evidence of "actual vindictiveness" and retribution. *United States v. Johnson*, 171 F.3d 139, 140-41 (2d Cir. 1999) (quoting

*Goodwin*, 457 U.S. at 384 n.19).  As courts have found, defendants can directly prevail on a vindictive prosecution claim, without resort to any of the competing presumptions, if "(1) the prosecutor harbored genuine animus toward the defendant . . . and (2) [the defendant] would not have been prosecuted except for the animus." *United States v. Roberts*, 280 F. Supp. 2d 325, 339 (D. Del. 2003) (quoting *Koh*, 199 F.3d at 640); *see also, e.g.*, *United States v. Villa*, 70 F.4th 704, 710 (4th Cir. 2023).  Both prongs of that test are satisfied here.

*First*, the Executive Branch's "genuine animus" toward McIver is apparent from the public record.  As McIver's brief amply explains, *see* App.Br. 52-53; 61-62, the Department of Homeland Security, the Department of Justice, and the President have all made public statements revealing that McIver faces prosecution for doing "what the law plainly allows [her] to do."  *Bordenkircher*, 434 U.S. at 363. [4]  Those direct statements are tantamount to an "actual confession" of retributive animus. *United States v. Andrews*, 633 F.2d 449, 453 (6th Cir. 1980); *see also Johnson*, 171 F.3d at 141 ("direct evidence" of vindictiveness can include "a

---

[4] This is true whether the government is retaliating against McIver for exercising her congressional oversight authority or for her speech about immigration matters. *Cf. Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 188 (2024) (noting that the government cannot "use the power of the State to punish or suppress disfavored expression").

statement by the prosecutor"); *United States v. Velsicol Chem. Corp.*, 498 F. Supp. 1255, 1266 (D.D.C. 1980) (finding actual vindictiveness and dismissing indictments where the U.S. Attorney "clearly expressed his intent and motivation" for bringing charges).

*Second*, the evidence indicates that absent that genuine animus emanating from the Executive Branch, McIver would not otherwise have been indicted. The sole signatory on the indictment, A.73, was an interim U.S. Attorney (later found to be unlawfully appointed, *see United States v. Giraud*, 160 F.4th 390, 406-07 (3d Cir. 2025)) who had publicly announced her intention to use her role for political ends, *see supra* pp.15-16. On the same day as the incident, the DHS Secretary falsely claimed that McIver and the other Representatives "stormed" Delaney Hall, and before any criminal charges had been filed, the DHS Secretary accused McIver of "commiting felonies" there. App.Br. 61-62. DHS officials also falsely denied that McIver was conducting congressionally-authorized oversight at the facility (although the government now admits she was), and DHS has since "adopted multiple unlawful policies purporting to bar Members of Congress from conducting unannounced oversight visits." App.Br. 62. The record thus indicates that this indictment was the product of animus, undertaken in retaliation for Congresswoman McIver's protected oversight activity.

21

The ways in which this case diverged from longstanding Justice Department policy and practice reinforce the conclusion that the prosecution would not have proceeded but for that retributive animus.  For one, the Executive suspended the Department's policy requiring consultation with the Public Integrity Section before prosecuting political figures mere weeks before filing charges in this case.  *See* App.Br. 54; A42.  Bypassing that critical safeguard as part of an apparent rush to charge Congresswoman McIver reflected—as a judge recently found when dismissing the related charges against the Newark Mayor—"a failure to adequately investigate, to carefully gather facts, and to thoughtfully consider the implications of [the government's] actions before wielding [its] immense power."  *United States v. Baraka*, No. 25-mj-11131 (D.N.J.), Dkt. 15 (May 21, 2025).  Such an approach to prosecution cannot be squared with the Principles' requirement that federal prosecutors make "a reasoned exercise of prosecutorial authority" that "contributes to the fair, evenhanded administration of the federal criminal laws."  Justice Manual, § 9-27.001.

**2.** The McIver prosecution also contravenes the "fundamental premise" that the government must "wield its formidable criminal enforcement powers in a rigorously disinterested fashion."  *Young*, 481 U.S. at 810.

