**Nos. 25-3573, 26-1122**

---

## IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

---

UNITED STATES OF AMERICA,

Appellee,

v.

LaMONICA McIVER,

Appellant.

---

On Appeal From the United States District Court for the District of New Jersey
No. 3:24-cv-259
Honorable Jamel K. Semper

---

## BRIEF OF *AMICI CURIAE* AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY, NATIONAL WOMEN'S LAW CENTER, AND NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC. IN SUPPORT OF APPELLANT

---

JEANNE LOCICERO
EZRA D. ROSENBERG
LIZA F. WEISBERG
AMERICAN CIVIL LIBERTIES UNION
OF NEW JERSEY FOUNDATION
570 Broad Street, 11th Floor
P.O. Box 32159
Newark, New Jersey 07102
(973) 854-1714

LAWRENCE S. LUSTBERG
MICHAEL R. NOVECK
ANDREW J. MARINO
JOHN J. GIBBONS FELLOWSHIP IN
PUBLIC INTEREST AND
CONSTITUTIONAL LAW
FBT GIBBONS LLP
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
*Counsel for* Amici Curiae

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ....................................................................... ii

CORPORATE DISCLOSURE STATEMENT ........................................................1

STATEMENT OF *AMICI CURIAE* .................................................................2

PRELIMINARY STATEMENT ...................................................................5

ARGUMENT .........................................................................................6

I.      THE HISTORY OF THE SPEECH OR DEBATE CLAUSE
COUNSELS IN FAVOR OF DISMISSING THIS PROSECUTION. ...........6

      A.     The Speech or Debate Clause Was Designed to Protect
Legislators from Retaliatory Prosecutions by the Executive
Branch and Reinforce the Separation of Powers. ................................6

      B.     Congresswoman McIver's Prosecution Implicates the
Fundamental Purposes of the Speech or Debate Clause, and the
District Court's Narrow Reading of the Clause Vitiates Those
Purposes .......................................................................................10

II.    BECAUSE THE COURT PLAYS A VITAL ROLE IN
ADJUDICATING DISPUTES BETWEEN THE EXECUTIVE AND
LEGISLATIVE BRANCHES, IT SHOULD REJECT THE
GOVERNMENT'S MOTION TO DISMISS MCIVER'S
SELECTIVE AND VINDICTIVE PROSECUTION CLAIM FOR
LACK OF JURISDICTION. .................................................................19

CONCLUSION.......................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abney v. United States*,
431 U.S. 651 (1977)..................................................................23, 24

*CTF Hotel Holdings, Inc. v. Marriott Int'l, Inc.*,
381 F.3d 131 (3d Cir. 2004) ...............................................................22

*Dombrowski v. Eastland*,
387 U.S. 82 (1967)...............................................................21, 25

*Eastland v. U.S. Servicemen's Fund*,
421 U.S. 491 (1975)................................................................7, 11

*Flanagan v. United States*,
465 U.S. 259 (1984)..............................................................................25

*Gov't of Virgin Islands v. Lee*,
775 F.2d 514 (3d Cir. 1985) ........................................................17, 18

*Gravel v. United States*,
408 U.S. 606 (1972).........................................................10, 17, 19

*Helstoski v. Meanor*,
442 U.S. 500 (1979).................................................................*passim*

*Kilbourn v. Thompson*,
103 U.S. 168 (1881)............................................................................8

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)...........................................................................19

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) .............................................................19

*Midland Asphalt Corp. v. United States*,
489 U.S. 794 (1989).........................................................................22

*Neguse v. U.S. Immigr. & Customs Enf't*,
   No. 25-CV-2463 (JMC), --- F. Supp. 3d ---, 2026 WL 575509
   (D.D.C. Mar. 2, 2026)................................................................................12, 14

*Richardson-Merrell, Inc. v. Koller*,
   472 U.S. 424 (1985)...........................................................................................22

*In re Sealed Case*,
   80 F.4th 355 (D.C. Cir. 2023).........................................................................18

*Tenney v. Brandhove*,
   341 U.S. 367 (1951)..........................................................................7, 8, 10, 19

*Trump v. Mazars USA, LLP*,
   591 U.S. 848 (2020).....................................................................................10, 11

*Trump v. United States*,
   603 U.S. 593 (2024).....................................................................................23, 24

*United States v. Brewster*,
   408 U.S. 501 (1972)...........................................................................................15

*United States v. Dowdy*,
   479 F.2d 213 (4th Cir. 1973) ..........................................................................15

*United States v. Helstoski*,
   442 U.S. 447 (1979)........................................................................................9, 15

*United States v. Hollywood Motor Car Co.*,
   458 U.S. 263 (1982)......................................................................................24, 25

*United States v. Johnson*,
   383 U.S. 169 (1966)....................................................................................*passim*

*United States v. McDade*,
   28 F.3d 283 (3d Cir. 1994) .........................................................................11, 15

*United States v. Menendez*,
   831 F.3d 155 (3d Cir. 2016) .......................................................................15, 22

