Nos. 25-3573, 26-1122

# UNITED STATES COURT OF
# APPEALS FOR THE THIRD CIRCUIT

---

**UNITED STATES OF AMERICA**,

*Plaintiff-Appellee*,

v.

**LAMONICA MCIVER,**

*Defendant-Appellant.*

---

On Appeal from Order of the United States District Court
for the District of New Jersey
U.S. District Court Action No. 25-cr-0388-JKS

---

# BRIEF OF *AMICI CURIAE* FORMER MEMBERS OF CONGRESS IN
# SUPPORT OF DEFENDANT-APPELLANT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION AND INTEREST OF *AMICI CURIAE* ........................................................ 1

ARGUMENT.......................................................................................................................... 8

    I.    On Location Oversight Undertaken by Members of Congress is Vitally Important and Protected by Speech or Debate Clause Immunity.......................................................... 8

    II.    If Permitted to Proceed, this Prosecution Would Create a Dangerous New Tool for the Executive Branch to Deter Effective Congressional Oversight................................................. 11

    III.    Congresswoman McIver's Alleged Actions in Counts One and Three Are Protected by the Speech or Debate Clause.......................................................................... 13

    IV.    Congresswoman McIver's Alleged Actions Charged in Count Two Are Protected by the Speech or Debate Clause...................................................................................... 16

CONCLUSION .................................................................................................................... 17

i

# TABLE OF AUTHORITIES

## Cases

*Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975)................................8, 17
*Gov't of V.I. v. Lee*, 775 F.2d 514 (3rd Cir. 1985) ....................................................9
*In re Grand Jury*, 821 F.2d 946 (3d Cir. 1987) ......................................................18
*McGrain v. Daugherty*, 273 U.S. 135, 175 (1927) .................................................14
*McSurely v. McClellan*, 553 F.2d 1277 (D.C. Cir. 1976)........................................10
*Neguse v. ICE*, No. 25-CV-2463 (JMC),
   2025 WL 3653597 (D.D.C. Dec. 17, 2025) ...................................... 13, 17
*U.S. v. Brewster*, 408 U.S. 501 (1972).......................................................9
*U.S. v. Helstoski*, 442 U.S. 477 (1979) ...................................................9, 12
*United States v. Johnson*, 383 U.S. 169 (1966) ...............................................1

## Statutes

*Further Consolidated Appropriations Act (2024)*, Pub. L. No. 118-47, div. C, tit.
   V, § 527(a), 138 Stat. 460 (2024)................................................... 13, 16

## Rules

Rules of the House of Representatives,
   119th Cong., Rule X, cl. 2(b)(1)..............................................................10
Rules of the House of Representatives,
   119th Cong. Rule X, cl. 1(j), 3(g)(2) (2025) ........................................10

## Other Authorities

Lee, Chantelle, New York City Mayoral Candidate Brad Lander Arrested at
   Immigration Courthouse, Time Magazine (Jun. 17, 2025)...................................4
Popli, Nik, *Democratic Senator Slammed to the Ground and Handcuffed at Kristi
   Noem Event in L.A.*, Time Magazine (Jun. 12, 2025) ............................................4
Rivero, Tanya, *New video shows federal agents handcuff Rep. Nadler's staffer*,
   ABC 7 NY (Jun. 6, 2025)............................................................................4
*Scope of Congressional Oversight and Investigative Power With Respect to the
   Executive Branch*, 9 Op. O.L.C. 60, 60 (1985).....................................................14

**INTRODUCTION AND INTEREST OF *AMICI CURIAE*[1]**

"There is little doubt that the instigation of criminal charges against critical or disfavored legislators by the executive in a judicial forum was the chief fear prompting the long struggle for parliamentary privilege in England and, in the context of the American system of separation of powers, is the predominate thrust of the Speech or Debate Clause." *United States v. Johnson*, 383 U.S. 169, 182 (1966). That threat—of an overzealous Executive weaponizing the powers of criminal law enforcement to target its political opponents in the legislature—is precisely the issue in this case. Congresswoman Lamonica McIver engaged in core acts of legislative oversight, in her own congressional district, relating to controversial immigration detention and aggressive enforcement policies implemented and effectuated by the Trump Administration. The Administration's Department of Justice now attempts to prosecute Congresswoman McIver for an incident that occurred in the course of that oversight work.