The United States Attorney for the District of New Jersey cannot ethically or constitutionally "serve two masters," *Ganger*, 379 F.2d at 714: (1) the Constitution and People of the United States, and (2) partisan prosecutions. But the objective evidence suggests that the latter is what occurred here: many public Executive Branch statements strongly indicate that this prosecution has been improperly driven by McIver's "political association, activities, or beliefs," Justice Manual, § 9-27.260, and that she was targeted in retaliation for her protected criticism and oversight of this Administration. Pursuing politicized prosecutions might well align with the former interim U.S. Attorney's avowedly partisan goal to "help th[e] cause" of "turn[ing] New Jersey red." *See supra* pp.15-16. But politically biased prosecutions of that sort are anathema not only to the Department's policies and norms; they fail to embody the exercise of "fairminded" prosecutorial judgment, *Ganger*, 379 F.2d at 713, that the Constitution requires.

## III. THE INDICTMENT ALSO VIOLATES SELECTIVE PROSECUTION PRINCIPLES.

The prosecution of Congresswoman McIver was not only vindictive, but also selective. *See* App.Br. 47-60. Equal protection principles bar the government from selectively prosecuting individuals based on arbitrary or discriminatory classifications. Here, the government selectively targeted McIver after she engaged in congressional oversight at an immigration

detention facility.   The Executive's multiple statements that McIver was guilty of a crime before any charges had been filed, alongside statements by the interim U.S. Attorney who charged McIver that she intended to use her office for blatantly partisan objectives, constitute direct admissions of the government's discriminatory purpose to single out a perceived political enemy for prosecution.  And the selective nature of this prosecution is further laid bare by comparison to the government's recent conduct in other cases involving charges under the same federal assault statute, where defendants who engaged in far more violent and destructive acts at the U.S. Capitol on January 6, 2021 were permitted to escape criminal consequences.

A. **The Constitution Prohibits the Government from Selectively Prosecuting a Defendant for Arbitrary or Discriminatory Reasons.**

The "equal protection component of the [Fifth Amendment's] Due Process Clause" prohibits the federal government from selectively deciding "whether to prosecute . . . based on an unjustifiable standard such as race, religion, or other arbitrary classification." *Armstrong*, 517 U.S. at 464 (internal quotations omitted). Defendants most often invoke a selective-prosecution defense when the government has targeted them for membership in a protected class.  *See id.* at 469-70.  But a defendant may also raise a "class of one" claim by showing that she "has been intentionally

24

treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *see United States v. Torquato*, 602 F.2d 564, 569 n.9 (3d Cir. 1979) ("It is clear that [the defendant] could raise his claim of selective prosecution based on individual discrimination.").

"To establish a selective-prosecution claim, a defendant must demonstrate that the prosecution 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996) (quoting *Wayte*, 470 U.S. at 608). The government has acknowledged that a defendant may be able to satisfy both selective-prosecution prongs by identifying "direct admissions by" government officials "of discriminatory purpose." *Armstrong*, 517 U.S. at 469 n.3 (citing Brief for United States). Absent such evidence, a defendant must establish "both (1) that similarly situated individuals . . . were not prosecuted" and "(2) that the decision to prosecute was invidious or in bad faith." *Olvis*, 97 F.3d at 743 (internal quotations omitted). The prosecution of Congresswoman McIver fails under either framework.

**B. The Executive Branch Has Directly Admitted that the Government is Prosecuting Congresswoman McIver For an Impermissible Discriminatory Purpose.**

In most cases, "the 'presumption of regularity' that supports prosecutorial decisions" requires the defendant to "support a selective-prosecution claim with 'clear evidence'" that similarly situated individuals were not prosecuted. *Olvis*, 97 F.3d at 743 (quoting *Armstrong*, 517 U.S. at 464). But where the record shows that the government's actions are infected with "bad faith or improper behavior," the presumption of regularity falls away. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971). That is true here.

The government's decision to prosecute an individual has an impermissible "discriminatory purpose" if it is based on "the exercise of protected statutory and constitutional rights" or other "arbitrary" factors. *Wayte*, 470 U.S. at 608. For example, the government cannot selectively prosecute an individual "because of his exercise of First Amendment rights." *Id.* at 606-07. Nor can the government selectively prosecute an individual based on "personal or political bias" against that individual. *Torquato*, 602 F.2d at 568; *see Goodfellas, Inc. v. Dunkel,* No. 3:15-CV-1633, 2016 WL 6599977, at *9 (M.D. Pa. Nov. 8, 2016) (explaining that a "prosecuting body's

26

personal bias unrelated to suspect classifications may serve as a cognizable 'arbitrary factor' for purposes of a selective enforcement claim").