*United States v. Nixon*,
   418 U.S. 683 (1974)...........................................................................................19

iii

*United States v. Rose*,
   28 F.3d 181 (D.C. Cir. 1994)...................................................................23

*United States v. Rostenkowski*,
   59 F.3d 1291 (D.C. Cir. 1995)................................................................23

*United States v. Trump*,
   91 F.4th 1173 (D.C. Cir. 2024), *rev'd on other grounds*, 603 U.S.
   593 (2024)...............................................................................................23

*United States v. Washington*,
   869 F.3d 193 (3d Cir. 2017) ...................................................................14

**Constitutional Provisions**

U.S. Const. Art. I, § 6, cl. 1.........................................................................6

**Statutes**

18 U.S.C. § 111 ..........................................................................................14

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47,
   div. C, tit. V, § 52(a), 138 Stat. 460, 619...............................................11

**Rules**

Fed. R. App. P. 26.1 .....................................................................................1

**Other Authorities**

119th Cong. Rule X, cl. 1(j), 3(g)(2) (2025)..............................................12

6 William Holdsworth, A History of English Law 214 (1927) .....................7

Articles of Confederation of 1781, art. V ....................................................8

*DHS Announces ICE Law Enforcement are Now Facing an 830
   Percent Increase in Assaults*, DHS (July 15, 2025),
   https://perma.cc/7YZP-PGWS................................................................13

*DHS Debunks Fake News Narratives About Law Enforcement During
   Police Week*, DHS (May 16, 2025), https://perma.cc/9XKE-3K3U .................13

English Bill of Rights of 1689, 1 W. & M., Sess. 2, c. 2................................7

THE FEDERALIST No. 48 (James Madison) ..............................................................20

*Members of Congress Break into Delaney Hall Detention Center*,
    DHS (May 9, 2025), https://perma.cc/G6MH-2KXF.........................................13

Story, Commentaries on the Constitution § 866.....................................................8, 9

*Trump Defends McIver Charges*, Axios (May 20, 2025),
    https://bit.ly/3PwNx9E .................................................................................14

## **CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for *amici* certify that (1) *amici* do not have any parent corporations, and (2) no publicly held companies hold 10% or more of the stock or ownership interest in *amici*.

## STATEMENT OF *AMICI CURIAE*[1]

*Amicus Curiae* American Civil Liberties Union of New Jersey ("ACLU-NJ") is a private, non-profit, non-partisan membership organization.  For over 60 years, the ACLU-NJ has defended liberty and justice, guided by the vision of a fair and equitable New Jersey for all. The ACLU-NJ's mission is to preserve, advance, and extend the individual rights and liberties guaranteed to every New Jerseyan by the State and Federal Constitutions in courts, in legislative bodies, and in our communities. Founded in 1960 and based in Newark, the ACLU-NJ operates on several fronts—legal, political, cultural—to bring about systemic change. The ACLU-NJ is the state affiliate of the American Civil Liberties Union, which was founded in 1920 for identical purposes, and is composed of over one million members nationwide.  The ACLU-NJ is committed to challenging abuses of power, defending political expression, and fighting for a freer and fairer democracy.  It files this brief consistent with that commitment.

*Amicus Curiae* National Women's Law Center ("NWLC") fights for gender justice—in the courts, in public policy, and in our society—working across the issues that are central to the lives of women and girls.  NWLC uses the law in all its forms to change culture and drive solutions to the gender inequity that shapes our society

---

[1] All parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part, and no person or entity contributed money to fund the preparation or submission of this brief, other than *Amici* and their counsel.

and to break down the barriers that harm all of us—especially women of color, LGBTQ people, and low-income women and families. Since its founding in 1972, NWLC has participated as counsel or *amicus curiae* in a range of cases in the U.S. Supreme Court and the lower courts. As an organization that fights for gender justice, NWLC recognizes that its work depends on a fair and functioning democracy, that the progress we have made has been possible because women have been able to exercise their right to vote for leaders who represent them, their interests, and who will speak on their behalf. However, women—particularly Black women—face disproportionate scrutiny and retribution when they challenge systems of power. Decisive protection of legislative immunity is essential to prevent these abuses, to ensure that Congress can conduct oversight and function as a co-equal branch of government, and to enable elected leaders to fully represent their communities.

*Amicus Curiae* NAACP Legal Defense & Educational Fund, Inc. ("LDF") is the nation's first and foremost civil rights legal organization. Through litigation, advocacy, public education, and outreach, LDF strives to secure the constitutional promise of equal justice under the law for all Americans, and to break down barriers that prevent African Americans from realizing their basic civil and human rights. As relevant here, LDF has long been committed to defending our democratic

3

institutions, protecting against governmental abuses of power, and opposing the use of selective prosecution.