*Amici* are a bipartisan group of former members of Congress who, during their respective tenures, routinely engaged in constitutionally and legislatively mandated

---

[1] In accordance with Federal Rule of Appellate Procedure 29, all parties have consented to the filing of this amicus brief. See Fed. R. App. P. 29(a)(2). No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person contributed money that was intended to fund preparing or submitting the brief. See Fed. R. App. P. 29(a)(4)(E).

oversight. As such, *amici* have a unique appreciation of the scope and challenges of Congressional oversight and the critical function of Speech or Debate Clause immunity in making meaningful oversight possible. *Amici* write in support of Congresswoman McIver's appeal to express grave concern that prosecutions like hers, if allowed to go forward, would have a dangerous chilling effect on Congress's ability to fully carry out its Article I responsibilities. An Executive Branch allowed to prosecute Members of Congress in this fashion would have the power to hobble one of the critical checks and balances in our Constitutional system. *Amici*—like all Americans—have a strong interest in ensuring that Members of Congress continue to retain the powers and prerogatives granted to them by the Constitution that enable meaningful oversight of the Executive. Their experience in the Legislative Branch gives them a valuable perspective on the essential role Speech or Debate Clause immunity plays in enabling that oversight.

Members of Congress are responsible, not only for drafting and passing legislation, but also for engaging in oversight of the Executive Branch's implementation of those laws and investigation into whether further legislative action is needed. Their oversight is both a necessary component of the legislative process and also essential to the separation of powers built into this nation's constitutional governing framework. It provides a crucial check and measure of accountability over the Executive by shining sunlight into the Executive's operations

and informing legislative efforts to safeguard Americans' rights and fundamental interests.

The Department of Justice's prosecution of Congresswoman McIver for actions that occurred in the course of her legislative oversight of Administration detention policies and the conduct of Executive Branch officials strikes directly at the heart of the purpose of legislative immunity. If allowed to proceed, the prosecution would grant the Executive dangerous and unconstitutional leverage over Congress.

The government acknowledges that Congresswoman McIver was engaged in an oversight investigation of Delaney Hall, an immigration detention facility in her district, when the events underlying these charges occurred. It acknowledges that federal law expressly authorizes such visits. Legitimate oversight obviously is not confined to the premises of the facility in question; naturally, the activities of Executive Branch agents operating those facilities—including unlawful arrests, other abuses of individual rights, and efforts to obstruct the oversight process itself – are certainly valid subjects of legislative oversight. Thus, Congress's oversight function does not begin and end at the exterior of such facilities. Congressional oversight extends to the actions of federal officers wherever they may be engaged in official conduct, particularly where that conduct violates the law or seeks to intimidate citizens or other public officials from exercising their constitutional

3

rights. Like the conditions in the detention facility, misconduct of Department of Homeland Security (DHS) officials, including U.S. Immigration and Customs (ICE) agents, in connection with a facility tour or efforts by ICE agents to suppress the expression of public concern about the facility are both legitimate—and important—subjects for congressional inquiry and oversight.

Indeed, overzealous ICE agents' manhandling public officials, including legislators and local officials and their staffs, have become far too common. Nik Popli, *Democratic Senator Slammed to the Ground and Handcuffed at Kristi Noem Event in L.A.*, Time Magazine (Jun. 12, 2025), https://time.com/7293667/alex-padilla-noem-los-angeles/; Tanya Rivero, *New video shows federal agents handcuff Rep. Nadler's staffer*, ABC 7 NY (Jun. 6, 2025), https://abc7ny.com/post/new-video-shows-federal-ice-agents-handcuff-rep-jerry-nadlers-staffer-nyc-office/16681359/; Chantelle Lee, *New York City Mayoral Candidate Brad Lander Arrested at Immigration Courthouse*, Time Magazine (Jun. 17, 2025), https://time.com/7295152/brad-lander-arrest-immigration-court. That disturbing executive branch behavior underscores the need for congressional oversight to extend to any physical location where it takes place.

The actions alleged in each count of the indictment all fit comfortably within Congress's oversight role, and thus this prosecution clearly transgresses the Speech or Debate Clause. On-the-ground oversight can lead to unpredictable circumstances,

particularly when the Executive Branch officials subject to the oversight engage in unlawful and obstructive activities in plain sight. Permitting the prosecution of a sitting Congresswoman engaged in legitimate oversight activity based on some incidental contact that occurs while she was conducting her official legislative duties would have a chilling effect on Congress's oversight role. Indeed, Speech or Debate Clause immunity is perhaps *most* important when members of Congress undertake legislative acts of oversight in volatile environments. Without that protection, members would necessarily be discouraged from engaging in that function in those critical arenas.