For many of the same reasons discussed above, *see supra* pp.20-21, the indictment in this case runs afoul of those basic principles. The numerous public statements by the President, the interim U.S. Attorney, and DHS officials about this case, *see* App.Br. 52-53; 61-62, collectively make clear that this indictment was motivated by partisan bias, and that Congresswoman McIver was singled out for prosecution because of her decision to use her protected legislative speech rights and her statutorily-authorized congressional oversight responsibilities in a way that this Administration found offensive. But "t[o] permit criminal prosecutions to be initiated on the basis of [such] arbitrary or irrational factors" would irreparably "transform the prosecutorial function" and "'corrode respect for [the] rule of law.'" *Torquato*, 602 F.2d at 568 (quoting *United States v. Berrios*, 501 F.2d 1207, 1209 (2d Cir. 1974)). "It is the wisdom of our Constitution that such personal abuses of governmental power are proscribed." *Id.* This Court can direct dismissal of the indictment on that basis alone.

### C. The Government's Disparate Treatment of McIver, Compared to Far More Culpable January 6, 2021 Defendants, Further Evinces Impermissible Bad Faith.

Even if the Executive Branch's own professedly partisan statements and "direct admissions . . . of discriminatory purpose," *Armstrong*, 517 U.S. at 469 n.3, against Congresswoman McIver were not enough, a comparison of this case to many other recent Section 111 prosecutions leaves no room for doubt concerning the government's discriminatory intent and impact.

Amici handled multiple prosecutions in connection with the attack on the U.S. Capitol on January 6, 2021, and strongly endorse McIver's claim (at App.Br. 48-52) that her alleged conduct "is far less worthy of prosecution" than the violent attacks perpetrated against law enforcement officers there. "During the siege of the Capitol that day, over 140 police officers were assaulted—including over 80 from the U.S. Capitol Police and over 60 from the Washington, D.C. Metropolitan Police Department." U.S. Atty's Off., Dist. of Columbia, *48 Months Since the Jan. 6 Attack on U.S. Capitol* (Jan. 6, 2025), https://perma.cc/S9EF-ZK43. "As proven in Court,"—and in stark contrast to the fleeting scuffle here involving an unarmed Congresswoman— "the weapons used and carried on Capitol grounds include[d] firearms; OC [pepper] spray; tasers; edged weapons, including a sword, axes, hatches, and knives; and makeshift weapons, such as destroyed office furniture, fencing,

28

bike racks, stolen riot shields, baseball bats, hockey sticks, flagpoles, PVC piping, and reinforced knuckle gloves." *Id.*

The Capitol rioters—also in stark contrast to Congresswoman McIver—included many individuals with serious criminal records, *see* A.37-38, who wielded their weapons in sustained assaults against law enforcement as part of an unlawful attempt to thwart the peaceful transfer of presidential power, *see* App.Br. 49-50. And multiple law enforcement officers sustained serious physical injuries during those attacks, including from being "crushed by the rioters" and "beaten in the head"[5]—as compared with the complete lack of injuries resulting from the brief incident involving Congresswoman McIver at Delaney Hall.

The Justice Department, including Amici and other federal prosecutors, charged more than 1,500 individuals with federal crimes arising out of the January 6 attacks—including approximately 160 charged with one or more felony violations of Section 111, the same offense for which Congresswoman McIver was indicted.[6] As McIver's brief correctly details,

---

[5] Mary Clair Jalonick, *Officers who defended the Capitol on Jan. 6 say their struggles linger,* Los Angeles Times (Jan. 4, 2026), https://perma.cc/LHR2-QHJH.

[6] *See Jan. 6 Archive: The Capitol Charges*, NPR (captured Mar. 30, 2026), https://perma.cc/SB56-JQHY.