## **PRELIMINARY STATEMENT**

This case arises, and this appeal occurs, at an historic moment during which, as perhaps never before in the history of our Republic, the separation of powers between the Executive, Legislative, and Judicial Branches of Government is at terrible risk.  Today, each Branch of Government is uniquely challenged to fulfill its constitutional responsibility, including in this case.

In this historical context, the Court is presented with a case in which the Executive Branch seeks to prosecute a member of the Legislative Branch, Congresswoman LaMonica McIver, not for corruption, but for action that the Congresswoman took in the context of performing her lawful duties of oversight. And the Executive Branch criminalized those actions expressly because that duly elected Congresswoman was a member of the opposition party and vocally disagreed with the Executive Branch on related policy—here, regarding the hot-button issue of immigration.

Congresswoman McIver appropriately moved to dismiss on the basis of both legislative immunity and because her prosecution was so obviously selective, based upon her party membership and political positions. The trial court below denied that motion.  *Amici curiae* write in respectful disagreement with that decision and urge this Court to fulfill its constitutional responsibility to address the issues before it and

to reverse, thereby vindicating the fundamental structure of our Constitution and Republican form of Government.

## ARGUMENT

### I. THE HISTORY OF THE SPEECH OR DEBATE CLAUSE COUNSELS IN FAVOR OF DISMISSING THIS PROSECUTION.

*Amici* respectfully submit that, for the reasons set forth in Defendant-Appellant's brief, and those discussed below, the district court erred in failing to dismiss this prosecution on both Speech or Debate (i.e., legislative immunity) and vindictive or selective prosecution grounds.

#### A. The Speech or Debate Clause Was Designed to Protect Legislators from Retaliatory Prosecutions by the Executive Branch and Reinforce the Separation of Powers.

When establishing our constitutional framework, the Founders sought to ensure that legislators would be protected from a vindictive Executive through legislative immunity. This protection was embodied in the Constitution's Speech or Debate Clause, which provides that Senators and Representatives "shall in all cases, except treason, felony, and breach of the peace, be privileged from arrest during their attendance at the session of their respective Houses, and in going to and returning from the same; and for any speech or debate in either House they shall not be questioned in any other place." U.S. Const. Art. I, § 6, cl. 1. To provide sufficient protection for legislators, the Supreme Court has instructed that the Clause is to be

6

construed "broadly." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 501–03 (1975)

The Speech or Debate Clause derived from a provision in the English Bill of Rights of 1689, which states "[t]hat the Freedom of Speech, and Debates or Proceedings in Parliament, ought not to be impeached or questioned in any Court or Place out of Parliament." 1 W. & M., Sess. 2, c. 2. This provision, in turn, was "the culmination of a long struggle for parliamentary supremacy." *United States v. Johnson*, 383 U.S. 169, 178 (1966). The Tudor and Stuart monarchs used both civil and criminal law against the House of Commons as a means "to suppress and intimidate critical legislators." *Id.* (citing C. Wittke, The History of English Parliamentary Privilege (Ohio State Univ. 1921); Neale, The Commons' Privilege of Free Speech in Parliament in Tudor Studies (Seton-Watson ed. 1924)). Frequently, the common law of seditious libel "was interpreted with the utmost harshness against those whose political or religious tenets were distasteful to the government," and used to imprison "disfavored" Members of Parliament. 6 William Holdsworth, A History of English Law 214 (1927). An often-cited example is Charles I's prosecution of Sir John Eliot for "seditious" speeches in Parliament that advocated for the rights of Parliament; for his offense of disagreeing with the King, he was imprisoned in the Tower of London. *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951); *Johnson*, 383 U.S. at 181 & n.10. Following the overthrow of James II,

7

the last Stuart king, and the accession of William and Mary in the Glorious Revolution of 1688, the English Bill of Rights of 1689 sought to insure parliamentary independence through legislative immunity. *Johnson*, 383 U.S. at 178.

The English Bill of Rights' codification of legislative immunity found its way to America through colonial charters and early state constitutions, many of which included an analogous version of legislative immunity. *Kilbourn v. Thompson*, 103 U.S. 168, 201–02 (1881); *Tenney*, 341 U.S. at 372–73. And after the American War of Independence, the Articles of Confederation included a provision guaranteeing that "[f]reedom of speech and debate in Congress shall not be impeached or questioned in any court, or place out of Congress." Articles of Confederation of 1781, art. V; *Johnson*, 383 U.S. at 177.

Ultimately, the English principle of legislative immunity was incorporated into the United States Constitution's Speech or Debate Clause, which commentators recognized as "an important protection of the independence and integrity of the legislature." *Johnson*, 383 U.S. at 178 (citing Story, Commentaries on the Constitution § 866; II The Works of James Wilson 37–38 (Andrews ed. 1896)). *See Kilbourn*, 103 U.S. at 202 (holding that it "may be reasonably inferred that the framers of the Constitution" meant to incorporate the principles underlying English

8

law's legislative privilege when it "use[d] . . . language borrowed from that source.").