Failing to apply legislative immunity in the present context would reward efforts by the very agents who are subject to that oversight to impede investigation and public criticism of their actions. In fact, such a decision would also create a dangerous loophole in the Speech or Debate Clause doctrine: Federal agents could avoid oversight, or punish members of Congress for engaging in oversight after the fact, by initiating conflict with Members in order to incite a natural response. As here, the Executive Branch agents could count on being insulated from prosecution or discipline for unruly actions because the Executive Branch itself is the prosecutor, while Legislators would know they were at risk of criminal liability as events unfold. If the Department of Justice is allowed to proceed with this prosecution, it would create a perverse incentive for Executive Branch officials to act in a more chaotic

5

and unsafe fashion, and create new, unprecedented tools to block legitimate legislative oversight. Not only would that frustrate the clear purpose of legislative immunity for Members of Congress, it would also grant the Executive a dangerous new weapon, thereby tilting the balance of power between Congress and the Executive Branch that the Speech or Debate Clause is intended to protect.

The Court should therefore hold that Congresswoman McIver's actions are protected by legislative immunity. To do otherwise would deter Members of Congress from carrying out their essential oversight responsibilities and insulate Executive abuses from the checks and balances the Constitution intends. Thus, it is no exaggeration to say that if this prosecution is allowed to proceed, it would imperil the constitutionally mandated powers of Congress and the fabric of our constitutional order.

The former members of Congress in support of this brief are:

- Steve Bartlett, Representative of the 3rd Congressional District of Texas from 1983-1991 (R).

- Cori Bush, Representative of the 1st Congressional District of Missouri from 2021-2025 (D).

- Tom Coleman, Representative of the 6th Congressional District of Missouri from 1976-1993 (R).

- Barbara Comstock, Representative of the 10th Congressional District of Virginia from 2015-2019 (R).

- Mickey Edwards, Representative of the 5th Congressional District of Oklahoma from 1977-1993 (R).

- David Emery, Representative of the 1st Congressional District of Maine from 1975-1983 (R).

- Wayne Gilchrest, Representative of the 1st Congressional District of Maryland from 1991-2009 (R).

- Tommy Hartnett, Representative of the 1st Congressional District of South Carolina from 1981-1987 (R).

- John LeBoutillier, Representative of the 6th Congressional District of New York from 1981-1983 (R).

- Claudine Schneider, Representative of the 2nd Congressional District of Rhode Island from 1981-1991 (R)

- Christopher Shays, Representative for the 4th Congressional District of Connecticut from 1987-2009 (R).

- Peter Smith, Representative-at-Large of Vermont from 1989-1991 (R).

- David Trott, Representative of the 11th Congressional District of Michigan from 2015-2019 (R).

- Gordon Humphrey, United States Senator from New Hampshire, 1979-1990 (R).

- Donna Edwards, Representative of the 4th Congressional District of Maryland from 2008-2017 (D).

- William Joseph Walsh, Representative of the 8th Congressional District of Illinois from 2011-2013 (R).

- Bob Inglis, Representative of the 4th Congressional District of South Carolina from 1993-1999 and from 2005-2011 (R).

- Joe Crowley, Representative from New York from 1991-2019 (D).

- Alan Steelman, Representative of the 5th Congressional District of Texas from 1973-1977 (R).

- Hon. Denver Riggleman, Representative of the 5th Congressional District of Virginia from 2019-2021 (R).

## ARGUMENT

### I. On Location Oversight Undertaken by Members of Congress is Vitally Important and Protected by Speech or Debate Clause Immunity

The Speech or Debate Clause provides criminal and civil immunity for all legislative acts taken in the course of a Member of Congress's official responsibilities. Official oversight undertaken by Members of Congress falls squarely within the conduct covered by the Speech or Debate Clause. *Eastland v.*