*see* App.Br. 49, many of those Section 111 cases involved serious acts of physical violence, including the detonation of an "'explosive device,'" *id.* (quoting *United States v. Ball*, No. 23-cr-160 (D.D.C.), Dkt. 1-1 at 2 (Apr. 27, 2023)); the repeated deployment of chemical weapon sprays, *id.*; and the use of objects such as metal bike racks, baseball bats, and stolen riot shields as weapons to assault law enforcement officers, "'causing serious injury,'" *id.* (quoting *United States v. Lang*, No. 21-cr-0053 (D.D.C.), Dkt. 127 at 1-2, (Feb. 21, 2024)).

Shortly after President Trump's inauguration in January 2025, however, the Justice Department, acting pursuant to an Inauguration Day presidential proclamation, pardoned or granted commutations to all convicted January 6 defendants—including all of the aforementioned individuals convicted under Section 111.  Pres. Proc. No. 10887, 90 Fed. Reg. 8331 (Jan. 20, 2025); <u>see</u> App.Br. 18-19.  The government also dismissed all other pending charges arising out of the January 6 attacks.  *Id.*

Amici firmly agree with Congresswoman McIver that her conduct was "manifestly less egregious" than that of the violent January 6 Capitol siege defendants—as the district court itself recognized when perversely denying her selective-prosecution claim. A.37-38.  But the government is nonetheless selectively pressing forward with its Section 111 prosecution against McIver,

after wholly abandoning any effort to enforce that same statute against the far more violent January 6 defendants. Such a "lopsided prosecutorial response" is impermissibly selective if it "turns on 'unlawful favoritism,' rather than lawful prosecutorial considerations." *Frederick Douglass Found., Inc. v. D.C.*, 82 F.4th 1122, 1137-38 (D.C. Cir. 2023) (quoting *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002)). Yet the record reveals that is exactly the case here.

Neither the government, nor the district court in denying McIver's motion, has identified any "distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions" for Congresswoman McIver, as compared to the January 6 defendants. *Id.* at 1137 (internal quotations omitted). But once again, the Executive Branch's own public statements reveal the actual (and wholly illegitimate) basis for the disparate treatment: The government favors the January 6 defendants' partisan affiliation, and it has forgone prosecution of their crimes because the President views their conduct as aligned with his own political ends. *See* 90 Fed. Reg. 8331 (characterizing the January 6 prosecutions as a "grave national injustice"); *see also* App.Br. 51-52 (collecting other presidential expressions of support and favoritism for January 6 defendants). Meanwhile, Congresswoman McIver was charged because the Executive

31

Branch disfavors her exercise of her protected rights to criticize and investigate the government's immigration policies. *See supra* pp. 20-22; App.Br. 52-53; 61-62 (collecting "[n]umerous statements from officials throughout the Executive Branch confirm[ing] the partisanship of this prosecution"). Such "unlawful favoritism" is the hallmark of an unconstitutionally selective prosecution, *Frederick Douglass Found.*, 82 F.4th at 1137, and this Court should not allow it to stand.[7]

## CONCLUSION

This Court should reverse and remand with instructions to dismiss the indictment.

Respectfully submitted,

April 6, 2026

/s/ James I. Pearce
JAMES I. PEARCE
SAMANTHA P. BATEMAN
WASHINGTON LITIGATION GROUP
1717 K St NW
Suite 1120
Washington, DC 20006
202-521-8750
jpearce@washingtonlitigationgroup.org
sbateman@washingtonlitigationgroup.org

*Counsel for Amici Curiae*

---

[7] At a minimum, Amici agree with McIver that this record easily contains "some evidence" of selective and biased prosecution, requiring remand for further discovery. *Washington*, 869 F.3d at 220-21.

# CERTIFICATION OF BAR MEMBERSHIP

Pursuant to Local R. 28.3(d) and Local R. 46.1(e), I certify that I, James I. Pearce, am admitted as an attorney and counselor of the United States Court of Appeals for the Third Circuit.

April 6, 2026

/s/ James I. Pearce
JAMES I. PEARCE
WASHINGTON LITIGATION GROUP
1717 K St NW
Suite 1120
Washington, DC 20006
202-521-8750
jpearce@washingtonlitigationgroup.org

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Local R. 31.1, I certify the following:

1. This brief complies with Fed. R. App. P. 29(a)(5) because it contains 6,491 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Georgia 14-point font using Microsoft Word 2018.

3. This brief complies with the electronic filing requirements of Local R. 31.1(c) because the text of the electronic brief is identical to the text of the paper copies and because OpenText was run on the file containing the electronic version of this brief and no viruses were detected.