Significantly, from the outset, the United States's version of legislative immunity expressly served the "additional function" of bolstering the "separation of powers so deliberately established by the Founders." *Johnson*, 383 U.S. at 178–79 (quoting Federalist No. 48). Thus, the Clause's purpose "was to preserve the constitutional structure of separate, coequal, and independent branches of government." *United States v. Helstoski*, 442 U.S. 447, 491 (1979) ("*Helstoski I*"). Legislative immunity is, then, designed to "protect[] against possible prosecution by an unfriendly executive." *Johnson*, 383 U.S. at 179; *id.* at 181–82 (the Speech or Debate Clause was designed "to prevent intimidation by the executive" and there "is little doubt that the instigation of criminal charges against critical or disfavored legislators by the executive in a judicial forum . . . is the predominate thrust of the Speech or Debate Clause"). Indeed, Justice Story wrote that "[t]he next great and vital privilege is the freedom of speech and debate, without which all other privileges would be comparatively unimportant or ineffectual." Story, Commentaries on the Constitution § 866.

Where, as here, the Speech or Debate Clause is implicated by executive action, it is important that its "fundamental purpose" be brought to bear: it should be applied to free "the legislator from executive and judicial oversight that realistically

threatens to control [her] conduct as a legislator." *Gravel v. United States*, 408 U.S. 606, 618 (1972). Only then can legislators be "immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good." *Tenney*, 341 U.S. at 377.

**B.    Congresswoman McIver's Prosecution Implicates the Fundamental Purposes of the Speech or Debate Clause, and the District Court's Narrow Reading of the Clause Vitiates Those Purposes.**

*Amici* respectfully submit that this prosecution challenges those principles underlying the Speech or Debate Clause, and in doing so threatens this crucial underpinning of our democratic system. This is the prototypical case of the Executive Branch seeking to punish a legislator for her speech as a legislator, her opposition to Executive action, and the exercise of the Legislative Branch's essential oversight activities.

It is undisputed that Congresswoman McIver's inspection of Delaney Hall constituted legislative activity protected by the Speech or Debate Clause. Indeed, the Government conceded below that "conducting an inspection of Delaney Hall" was a "clearly legislative act." D.Ct.Dkt.27 at 57, 61–62. The district court agreed, holding that "legislative fact-finding" is protected by legislative immunity. A19. And, of course, no other conclusion was possible. The authority "to secure needed information . . . is an essential and appropriate auxiliary to the legislative function." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 862 (2020). It is therefore the "proper

10

duty" of legislators "to look diligently into every affair of government and to talk much about what [they] see," because "[u]nless Congress have and use every means of acquainting itself with the acts and the disposition of the administrative agents of the government, the country must be helpless to learn how it is being served." *Id.* at 865. "[T]he power to investigate is inherent in the power to make laws because a legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." *Eastland*, 421 U.S. at 504 (cleaned up). Rigorous oversight and investigation of Executive conduct is, in sum, a core function of the Legislative Branch. *See United States v. McDade*, 28 F.3d 283, 304 (3d Cir. 1994) (Scirica, J., concurring in part and concurring in the judgment) ("[O]versight is the way Congress evaluates legislation, and in the appropriate manner, monitors the operations of executive departments and agencies. Properly done, oversight is part of our system of checks and balances.").

This general proposition is particularly true with respect to the Department of Homeland Security ("DHS"), as the appropriations scheme for DHS specifically provides for the exercise by legislators of the oversight function. Since 2019, Members of Congress have been entitled by federal law to enter "for the purpose of conducting oversight[] any facility operated by or for the Department of Homeland Security used to detain or otherwise house aliens." Further Consolidated

Appropriations Act, 2024, Pub. L. No. 118-47, div. C, tit. V, § 52(a), 138 Stat. 460, 619.  And they can do so without providing advance notice.  *Id.* § 527(b); *see also Neguse v. U.S. Immigr. & Customs Enf't*, No. 25-CV-2463 (JMC), --- F. Supp. 3d ---, 2026 WL 575509, at *2 (D.D.C. Mar. 2, 2026) (explaining the statutory scheme). Congresswoman McIver is a member of the House Committee on Homeland Security, and she is thus *obligated* by House Rules to "review and study on a primary and continuing basis all Government activities, programs and organizations related to homeland security."  Rules of the House of Representatives, 119th Cong. Rule X, cl. 1(j), 3(g)(2) (2025).

There is, then, no question: Congresswoman McIver had and has the right as a legislator to oversee the Executive Branch's discharge of its statutory duties, to ensure compliance with federal law, and to collect facts that inform the Legislative Branch's lawmaking.  Indeed, the district court acknowledged that Congresswoman McIver not only was engaged in oversight, but also that oversight of immigration enforcement has been her particular focus since joining the House of Representatives.  A6 & n.3 (noting that "[s]ince joining Congress, [Congresswoman McIver] has focused on executive immigration action in New Jersey," and citing her February 2025 oversight visit of an ICE detention facility, her March 2025 meeting with ICE officials, and her multiple "written letters to DHS Secretary Kristi Noem

12

to express concern over ICE's operation in New Jersey including its treatment of detainees in private detention centers").