*U.S. Servicemen's Fund*, 421 U.S. 491, 501 (1975) ("The power to investigate and to do so through compulsory process plainly falls within that definition" of the "legitimate legislative sphere."). Indeed, "fact-finding, information gathering, and investigative activities are essential prerequisites to the drafting of bills and the enlightened debate over proposed legislation. As such, fact-finding occupies a position of sufficient importance in the legislative process to justify the protection afforded by legislative immunity." *Gov't of V.I. v. Lee*, 775 F.2d 514, 521 (3d Cir. 1985). Legislative immunity is of such constitutional importance that, in addition to immunity from both criminal and civil liability, the Speech or Debate Clause also carries an evidentiary privilege barring the introduction of evidence of legislative acts against a protected party[2] or the placing of legislative acts before a jury.[3]

Legislative oversight, including on location oversight outside the four walls of the Capitol, is critically important to our constitutional system of checks and balances.  To that end, the operative House Rules grant the various standing committees general oversight responsibilities, "[i]n order to determine whether laws and programs addressing subjects within the jurisdiction of a committee are being

---

[2] *See U.S. v. Helstoski*, 442 U.S. 477, 487 (1979)("evidence of a legislative act of a Member may not be introduced by the Government …"); *U.S. v. Brewster*, 408 U.S. 501, 527 (1972) ("evidence of acts protected by the Clause is inadmissible").
[3] *Helstoski*, 442 U.S. at 490 ("Revealing information as to a legislative act— speaking or debating—to a jury would subject a Member to being 'questioned' in a place other than the House or Senate, thereby violating the explicit prohibition of the Speech or Debate Clause.")

9

implemented and carried out in accordance with the intent of Congress and whether they should be continued, curtailed, or eliminated." H.R. Rules, 119th Cong., Rule X, cl. 2(b)(1). That includes "the application, administration, execution, and effectiveness of laws and programs addressing subjects" within a committee's jurisdiction, and "any conditions or circumstances that may indicate the necessity or desirability of enacting new or additional legislation addressing subjects within its jurisdiction (whether or not a bill or resolution has been introduced with respect thereto)." *Id.* Indeed, the House Committee on Homeland Security's rules expressly require such oversight.[4] Rules of the House of Representatives, 119th Cong. Rule X, cl. 1(j), 3(g)(2) (2025) ("the committee shall review and study on a primary and continuing basis all Government activities, programs and organizations related to homeland security that fall within its primary legislative jurisdiction.").

Meaningful oversight frequently requires "field work" by Members of Congress, which is "essential to informed deliberation over proposed legislation." *McSurely v. McClellan*, 553 F.2d 1277, 1286-87 (D.C. Cir. 1976). As former members of Congress, *amici* can confirm that this type of on location oversight is a

---

[4] While some oversight functions are carried out by congressional committees, Congress also "acts through its individual Members," all of whom have "constitutionally recognized status entitling them to share in general congressional powers and responsibilities, many of them requiring access to executive information," and "each is entitled to request such information from the executive agencies as will enable him to carry out the responsibilities of a legislator." *Murphy v. Dep't of Army*, 613 F.2d 1151, 1157 (D.C. Cir. 1979).

vital part of Congress's legislative work. It provides individual Members and Congress as a whole a factually grounded perspective, otherwise unattainable, with which to understand the success or failure of legislative and executive policies, the conduct of Executive Branch officials in implementing those policies, and—in some cases—the lawfulness and harmful impact of actions by Executive branch officials. Each of the *amici* has utilized the insights gleaned through first-hand legislative oversight to inform our work on committees and in crafting legislation. Focusing on the circumstances here, legislative field investigation is particularly invaluable when it comes to DHS facilities and ICE operations, where analyzing the effectiveness and impact of policy is inextricably linked with conditions in detention centers and the conduct of DHS personnel.

## II. If Permitted to Proceed, this Prosecution Would Create a Dangerous New Tool for the Executive Branch to Deter Effective Congressional Oversight.

This prosecution poses a critical threat to the viability of congressional oversight and the protective function of the Speech or Debate Clause. All of the charges brought here by the Department of Justice against a sitting Member of Congress are based on actions she allegedly took in response to unruly, disruptive and unlawful conduct by the very Executive Branch officials over whom she was conducting oversight. It was those Executive Branch agents who first invited Newark's Mayor to enter the detention facility and then threatened to arrest him for

11

being there. *See* Br. at 10. It was those Executive Branch agents who pursued the Mayor outside the facility and then arrested him for "trespassing," a charge the Department of Justice obviously later concluded were unsustainable or a serious error in judgment. *See* Br. at 11. And it was those Executive Branch agents who created the ensuing chaos delaying and interfering with Congresswoman McIver's access to the facility. *See* Br. at 39. If the Executive branch agents who were the focus of the Congresswoman's valid oversight can intentionally create a chaotic circumstance that ultimately results in her prosecution, then this case will provide a roadmap for the Executive to obstruct and deter legitimate oversight: when Congress comes calling, create a scene and in the ensuing confusion dissect the legislator's every action, looking for incidental contact or other actions that can for the basis criminal charges.