/s/ James I. Pearce
JAMES I. PEARCE
WASHINGTON LITIGATION GROUP
1717 K St NW
Suite 1120
Washington, DC 20006
202-521-8750
jpearce@washingtonlitigationgroup.org

April 6, 2026

## CERTIFICATE OF SERVICE

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on April 6, 2026. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

/s/ James I. Pearce
JAMES I. PEARCE
WASHINGTON LITIGATION GROUP
1717 K St NW
Suite 1120
Washington, DC 20006
202-521-8750
jpearce@washingtonlitigationgroup.org

April 6, 2026

## APPENDIX: LIST OF *AMICI CURIAE*

Amici include the following former federal prosecutors, listed along with their relevant positions at the time that they prosecuted January 6, 2021 Capitol siege cases, and their dates of federal prosecutorial service:

- Brendan Ballou, former Attorney, Department of Justice (2016-2017, 2020-2025), detailed to District of Columbia United States Attorney's Office to handle January 6 cases (2023-2025)

- Cindy J. Cho, former Assistant United States Attorney, Southern District of Indiana (2010-2023), detailed to District of Columbia United States Attorney's Office to handle January 6 cases (2021-2023)

- Mary L. Dohrmann, former Assistant United States Attorney, District of Columbia (2017-2025)

- Adam Dreher, former Assistant United States Attorney, District of Columbia (2022-2025)

- Michael Gordon, former Assistant United States Attorney, Middle District of Florida (2017-2025), detailed to District of Columbia United States Attorney's Office to handle January 6 cases (2021-2023), served as Senior Trial Counsel for the Capitol Siege Section

- Norman Gross, former Assistant United States Attorney, District of New Jersey (1998-2024); detailed to District of Columbia United States Attorney's Office to handle January 6 cases (2021-2023)

- Susan T. Lehr, former United States Attorney and Assistant United States Attorney, District of Nebraska (2000-2025), detailed to District of Columbia United States Attorney's Office to handle January 6 cases (2021-2023)

- Alexis Loeb, former Attorney, Department of Justice (2013-2024), detailed to District of Columbia United States Attorney's Office to handle January 6 cases (2021-2024), served as Deputy Chief of the Capitol Siege Section

- Jason M. Manning, former Trial Attorney, Criminal Division, Fraud Section (2017-2024), detailed to District of Columbia United States Attorney's Office to handle January 6 cases (2022-2024)

- Sean Murphy, former Assistant United States Attorney, District of Puerto Rico (2018-2025), detailed to District of Columbia United States Attorney's Office to handle January 6 cases (2021-2025), served as the Federal Assault Coordinator of the Capitol Siege Section

- James I. Pearce, former Attorney, Criminal Division, Appellate Section (2013-2025); detailed to detailed to District of Columbia United States Attorney's Office to handle January 6 cases (2021-2023), served as Senior Appellate Counsel of the Capitol Siege Section

- Zachary Phillips, former Assistant United States Attorney, District of Colorado (2008-2026), detailed to District of Columbia United States Attorney's Office to handle January 6 cases (2022-2025), served as Deputy Chief of the Capitol Siege Section

- Michael Romano, former Trial Attorney, Criminal Division, Public Integrity Section (2019-2025); detailed to District of Columbia United States Attorney's Office to handle January 6 cases (2021-2025), served as Deputy Chief of the Capitol Siege Section

- Gregory P. Rosen, former Assistant United States Attorney, District of Columbia (2015-2025), served as Chief of the Capitol Siege Section

- Karen Rochlin, former Assistant United States Attorney, Southern District of Florida (1989-2025); detailed to detailed to

37

District of Columbia United States Attorney's Office to handle January 6 cases (2021-2025), served as Deputy Chief of the Capitol Siege Section

- Andrew Tessman, former Assistant United States Attorney, Southern District of West Virginia (2019-2025), detailed to detailed to District of Columbia United States Attorney's Office to handle January 6 cases (2022-2025)

- Francesco Valentini, former Attorney, Criminal Division, Appellate Section (2016-2025), detailed to detailed to District of Columbia, United States Attorney's Office to handle January 6 cases (2022-2024), served as Deputy Chief of the Capitol Siege Section