This prosecution, however, is an attempt by the Executive Branch to curtail Congresswoman McIver's legislative oversight function by criminalizing conduct that can only be viewed as part and parcel of that oversight. The Executive plainly disagrees with how Congresswoman McIver has chosen to exercise her oversight function. And it has tailored its public statements to express and emphasize that disagreement. It has represented, completely inaccurately, that Congresswoman McIver "stormed the gate and broke into the detention facility." *Members of Congress Break into Delaney Hall Detention Center*, DHS (May 9, 2025), https://perma.cc/G6MH-2KXF. It has described her conduct as a "political stunt[]" and expressly *not* "oversight." *DHS Debunks Fake News Narratives About Law Enforcement During Police Week*, DHS (May 16, 2025), https://perma.cc/9XKE-3K3U. The Executive Branch's statements have explicitly tied Congresswoman McIver's actions to her political affiliation, specifically referring to her as a "Democratic member[] of Congress" in discussing this case. *DHS Announces ICE Law Enforcement are Now Facing an 830 Percent Increase in Assaults*, DHS (July 15, 2025), https://perma.cc/7YZP-PGWS. And when asked about the charges against Congresswoman McIver, the President has represented that "[t]he days of woke are over," making clear that Congresswoman McIver's political views were

the impetus for or somehow justified her prosecution. *Trump Defends McIver Charges*, Axios (May 20, 2025), https://bit.ly/3PwNx9E.[2]

Of course, the Executive Branch is entitled to disagree with a legislator's individual political views or affiliation, or even the way she chooses to exercise the oversight functions granted to her by statute and inherent in her status as a member of a coordinate branch of government. Here, for example, the Executive Branch clearly disagrees with Congresswoman McIver's view on the importance of legislative oversight: only one month after the Congresswoman's inspection of Delaney Hall, the Executive specifically sought to limit legislators' oversight inspections by requiring advance notice of those inspections, a policy that has been enjoined as unlawful. *Neguse*, 2026 WL 575509, at *1, 3. But what the Executive cannot do is bring to bear its prosecutorial power "to suppress and intimidate critical legislators" through an improper criminal prosecution that violates legislative immunity. *Johnson*, 383 U.S. at 178. Indeed, the "instigation of criminal charges

---

[2] *Amici* therefore agree with Congresswoman McIver's argument that she is being selectively and vindictively prosecuted by the Executive Branch. This is particularly clear when one compares her prosecution under 18 U.S.C. § 111 to those of January 6 defendants, whom the Executive has treated significantly more leniently by either issuing pardons or dismissing pending prosecutions, based upon agreement with the Executive. At minimum, this differential treatment certainly sets forth a *prima facie* case—and without question provides "some evidence"—of selective treatment that warrants discovery. *See* Defendant-Appellant's Opening Brief at 17–19, 47–60, 64–66; *United States v. Washington*, 869 F.3d 193, 220–21 (3d Cir. 2017).

14

against critical or disfavored legislators by the executive in a judicial forum" is precisely what the Speech or Debate Clause was designed to prevent. *Id.* at 181–82.

That principal purpose is particularly apposite in a case like this one, arising out of the exercise of a Congresswoman's indisputably legislative oversight acts. This is not a case in which the Speech or Debate Clause is invoked by a Member of Congress to defend against a charge of bribery. *See, e.g.*, *Helstoski I*, 442 U.S. 477; *United States v. Brewster*, 408 U.S. 501 (1972); *United States v. Menendez*, 831 F.3d 155 (3d Cir. 2016); *McDade*, 28 F.3d 283; *United States v. Dowdy*, 479 F.2d 213 (4th Cir. 1973). Those prosecutions may or may not implicate the Clause's substantive protections, but unlike the case here, there are certainly challenges in claiming that protecting politicians who engage in bribery was at the heart of the Founders' motivations in incorporating English law's principles of legislative immunity.

On the other hand, this case directly implicates the concerns that resulted in the establishment of Parliament's, and later Congress's, legislative immunity. Congresswoman McIver is a legislator who is "critical" of and "disfavored" by the Executive Branch. Her views are "distasteful" to that "unfriendly" Executive. And she has directly opposed the policies of the current administration on the issue of immigration, one of the most salient political issues of our day. The Executive's prosecution of a Member of Congress it views as meddlesome calls to mind Charles

15

I's imprisonment of antagonistic Members of Parliament, who opposed the King with regard to what could be considered that era's most salient issue—the respective rights of Parliament and the Crown.