As former Members, *amici* can attest that the threat of opportunistic, politically motivated prosecutions generated through Executive Branch disruption of legitimate oversight activities would make members of Congress hesitate to engage in oversight they view as necessary. If this prosecution goes forward, therefore, it will frustrate the fundamental purpose of the Speech or Debate Clause, which is to "prevent intimidation by the executive and accountability before a possibly hostile judiciary." *Helstoski*, 442 U.S. at 491.

## III. Congresswoman McIver's Alleged Actions in Counts One and Three Are Protected by the Speech or Debate Clause.

With respect to the specific charges here, all of the conduct alleged in Counts One and Three fall within Congress's oversight role and must be immune from prosecution. Congresswoman McIver's oversight visit was legislative in nature and is fully protected by the Speech or Debate Clause. There is no dispute that the alleged brief physical contact between the Congresswoman and ICE agents, described in Count One, occurred after she and other Members arrived at the detention facility to inspect it and before that inspection concluded. The Members exited the facility only because they observed ICE agents' increasingly hostile interactions with the Mayor—first inside the Security Gate, after he had been invited to enter, and subsequently, outside the facility when the agents moved outside to a public area, where the Mayor and other peaceful protesters were located, in order to arrest the Mayor for trespassing on property he had been invited to enter..

The congressional oversight function certainly extends to reviewing the actions of Federal agents inside a detention facility and when they exit the facility to arrest elected officials or others protesting conditions inside the facility in adjacent public areas. *Neguse v. ICE*, No. 25-CV-2463 (JMC), 2025 WL 3653597, at \*10, 25 (D.D.C. Dec. 17, 2025) (holding that Congress has preserved the right to conduct unannounced visits to immigration detention facilities); *Further Consolidated Appropriations Act (2024)*, Pub. L. No. 118-47, div. C, tit. V, § 527(a), 138 Stat.

13

460, 619 (2024) (barring DHS from using appropriated funds to restrict access of Members of Congress to detention facilities "for the purpose of conducting oversight" or making a change to their operations "that in any way alters what is observed by a visiting Member of Congress"). The agents' actions toward public officials and protestors in Congresswoman McIver's district are obviously appropriate subjects of oversight. "A legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927). Indeed, Congress's "broad and well-established authority" to conduct "oversight respecting the Executive Branch" extends to "inquiries concerning the administration of existing laws or the determination of whether new or additional laws are needed." *Scope of Congressional Oversight and Investigative Power With Respect to the Executive Branch*, 9 Op. O.L.C. 60, 60 (1985). Thus, Congress has an interest in whether ICE agents are improperly exercising their authority and the conduct of ICE officials is germane to the Homeland Security Committee's oversight jurisdiction. Congresswoman McIver's legitimate interest in overseeing the actions of the federal agents was further enhanced by the fact that the facility was in her congressional district and the agents were interacting with the Mayor of the largest city in that district and with her constituents.

14

When Congresswoman McIver followed ICE agents outside the facility as they attempted to arrest the Mayor—for entering an area he had been invited to enter— it was a natural and legitimate continuation of her oversight. The purpose of the Congresswoman's visit to the Delaney facility was to investigate reports of misconduct by officials; and, while conducting her on-site oversight, she witnessed officials exiting the facility to engage in misconduct and abuse of her constituents related to the protest of activities in the facility. Legitimate subjects for legislative oversight include official misconduct inside the facility, official attempts to suppress peaceful expression of public concern in the surrounding areas, and improper attempts by officials to arrest the Mayor of Newark. The Congresswoman's observation of the latter categories of activities by ICE agents were no less a part of her oversight role simply because they occurred outside the gates of the facility.