This prosecution accordingly also implicates the separation of powers concerns that motivated the Framers. Diligent legislative oversight of immigration facilities serves important separation-of-powers values. It can prompt congressional reform efforts, force executive branch change, or at the very least influence public opinion on a prominent issue. It follows that prosecutions like this one, which target legislators who engage in oversight, by chilling that crucial oversight function, cannot but impinge on the separation of powers. The next time a Member of Congress has a concern about a Department of Homeland Security facility in her District, she may think twice about an unannounced visit, worried that it could result in an inflammatory response from DHS officials and ultimately her arrest. Accordingly, this is precisely the kind of case that the Framers (and the English parliamentarians before them) had in mind when crafting the principle of legislative immunity; it is where the Speech or Debate Clause's protection should be at its zenith. *Johnson*, 383 U.S. at 182 (the Clause's "prophylactic purposes" should inform its application in a criminal prosecution).

The district court, however, concluded that Congresswoman McIver's "alleged intervention into the Mayor's questionable arrest had no cognizable

16

connection to any legislative function protected by the Speech or Debate Clause."

A19. This was error. Applying the Clause's protections "broadly," *Gravel*, 408 U.S.

at 615, Congresswoman McIver's intervention, which are properly viewed "as a

whole," *see Gov't of Virgin Islands v. Lee*, 775 F.2d 514, 524–25 (3d Cir. 1985),

was not only not distinct from her legislative oversight functions, but it directly *arose*

from them. Congresswoman McIver, of course, would not have been present at the

facility had it not been for her protected legislative fact-finding mission. But her

alleged conduct was also part and parcel of that oversight. Congresswoman McIver

was at Delaney Hall to review the operations of ICE agents in Newark, including to

assess whether they were engaging in misconduct. D.Ct.Dkt.19-1 at 6–7. While she

was there, those same ICE agents arrested the Mayor of Newark. That arrest, on

legally deficient charges later dismissed, not only provoked the predictable response

that followed, but—insofar as it was itself Executive action—was directly connected

to her statutorily permitted oversight function, which was the reason why she was at

the facility in the first place. D.Ct.Dkt.27;  A19.

Nor can Congresswoman McIver's conduct be divorced from her concededly

protected presence at the facility or the oversight purpose of her visit. The district

court's analysis, which isolates 68 seconds of her two-and-one-half hour presence at

Delaney Hall,[3] carving it out as "non-legislative," clashes with precedent instructing courts to evaluate a legislator's conduct "as a whole" when assessing whether that conduct is protected by the Speech or Debate Clause. *Lee*, 775 F.2d at 524–25; *cf. In re Sealed Case*, 80 F.4th 355, 373 (D.C. Cir. 2023) ("[W]hen a Member [of Congress] engages in a legislative act, the court cannot carve out from the privilege certain topics of discussion by labeling them 'merely incidental' or by deeming them illegitimate."). The district court's narrow parsing thus runs counter to the Speech or Debate Clause's broad scope and its historical justifications. The more a legislator's "clearly legislative act," D.Ct.Dkt.27 at 57, 61–62, can be subdivided, including into ostensibly non-legislative slices, the more leeway the Executive has to target critical legislators without fear of triggering the Clause's protections by identifying some conduct that may be incidental or more tangential to the underlying legislative activity. Doing so is all the less appropriate where, as here, the purportedly non-legislative conduct was a predictable part of the overall context, and a part of what Congresswoman McIver should have been and was appropriately investigating.

---

[3] It is significant to this analysis that, even after a group of DHS agents gathered outside the facility, the Mayor was arrested, and Congresswoman McIver purportedly engaged in the conduct alleged in the Indictment, she and the other Members of Congress were allowed to and did continue their oversight inspection. A10. Her mission—the reason she was there—remained ongoing and her allegedly criminal conduct occurred in the midst of and was part of it.

In sum, Congresswoman McIver's alleged conduct should have been viewed holistically, and as a core aspect of the oversight she engaged in at Delaney Hall. The alternative—allowing this retributive prosecution to go forward—threatens to undermine the principles embodied in the Speech or Debate Clause: to free "the legislator from executive and judicial oversight that realistically threatens to control [her] conduct as a legislator," *Gravel*, 408 U.S. at 618, and to protect "the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good," *Tenney*, 341 U.S. at 377.

## II.    BECAUSE THE COURT PLAYS A VITAL ROLE IN ADJUDICATING DISPUTES BETWEEN THE EXECUTIVE AND LEGISLATIVE BRANCHES, IT SHOULD REJECT THE GOVERNMENT'S MOTION TO DISMISS MCIVER'S SELECTIVE AND VINDICTIVE PROSECUTION CLAIM FOR LACK OF JURISDICTION.

The Government previously moved to dismiss Congresswoman McIver's appeal of the denial of her selective and vindictive prosecution claim for lack of jurisdiction. Dkt. No. 12. The motions panel referred disposition of that motion to the merits panel. Dkt. No. 16. *Amici* support McIver's argument that the Court has jurisdiction over this aspect of her appeal.

In particular, *Amici* respectfully submit that the same separation-of-powers principles described above also apply to the jurisdictional issues in this case. It is, of course, part of "the basic judicial task" to "say what the law is." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 410 (2024) (quoting *Marbury v. Madison*, 5 U.S.