Thus, the District Court plainly erred in holding that Congresswoman McIver's efforts to observe the unlawful arrest of Newark's Mayor was outside the scope of her legislative role. Congress has a clear interest in learning about improper efforts by government agents to intimidate or unlawfully arrest American citizens, no less so when the target of the unlawful government activity is a municipal official. That congressional concern does not amount to special pleading for the individual; to the contrary, the American public has a compelling interest in ensuring that federal agents comply with the law and respect First Amendment rights. Once that

15

compelling congressional interest is clear, it is also clear that the Speech or Debate Clause must protect a legislator against prosecution where federal agents' unlawful actions have created chaotic circumstances in which fleeting physical contact occurs. As discussed above, a narrow view that failed to protect the legislator in that context would create perverse incentives for Executive branch officials and chill legitimate congressional oversight.

IV.   **Congresswoman McIver's Alleged Actions Charged in Count Two Are Protected by the Speech or Debate Clause.**

Count Two is based on allegations of two-to-three seconds of physical contact between Congresswoman McIver and an ICE agent who was obstructing her path as she attempted to return to the facility. Count Two is also barred by the Speech or Debate Clause.

Contrary to the district court's focus, *See* Op. at 54, the question was not whether the ICE agent was acting intentionally to block Congresswoman McIver's path. The question, instead, should be whether Congresswoman McIver was acting in the course, and in furtherance, of her oversight mission; that is the only inquiry that would be consistent with the purpose of legislative immunity. The record indicates that was the case. Congresswoman McIver was moving toward the facility, and trying to reenter, throughout the time of her alleged physical contact with the ICE agent; and she subsequently proceeded with the tour once she reentered the facility. See Br. At 43. Her attempt to enter the facility falls squarely within her

statutorily mandated oversight authority, and it was the ICE agent who impermissibly interfered with the Congresswoman's oversight. Further Consolidated Appropriations Act, 2024, § 527(a) (authorizing Members to "enter[], for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to" house detainee, and prohibiting DHS from using its appropriated funds to "prevent" a Member from doing so); see also *Neguse v. ICE*, 2025 WL 3653597, at *10 (D.D.C. Dec. 17, 2025). Ignoring the Congresswoman's intent to reenter the facility and resume her oversight and focusing instead on the ICE agent's intent would improperly privilege the Executive Branch's prerogatives in the context of an immunity designed to protect members of the legislature. Because the Congresswoman was attempting to re-enter the facility to complete her oversight visit, her actions clearly fall within her legislative oversight authority and should be protected by immunity.

## CONCLUSION

*Amici* respectfully submit that the Speech or Debate Clause entirely precludes the Department of Justice's prosecution of Congresswoman McIver. The Supreme Court has consistently read legislative immunity "broadly to effectuate" the "purposes" of the Speech and Debate Clause. *Eastland*, 421 U.S. at 501. Those purposes include ensuring that "the legislative function the Constitution allocates to Congress may be performed independently," and thus the "central role" of legislative

17

immunity is to "prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary." *Id.* at 502-03 (citation omitted). Because the legislative function extends to oversight of activities by Federal agents, both within and outside detention facilities, the Court should afford Congresswoman McIver the "absolute immunity from criminal or civil suit" the Constitution provides for legislative functions, *In re Grand Jury*, 821 F.2d 946, 953 (3d Cir. 1987), and protect Congress's essential oversight role in our system of checks and balances.

Therefore, the Court should reverse the district court's order and remand with instructions to dismiss the indictment.

April 6, 2026

Respectfully submitted,

*/s/ Harold Craig Becker*
Harold Craig Becker
Norman L. Eisen
David W. Ogden
Joshua G. Kolb
Democracy Defenders Fund
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
202-594-9958
craig@democracydefenders.org
norman@democracydefenders.org
david@democracydefenders.org
joshua@democracydefenders.org

*Counsel for Amici Curiae*

18

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because it has been prepared in 14-point Times New Roman, a proportionally spaced serif font.

2. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 3,831 words, excluding the parts of the brief exempted under Rule 32(f).

3. The text of this electronic brief is identical to the text in the paper copies of the brief.

4. A virus scan was performed on this electronic brief using Microsoft Defender Antivirus, and no virus was detected.

5. I am a member of the bar of this Court.

April 6, 2026

*/s/ Harold Craig Becker*
Harold Craig Becker
Democracy Defenders Fund
600 Pennsylvania Avenue SE #15180
Washington, D.C. 20003
202-594-9958
craig@democracydefenders.org
*Counsel for Amici Curiae*