(1 Cranch) 137, 177 (1803)). That role is all the more important in refereeing disputes between the Executive and Legislative Branches like those at issue here. *See, e.g.*, *United States v. Nixon*, 418 U.S. 683, 707 (1974) (discussing "the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions" in rejecting absolute executive privilege); *Helstoski v. Meanor*, 442 U.S. 500, 506 (1979) ("*Helstoski II*") (explaining that Speech or Debate Clause's restrictions on Executive Branch's criminal prosecutions of Legislative Branch officials "are vitally important to our system of government and therefore are entitled to be treated by the courts with the sensitivity that such important values require").

This judicial role has powerful historical origins. The Constitution's founders were well aware of "a history of conflict" between the British parliament and monarchy "during which successive monarchs utilized the criminal and civil law to suppress and intimidate critical legislators." *Johnson*, 383 U.S. at 178. The American legal system, by contrast, recognizes that neither the Executive nor Legislative Branches "ought to possess directly or indirectly, an overruling influence over the others in the administration of their respective powers." *Id.* (quoting THE FEDERALIST No. 48 (James Madison)).

The Court has thus explained that "the instigation of criminal charges against critical or disfavored legislators by the executive in a judicial forum . . . in the context of the American system of separation of powers, is the predominate thrust

20

of the Speech or Debate Clause." *Id.* at 182. The same rationale applies to the selective and vindictive prosecution claims against McIver. In the extraordinary context here—criminal charges against a sitting legislator, of the opposite political party as the President, who has been avowedly critical of the President's immigration policies, and who is charged for conduct occurring when she was exercising her oversight of the implementation of those policies—a prosecution motivated by these improper purposes also offends the separation of powers. And, of course, this Court has the obligation to protect those separation-of-powers principles from the evisceration that the Executive seeks in this case, and—if allowed here—inevitably in others.

These circumstances also explain why the District Court's denial of the motion to dismiss the selective and vindictive prosecution claim should be subject to immediate appeal. Interlocutory appeal of a Speech or Debate claim is appropriate to protect congressional representatives "not only from the consequences of litigation's results but also from the burden of defending themselves." *Helstoski II*, 442 U.S. at 508 (quoting *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967)). Prompt judicial review thus fulfills "the fundamental guarantees of the Speech or Debate Clause" because "[o]nce a motion to dismiss is denied, there is nothing the Member can do under that Clause in the trial court to prevent the trial[.]" *Id.* at 507. Here, the Government's selective and vindictive prosecution raises the same separation-

21

of-powers concerns as does its violation of the Speech or Debate Clause, based as they both are upon her speech as a legislator and her political position as a member of the opposite party of the President. This "sufficient overlap in the facts relevant to both . . . issues" creates an "umbilical connection" that "is not neatly severed," which at the very least supports extending pendent appellate jurisdiction over the selective and vindictive prosecution claim. *CTF Hotel Holdings, Inc. v. Marriott Int'l, Inc.*, 381 F.3d 131, 136 (3d Cir. 2004); *see also Menendez*, 831 F.3d at 164 (citing *CTF Hotel Holdings* to exercise pendent appellate jurisdiction over separation-of-powers claims alongside Speech or Debate claims). Exercising pendent jurisdiction also recognizes that one of the ordinary reasons for the final judgment rule—avoiding "unreasonable disruption, delay, and expense," *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 430 (1985)—does not apply here because the trial has already been delayed pending appeal on the Speech or Debate claim. In that way, there is no additional cost to this Court's assuming jurisdiction over the selective and vindictive prosecution claim.

Even absent pendent jurisdiction, the Court should apply the collateral order doctrine to McIver's claim under the circumstances of this case. To be sure, as the Government has argued, the Supreme Court has "interpreted the collateral order exception with the utmost strictness in criminal cases." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799 (1989) (internal quotation marks omitted). And

22

neither this Court nor the Supreme Court has extended the doctrine to selective and vindictive prosecution claims.  But the "numerous [cases] in which [the Court] ha[s] refused to permit interlocutory appeals" are part only of a "general rule," *id.*, and not one that—as *Helstoski II* makes clear—covers separation-of-powers principles.  *See* 442 U.S. at 507 (explaining that interlocutory appeals are permitted to enforce "the fundamental guarantees of the Speech or Debate Clause").  In that context, the Court of Appeals for the District of Columbia has recognized that separation-of-powers claims are immediately appealable "[f]or similar reasons" as Speech or Debate claims.  *United States v. Rostenkowski*, 59 F.3d 1291, 1297 (D.C. Cir. 1995) (citing *United States v. Rose*, 28 F.3d 181, 185 (D.C. Cir. 1994)).  More recently, that court applied the same principles to President Trump's appeal of the denial of immunity from prosecution after his departure from office, reasoning that "[h]is separation of powers argument . . . is closely akin to a claim of Speech or Debate Clause immunity, making it immediately appealable because there are equivalent reasons for advancing it in advance of trial."  *United States v. Trump*, 91 F.4th 1173, 1187 (D.C. Cir. 2024) (citation modified), *rev'd on other grounds*, 603 U.S. 593 (2024).

As Justice Barrett's concurrence in the Supreme Court's review of that opinion recognized, an appeal challenging "whether the Constitution allows Congress to criminalize the alleged conduct" is "a question 'collateral to, and separable from' his guilty or innocence."  *Trump v. United States*, 603 U.S. 593, 654

23

(2024) (Barrett, J., concurring) (quoting *Abney v. United States*, 431 U.S. 651, 659 (1977)). Similarly here, McIver's argument that this prosecution is improper because it embodies the Executive Branch's effort to criminalize conduct based upon political party membership and political speech—and could not be prosecuted without reference to activity protected by the Speech or Debate Clause—is separable from whether she actually committed the conduct alleged. Instead, this appeal seeks to vindicate McIver's "as-applied constitutional challenge" to Executive branch action in prosecuting the conduct of a legislator. *Id.* at 655 (citing *Helstoski II*, 442 U.S. at 507–08, and *Abney*, 431 U.S. at 659–61). The selective and vindictive prosecution claim—like the Speech or Debate Clause argument— thus implicates separation-of-powers principles, unlike the case upon which the Government so heavily relies in support of its motion to dismiss this appeal, *United States v. Hollywood Motor Car Co.*, 458 U.S. 263 (1982). There, the defendants, who were not public officials, claimed a vindictive motive resulting from their motion for a change of venue. *Id.* at 267. Here, McIver asserts that the Government seeks to prosecute her for core political and legislative activities: speaking out about immigration policies, overseeing immigration detention facilities, and criticizing Executive Branch officials. The motives here, which were designed to challenge McIver's legislative authority and "could distort [her] decisions while in office," are thus indistinguishable from the ones that animated the right to an interlocutory

24

appeal in *Trump*, 603 U.S. at 654–55 (Barrett, J., concurring), and in *Helstoski II*, 442 U.S. at 508 (explaining that interlocutory appeal was appropriate because "the Speech or Debate Clause was designed to protect Congress[people] 'not only from the consequences of litigation's results but also from the burden of defending themselves'" (quoting *Dombrowski*, 387 U.S. at 85).

Finally, the ordinary reasons for following the final judgment rule and declining jurisdiction over interlocutory appeals do not apply here. The Supreme Court has defended the rule as "inimical to piecemeal appellate review of trial court decisions." *Hollywood Motor Car Co.*, 458 U.S. at 265. It has accordingly supported restrictions on interlocutory appeals as "reduc[ing] the ability of litigants to harass opponents and to clog the courts through a succession of costly and time-consuming appeals" and ensuring "[p]romptness in bringing a criminal case to trial." *Flanagan v. United States*, 465 U.S. 259, 264 (1984). In this context, implicating as it does the same separation of powers concerns as underlie the Speech of Debate Clause, it is all the more critical for the Court, to review any allegations of Executive overreach now, prior to trial, so that the judiciary can fulfill its fundamental role of preventing one branch of the Federal Government from encroaching on another branch's lawful exercise of its own authority. *See Helstoski II*, 442 U.S. at 507–08.

25

## CONCLUSION

For the reasons set forth above, *amici curiae* the American Civil Liberties Union of New Jersey, National Women's Law Center, and the NAACP Legal Defense & Educational Fund, Inc., respectfully submit that the judgment of the district court should be reversed and the matter remanded for the entry of an order dismissing the Indictment in this case.

Dated: April 6, 2026

s/ Lawrence S. Lustberg
Lawrence S. Lustberg
Michael R. Noveck
Andrew J. Marino
John J. Gibbons Fellowship in Public
Interest and Constitutional Law
FBT Gibbons LLP
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

*Counsel for* Amici Curiae

## COMBINED CERTIFICATIONS

I, Lawrence S. Lustberg, Esquire, hereby certify that:

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5), because it contains 5,450 words, calculated by the word processing system used in its preparation (Microsoft Word), and excluding the parts of the brief exempted by Fed. R. App. P. 32(f) as well as the statement required by Fed. R. App. P. 29(a)(4)(e).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14-point font.

3.      The text of the electronic brief is identical to the text of the paper copies being filed.

4.      The electronic brief has been prepared on a computer that is automatically protected with a virus detection program, namely a continuously updated version of Core Agent and Sophos Intercept X, and no virus was detected.

5.      I am a member in good standing of the Bar of the United States Court of Appeals for the Third Circuit.

Dated: April 6, 2026                         s/ Lawrence S. Lustberg
                                             Lawrence S. Lustberg

27

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of April 2026, I caused a true copy of the foregoing to be filed through the Court's CM/ECF system, which will automatically serve all counsel of record.

Dated: April 6, 2026                         s/ Lawrence S. Lustberg
                                             Lawrence S. Lustberg