Nos. 25-3573, 26-1122

# In the United States Court of Appeals for the Third Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

LAMONICA MCIVER,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of New Jersey
No. 25-cr-0388-JKS (Hon. Jamel K. Semper)

**DEFENDANT-APPELLANT'S REPLY BRIEF**

Samuel F. Callahan
Orion de Nevers
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Ave. N.W.
Washington, D.C. 20001

Amanda J. Raines
ARNOLD & PORTER
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019

Paul J. Fishman
Lee M. Cortes, Jr.
John M. Fietkiewicz
ARNOLD & PORTER
KAYE SCHOLER LLP
One Gateway Center, Ste. 1025
Newark, NJ  07102

*Counsel for Defendant-Appellant LaMonica McIver*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION ............................................................................. 1

ARGUMENT .................................................................................. 2

I.     The Indictment Violates the Speech or Debate Clause ........................... 2

       A.     The Speech or Debate Clause Applies to This Case ...................... 2

       B.     The Indictment Impermissibly Questions Legislative Acts .......... 8

       C.     A Trial Would Unavoidably Mention Legislative Acts ................. 12

       D.     Any View of Congresswoman McIver's Conduct Identifies
              Legislative Acts .................................................................. 16

II.    The Indictment Violates the Separation of Powers ............................... 18

III.   The Indictment Violates the Doctrines of Selective and
       Vindictive Prosecution ............................................................... 20

       A.     This Prosecution Was Unconstitutionally Selective ..................... 20

       B.     The Prosecution Was Unconstitutionally Vindictive .................... 27

       C.     At Minimum, Discovery is Warranted ...................................... 30

       D.     The Court Has Jurisdiction to Resolve These Claims .................. 30

CONCLUSION ............................................................................... 33

CERTIFICATE OF BAR MEMBERSHIP ..................................................... 34

CERTIFICATE OF SERVICE ................................................................. 35

CERTIFICATE OF COMPLIANCE ........................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Blackledge v. Perry,*
  417 U.S. 21 (1974).............................................................28

*Coffin v. Coffin,*
  4 Mass. 1 (1808)...............................................................19

*CTF Hotel Holdings, Inc. v. Marriott Int'l, Inc.,*
  381 F.3d 131 (3d Cir. 2004) ...........................................30

*Doe v. McMillan,*
  412 U.S. 306 (1973)....................................................4, 9, 12

*Eastland v. U.S. Servicemen's Fund,*
  421 U.S. 491 (1975)...............................................12, 16, 19

*Fort Wayne Books v. Indiana,*
  489 U.S. 46 (1989)...........................................................32

*Frederick Douglass Found., Inc. v. D.C.,*
  82 F.4th 1122 (D.C. Cir. 2023) ..............................20, 22, 24

*Geo Grp., Inc. v. Menocal,*
  146 S. Ct. 774 (2026) ......................................................32

*Gov't of Virgin Islands v. Lee,*
  775 F.2d 514 (3d Cir. 1985) .........................................8, 11

*Gravel v. United States,*
  408 U.S. 606 (1972)................................................2, 3, 6, 11, 16

*Harvard v. Cesnalis,*
  973 F.3d 190 (3d Cir. 2020) ............................................24

*Kilbourn v. Thompson,*
  103 U.S. 168 (1880).........................................................3, 6

*Kisela v. Hughes,*
    584 U.S. 100 (2018)............................................................................4

*McCleskey v. Kemp,*
    481 U.S. 279 (1986)..........................................................................21

*Mireles v. Waco,*
    502 U.S. 9 (1991)...............................................................................4

*New York Times Co. v. United States,*
    403 U.S. 713 (1971)............................................................................3

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982)..........................................................................18

*Nixon v. United States,*
    703 F. Supp. 538 (S.D. Miss. 1988)..................................................25

*North Carolina v. Pearce,*
    395 U.S. 711 (1969)..........................................................................28

*Saucier v. Katz,*
    533 U.S. 194 (2001).........................................................................4, 5

*Scott v. Harris,*
    550 U.S. 372 (2007)............................................................................7

*In re Sealed Case,*
    80 F.4th 355 (D.C. Cir. 2023).........................................................10

*Sell v. United States,*
    539 U.S. 166 (2003)..........................................................................32

*Supreme Court of Virginia v. Consumers Union, Inc.,*
    446 U.S. 719 (1980)..........................................................................18

*Tenney v. Brandhove,*
    341 U.S. 367 (1951)..........................................................................19

*Trump v. United States,*
    603 U.S. 593 (2024)..........................................................4, 5, 6, 19, 23

*United States v. Armstrong,*
517 U.S. 456 (1996)................................................................20, 26

*United States v. Brewster,*
408 U.S. 501 (1972)...............................................................2, 4, 6, 8

*United States v. Goodwin,*
440 F.2d 1152 (3d Cir. 1971) ..............................................14

*United States v. Helstoski,*
442 U.S. 477 (1979).............................................................4, 12, 13

*United States v. Helstoski,*
635 F.2d 200 (3d Cir. 1980) ...............................................12, 13

*United States v. Hoffer,*
869 F.2d 123 (2d Cir. 1989) ...............................................14, 15

*United States v. Johnson,*
383 U.S. 169 (1966)...........................................4, 5, 8, 10, 11, 15

*United States v. McDade,*
28 F.3d 283 (3d Cir. 1994) ...............................................14, 15, 32

*United States v. McDade,*
827 F. Supp. 1153 (E.D. Pa. 1993)....................................15

*United States v. Menendez,*
831 F.3d 155 (3d Cir. 2016) ...............................6, 9, 10, 11, 30, 31

*United States v. Meyer,*
810 F.2d 1242 (D.C. Cir. 1987)..........................................28, 29

*United States v. Monsoor,*
77 F.3d 1031 (7th Cir. 1996)..............................................28

*United States v. Myers,*
635 F.2d 932 (2d Cir. 1980) ...............................................31

*United States v. Oliver,*
787 F.2d 124 (3d Cir. 1986) ...............................................29

*United States v. P.H.E., Inc.*,
965 F.2d 848 (10th Cir. 1992)................................................................32

*United States v. Paramo*,
998 F.2d 1212 (3d Cir. 1993) ..............................................................27

*United States v. Schoolcraft*,
879 F.2d 64 (3d Cir. 1989) .............................................................28, 29

*United States v. Swindall*,
971 F.2d 1531 (11th Cir. 1992)............................................................14

*United States v. Washington*,
869 F.3d 193 (3d Cir. 2017) ...............................................................30

*United States v. Washington*,
79 F.4th 320 (3d Cir. 2023)...........................................................13, 29

*Wayte v. United States*,
470 U.S. 598 (1985)......................................................................22, 26

## Regulations

90 Fed. Reg. 8331 (Jan. 20, 2025)..................................................21, 22

## Other Authorities

15C Wright & Miller's Fed. Prac. & Proc. § 3918.5 (2d ed.)..........................31

*Trump on Arrest of Dem Rep. McIver*, RealClear Politics (May
20, 2025), https://bit.ly/4dvYccJ ........................................................27

Josh Chafetz, *Democracy's Privileged Few* 222 (2007) ..................................5, 7

**INTRODUCTION**

The government never grapples with the central defect in this prosecution: Congresswoman McIver is criminally charged for her conduct carrying out a legislative act. Instead, the government's response proffers a categorical theory that no court has ever adopted: that legislative immunity evaporates whenever the government labels a legislator's conduct "violent." That exception has no basis in constitutional text, history, precedent, or the purposes animating the Speech or Debate Clause. The proper analysis does not turn on whether the Executive can characterize a legislator's conduct as forceful or even unlawful. It prohibits prosecutions that would "question" legislative acts. This prosecution does.

The government's contrary theory would fundamentally reorder the separation of powers. It would license the Executive to characterize contact between its agents and a Member as forceful, sever that contact from the legislative setting in which it occurred, and evade the Clause. That risk is at its apex in settings like this one, where a legislator is conducting on-the-ground oversight of the Executive itself. The bipartisan amicus brief of 20 former Members of Congress vividly explains the chilling effect that would result. Dkt.36.

This danger is especially acute here, where the Administration abandoned prosecutions against politically aligned January 6 defendants who actually committed serious assaults on federal officers, and then pursued felony charges against a Member of Congress from the opposing political party who was conducting statutorily authorized oversight of executive operations.

The Constitution does not permit that result. The Court should reverse.

## ARGUMENT

### I.    The Indictment Violates the Speech or Debate Clause

#### A.    The Speech or Debate Clause Applies to This Case

The government concedes that an indictment "predicated on legislative acts" must be dismissed, GB11; that Congresswoman McIver's investigation of Delaney Hall was a "clearly legislative act," D.Ct.Dkt.27 at 57, 61-62; and that the Speech or Debate Clause typically protects "anything" a Member "did in the" discharge of a legislative act, GB11 (quoting *United States v. Brewster*, 408 U.S. 501, 526 (1972)). But the government now seeks a categorical exception for conduct it labels as "threatening the security of the person or property of others." GB14. The government proposed no such exception below, no court has ever adopted it, and it is at war with the principles underlying

legislative immunity. In any event, Congresswoman McIver did not threaten anyone's security, so immunity would *still* apply on the government's theory.

**1.** The government hinges its "security" exception on one line of dictum from *Gravel v. United States*, 408 U.S. 606 (1972). GB14. But *Gravel* directly contradicts the government's position. There, the Court upheld immunity from "criminal … liability," *id.* at 608, 615, even though a Senator exposed classified information from the Pentagon Papers whose release, the government asserted in related litigation, "endanger[ed] troops in combat" and "imminently imperil[ed] the national security," U.S.Br. 20, 1971 WL 167581, *New York Times Co. v. United States*, 403 U.S. 713 (1971).

Despite those alleged security implications, the Court held that the Speech or Debate Clause protected Senator Gravel's conduct because it took place within "the legislative sphere." *Gravel*, 408 U.S. at 624-25. By contrast, the passage the government relies upon simply emphasized that—unlike the legislative act itself—criminal conduct in *preparation* for a legislative act (or *following* a completed legislative act) is not immunized. *Id.* at 618-22. The other cases *Gravel* relied upon, *id.*, reflect the same distinction—especially *Kilbourn v. Thompson*, which involved a member's authorizing an "actual assault" for which he was immunized, 103 U.S. 168, 200 (1880).

3

**2.** The same principle animates the Supreme Court's bribery cases. Bribery prosecutions are not categorically exempt from Speech or Debate immunity. *Contra* GB12-15. The Court permitted a bribery prosecution in *Brewster* because the crime was "*taking* the bribe"—not *fulfilling* "the illicit compact"—so no "inquiry into" the legislative act itself was "necessary." 408 U.S. at 526-27 (emphasis added). *United States v. Johnson*, by contrast, reversed a bribery conviction that put "in question the legislative acts of the defendant member of Congress." 383 U.S. 169, 185 (1966). *United States v. Helstoski* likewise forbade "references to past legislative acts" in the bribery context. 442 U.S. 477, 489 (1979). Each case reflects the same principle: immunity turns on whether the prosecution would question a legislative act, not whether the indictment charges a particular category of offense.

**3.** The government's blanket exception for assaults or "violence" is also inconsistent with the purpose of immunity. The whole point is to immunize conduct that, "if performed in other than legislative contexts, would in itself be … contrary to criminal or civil statutes." *Doe v. McMillan*, 412 U.S. 306, 312-13 (1973). That is why state and federal officers have qualified immunity, even when they use excessive force. *Kisela v. Hughes*, 584 U.S. 100 (2018); *Saucier v. Katz*, 533 U.S. 194 (2001). It is why judges have immunity even from

claims that they ordered violent conduct. *Mireles v. Waco*, 502 U.S. 9 (1991). And it is why *Trump v. United States* accepted that Presidential immunity would apply to "assault" undertaken in an "official capacity," 603 U.S. 593, 693 (2024) (Jackson, J., dissenting), rather than subordinate that immunity to "fear mongering on the basis of extreme hypotheticals," *id.* at 640 (majority op.). The government's observation that the Arrest Clause—unlike the Speech or Debate Clause—specifically *exempts* "breach of the peace" only confirms that the latter does not carve out particular categories of conduct. GB15.

History confirms that when a Member of Congress is accused of assault, the Constitution assigns any recourse to Congress, not courts. "The Houses can punish and have punished Members for any action they deem disruptive or objectionable, including, but not limited to, assaults." Josh Chafetz, *Democracy's Privileged Few* 222 (2007). Notorious assaults in (at least) the fifth, twenty-fifth, thirty-first, and thirty-ninth Congresses all were handled by that body. *Id.* at 214-15. The government does not identify a single instance in which legislative immunity was denied because the charge was for assault or any other purportedly "violent acts." GB12.

The consequences of the government's rule show that it is far too broad. Consider a Congresswoman from the Executive's "disfavored" party,

5

*Johnson*, 383 U.S. at 182, who is giving a floor speech and is aggressively "restrained" from completing it by Members of the Executive's favored party. Chafetz, *supra*, at 73-74. If she were to push the assailants aside to finish her speech, the government's approach would deny her immunity, no matter how reactive or proportional the contact. That cannot be right. A Congresswoman cannot be stripped of legislative immunity simply because the Executive could characterize as "violent" the contact in which she engaged to exercise her legislative duties. GB9.

This does not mean that anything goes. The Clause does not shield "extraordinary" conduct amounting to a Member's "utter perversion of their powers," *Kilbourn*, 103 U.S. at 204-05, or acts "manifestly or palpably beyond [the legislator's] authority," *Trump*, 603 U.S. at 618. Nor could a Member who committed a premeditated crime credibly claim that the "predominant purpose" of his conduct was legislative. *United States v. Menendez*, 831 F.3d 155, 173 (3d Cir. 2016). A prosecution for such conduct would not chill legitimate legislative activity.

But immunity remains "essential" to "foreclose executive control" over bona fide legislative conduct, *Gravel*, 408 U.S. at 620, and preserve "legislative independence," *Brewster*, 408 U.S. at 508. At the least, that requires shielding

6

conduct "incidental to the role of a legislator" in carrying out a legislative act, *id.* at 526, including actions that Members could reasonably believe are necessary to respond to "interfere[nce] with their ability to do their jobs," Chafetz, *supra*, at 90. Immunity must give Members the necessary "breathing room" to independently discharge their responsibilities. *Id.* That is the only principle necessary to decide this case.

**4.** Even under the government's novel proposal, Congresswoman McIver still would be immune because she did not threaten anyone's security.

Her contact with agents was minimal and incidental. The district court found her interaction with V-1 involved "brief physical contact," A9, and her contact with V-2 lasted "only two to three seconds," A50. Both alleged victims were among a sprawling team of agents, many of whom, including V-2, were armed and wearing tactical gear, including protective vests. A262 at 2:27-2:35; A258 at 1:16:58-1:17:19. Neither agent was injured. Neither required medical attention. Neither reported being placed in any fear. Shortly after the alleged conduct concluded, agents escorted the Congresswoman on an inspection. Any suggestion that she posed a threat "blatantly contradict[s]" the video evidence. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The government's own charging decisions and representations effectively concede the point. The indictment charges Congresswoman McIver under § 111(a). It does not charge § 111(b), which applies in cases of "bodily injury." And the government has unequivocally disclaimed any allegation that "the officer being impeded or interfered with experienced fear." D.Ct.Dkt.27 at 73-74. Thus, even under the government's approach, Congresswoman McIver's conduct threatened no one's security, and she remains immunized.

## B.    The Indictment Impermissibly Questions Legislative Acts

The government's few remaining arguments also fail. As explained in Congresswoman McIver's opening brief, a criminal indictment "contravenes the Speech or Debate Clause" when it "draw[s] in question the legislative acts of the defendant member of Congress," *Johnson*, 383 U.S. at 184-85, which the Court analyzes "at the level of the particular activity … as a whole," DB26 (cleaned up) (quoting *Gov't of Virgin Islands v. Lee*, 775 F.2d 514, 525 (3d Cir. 1985)). The government does not dispute this—or cite *Lee*—and that all but resolves this case.

Congresswoman McIver's investigation of Delaney Hall was, as the government concedes, a "clearly legislative act." D.Ct.Dkt.27 at 57, 61-62. But the Speech or Debate Clause "precludes any showing of how [a legislator]

8

acted" in discharging a legislative act, *Brewster*, 408 U.S. at 527, and the other Branches "have no authority to oversee the judgment of the [legislator] in this respect or to impose liability" over "disagree[ment] with their legislative judgment," *Doe*, 412 U.S. at 313. Yet that is what this prosecution does. Congresswoman McIver was conducting oversight of ICE; armed ICE agents disrupted her visit by executing a baseless arrest of a prominent constituent lawfully present at the facility; and the Congresswoman determined that, as part of her responsibilities, it was appropriate for her to briefly leave the gates to conduct oversight of the agents' behavior. In other words, she did not abandon her oversight when she walked through the gate; to the contrary, the indictment charges her for actions she took and judgments she made while exercising her statutory and constitutional responsibilities.

For that reason, Congresswoman McIver's "predominant purpose" was legislative oversight the "entire" time she was at Delaney Hall. *Menendez*, 831 F.3d at 173. She explained her oversight agenda to officials upon arrival, and questioned employees about the facility throughout the delay. A258 at 6:40-15:35, 16:00-17:23. Just before she exited the gate as the agents left to arrest the Mayor, she reminded them that the Members were "here to do our oversight visit," and admonished them for interfering. A262 at 4:32-5:58. She

followed the agents only when the kind of misconduct she had come to Delaney Hall to investigate unfolded before her eyes and necessarily became the object of her investigation. And after reentering the secured area, she quickly returned to her formal tour, diligently continuing her oversight mission. A257 at 1:28:23-1:29:48; A271 at 4:07-4:37; A332 at 02:50:46-2:51:05.

This is not a case where a legislator departed from her legislative conduct to pursue some personal errand disconnected from "actual legislative purposes," only to seek immunity after the fact. *Menendez*, 831 F.3d at 169. Nor is it one where a Member proactively abandoned her mission to strike a federal official "with a bat." GB20. Arriving so armed would undermine any claim that the Member had come to conduct oversight, as would similar extreme, premeditated, or pretextual conduct. But here, Congresswoman McIver made incidental physical contact with agents only as they continued to impair her ability to inspect the facility, including by embarking on an unlawful arrest of the Mayor. In that way, her conduct was inseparable from her broader oversight agenda.

These events are exactly why, "[i]n scrutinizing [a] criminal prosecution," courts "look particularly to the prophylactic purposes of the clause." *Johnson*, 383 U.S. at 182. Those purposes would be undermined by ex

10

post inquiries "carv[ing] out" non-legislative from legislative conduct on a frame-by-frame basis. *In re Sealed Case*, 80 F.4th 355, 373 (D.C. Cir. 2023). Indeed, the Clause's protection is needed most in settings involving "policy-based oversight" of the Executive Branch, *Menendez*, 831 F.3d at 173—and, in particular, where on-the-ground factfinding places Members directly at odds with the Executive and makes them especially susceptible to "intimidation," *Johnson*, 383 U.S. at 181. The chill is palpable if the government can send armed agents to disrupt oversight efforts and then claim that minor physical contact with those agents is an "assault." The bipartisan amicus brief submitted by 20 former Members of Congress makes that danger starkly clear. Dkt.36.

The government cannot dodge this bar, as the district court did, by excising and relabeling 68 seconds of Congresswoman McIver's investigation to claim that "she's being prosecuted for assaulting and impeding Federal law enforcement agents," not "for her legislative acts." GB16. If that were true, Senator Gravel could have been prosecuted by decoupling his reading of "classified documents" into the public record from the remaining "events occurring at the subcommittee hearing," *Gravel*, 408 U.S. at 615-16. That gambit could end-run virtually any immunity claim.

11

But that is not how this works. Instead, the Court asks whether the entire "event[]" was a "legitimate legislative act[]." *Lee*, 775 F.2d at 524. If it was, the Member was "acting within the 'legitimate legislative sphere'" and the Clause "is an absolute bar to interference." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975) (quoting *Doe*, 412 U.S. at 314).[1]

### C.    A Trial Would Unavoidably Mention Legislative Acts

The indictment should be dismissed for the independent reason that a criminal prosecution of a Member of Congress may not "reveal," "reference," or "mention" a legislative act. *Helstoski*, 442 U.S. at 489-90. "The Clause does not simply state, 'No proof of a legislative act shall be *offered*;' the prohibition of the Clause is far broader. It provides that Members 'shall not be *questioned* in any other Place.'" *Id.* at 489; *see United States v. Helstoski*, 635 F.2d 200, 204 (3d Cir. 1980) (applying rule on remand). Yet a trial here would revolve around a legislative act, DB30-37, and the government has again failed to explain how it could try this case without mentioning legislative oversight.

---

[1] The government's suggestion that a single decontextualized line from oral argument below concedes this argument is fanciful. GB18-19. Congresswoman McIver has emphasized this point throughout these proceedings. D.Ct.Dkt.19-1 at 22-24; D.Ct.Dkt.32 at 3-4; DB4, 26-27.

This is clear-cut. The indictment is replete with references to the Congresswoman's "congressional oversight inspection," A73-A78, as is the government's own statement of the case, GB2-5. Moreover, every witness who might testify at trial was at Delaney Hall solely because of the oversight investigation. And ICE's arrest of Mayor Baraka, Congresswoman McIver's conduct during that arrest in Counts One and Three, and the Congresswoman's efforts to reenter the facility in Count Two are all utterly inexplicable without "references to" her oversight investigation. *Helstoski*, 442 U.S. at 489.

Rather than dispute any of that, all the government offers is this: "the Government doesn't have to demonstrate how it will prove its case without using evidence of legislative acts." GB11. Instead, the government claims that proof of legislative acts wouldn't be part of its *prima facie* case. GB11, GB16. That's incorrect. But regardless, the Supreme Court rejected this approach in *Helstoski*. There, Justice Stevens argued in dissent that "evidence that merely *refers* to legislative acts" is permissible when it "is not offered for the purpose of *proving* the legislative act itself." *Helstoski*, 442 U.S. at 494 (emphasis added). But the majority held that even "[r]evealing information as to a legislative act … violat[es] the … Clause" regardless of "the prosecutor's

13

purpose." *Id.* Trying this case without "[r]evealing information as to a legislative act" is impossible, and that requires dismissal. *Id.* at 490.

The elements of § 111 underscore the point. The government must prove the alleged victims were "engaged in … the performance of official duties," *United States v. Washington*, 79 F.4th 320, 324 (3d Cir. 2023), which includes their "mission" during the encounter, *United States v. Hoffer*, 869 F.2d 123, 125 (2d Cir. 1989). The government cannot satisfy that burden here without reference to legislative acts. The government has no answer for that; it merely ignores the issue.

Additionally, Congresswoman McIver can cast doubt on the government's evidence of mens rea by showing she "reasonably believed" her actions were "defensible and justified," and "to sustain its overall burden of proof, the Government must, of course, remove this doubt." *United States v. Goodwin*, 440 F.2d 1152, 1156 (3d Cir. 1971). That is, the government will have to prove she did not reasonably believe she was validly exercising legislative authority, making legislative acts central to its case.

This trial would also impermissibly implicate legislative acts even if they came in only through Congresswoman McIver's "defenses." GB16-18. This Court distinguishes between prosecutions that "*force[]*" a member "to refute

14

charges that *directly implicate* legitimate legislative acts" (impermissible) from those where a Member simply "*chooses* to offer rebuttal evidence of legislative acts" (permissible). *United States v. McDade*, 28 F.3d 283, 294-95 & n.14 (3d Cir. 1994) (emphasis added); *see* U.S.Br. 17-18, 1995 WL 17107787, *McDade v. United States*, No. 94-849 (1995) (agreeing); *United States v. Swindall*, 971 F.2d 1531, 1546 (11th Cir. 1992).

In *Johnson*, for example, the Clause was violated even though "the defendant, not the prosecution, introduced the speech itself." 383 U.S. at 184. Because the government's theory was "dependent" on *how* the Senator delivered the speech and his "motives for giving it," the Senator's "defense" would "naturally" rely on legislative acts "to rebut the prosecution's case." *Id.* at 173-77, 184. In *McDade*, by contrast, the "conduct alleged in the indictment" was "all clearly outside the boundaries" of the Clause, *United States v. McDade*, 827 F. Supp. 1153, 1165 n.2 (E.D. Pa. 1993), and it was simply "tactically advantageous for [the] member to respond with proof of … legislative acts," *McDade*, 28 F.3d at 294. He was in no way "*forced*" to introduce those acts. *Id.* at 294-95 & n.14.

This case "directly implicate[s] legitimate legislative acts." *Id.* There is no way to disaggregate Congresswoman McIver's conduct outside the gates

15

from the concededly legislative conduct she undertook within them. Instead, the trial would center on whether Congresswoman McIver was continuing to engage in oversight when she exited the fenced perimeter, and whether ICE's illegal arrest of Mayor Baraka was part of its effort to thwart her investigation. The Clause would have little meaning if prosecutors could sever charges from all immediate context and then shift the blame to legislators for introducing acts necessary to mount a full defense. Because Congresswoman McIver cannot "defend[ herself] from prosecution" without reference to the legislative "events that occurred" at Delaney Hall, she "may not be made to answer" for them. *Gravel*, 408 U.S. at 616.

### D. Any View of Congresswoman McIver's Conduct Identifies Legislative Acts

Dismissal would still be warranted even if 68 seconds of Congresswoman McIver's oversight investigation were isolated.

Congresswoman McIver was continuing to conduct oversight when she exited Delaney Hall's secured area to investigate a full-scale operation by armed agents interrupting her investigation by illegally arresting the Mayor of Newark in a crowd of other constituents. Both of her colleagues joined her because ICE's behavior was what they had come to Delaney Hall to investigate. The government does not explain how "exit[ing] the Security

16

Gate" could have divested the Congresswoman of "oversight authority," GB19—because it did not, DB41—and its argument that "[i]mpeding an arrest" is not oversight "whether lawful or unlawful," GB19, simply reprises the kinds of categorical arguments disposed of above. Even if Counts One and Three could be separated from the broader oversight of which they were also a part, they would still involve self-contained legislative acts.

Congresswoman McIver's "few seconds" of contact with V-2 were also discretely legislative. A54. Section 527 of the FCAA authorizes Members of Congress to "enter[], for the purpose of conducting oversight, any facility operated by or for the Department of Homeland Security used to" house detainees. That is precisely what Congresswoman McIver was doing in Count Two. Meanwhile, V-2 "prevented Congresswoman McIver from" doing so. DB45. These points are *conceded*. The government does not dispute that entering a facility is a legislative act under § 527, does not dispute that Congresswoman McIver was making her way into the facility to conduct oversight in Count Two, and does not dispute that V-2 was preventing her from doing so. It forfeits each point. Count Two charges Congresswoman McIver purely for her attempt to reenter Delaney Hall to complete her oversight

inspection, and any incidental contact she made with an officer preventing her from doing so is immunized.

## II. The Indictment Violates the Separation of Powers

The indictment should separately be dismissed because it violates the separation of powers under the principles announced in *Trump*.

The government acknowledges that separation-of-powers immunity is "broad[]," but insists it "isn't absolute." GB21 (quoting *Supreme Court of Virginia v. Consumers Union, Inc.*, 446 U.S. 719, 733 (1980)). Exactly right. While the Speech or Debate Clause provides *absolute* immunity for *legislative acts*, the separation of powers provides *presumptive immunity* for *official acts*. That is the only separation-of-powers immunity Congresswoman McIver has claimed, and *Trump* proves that it is tethered to constitutional structure, not just text, and that it extends beyond the scope of the Speech or Debate Clause.

The government nevertheless contends that the President is entitled to greater protection than legislators because "the Constitution vests in him sweeping powers and duties." GB22. But the "separation of independent coequal powers dictates that a President" should be on "the same footing" with the other branches—not above them. *Nixon v. Fitzgerald*, 457 U.S. 731, 763-

64 (1982) (Burger, C.J., concurring). And legislators, unlike Presidents, face the unflagging threat of "intimidation … by the Executive" *during* their legislative service, *Eastland*, 421 U.S. at 502, so there is an even more acute need to preserve legislative independence through immunity "for the public good," *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951).

Finally, the government does not seriously dispute that the indictment charges Congresswoman McIver for an official act—or that this prosecution "would deter Members of Congress from carrying out their essential oversight responsibilities." Dkt.36 at 6. Instead, it falls back on the argument that immunity can never apply in a prosecution for assault, GB21-22. That theory remains wrong. The government cites a rhetorical question and hypothetical from *Coffin v. Coffin*, but neither of those scenarios involved an official act. 4 Mass. 1, 8, 35 (1808). And regardless, *Trump* specifically rejected the theory, acknowledging that official-act immunity *would* extend to "assault … committed [in an] official capacity." 603 U.S. at 693 (Jackson, J., dissenting); *see id.* at 640 (majority opinion addressing dissent).

19

## III. The Indictment Violates the Doctrines of Selective and Vindictive Prosecution

### A. This Prosecution Was Unconstitutionally Selective

The Trump Administration dismissed prosecutions against hundreds of January 6 defendants who assaulted federal officers because those individuals supported the Administration politically. This isn't a guess; the Administration said so out loud. DB51-52. But the prosecution of Congresswoman McIver, who opposes the Administration politically, continues. The January 6 defendants thus received favorable treatment that was denied to Congresswoman McIver (effect) *because of* their divergent political views (intent). That satisfies the selective prosecution inquiry under any standard, even though "motive" is not "required for a First Amendment" claim. *Frederick Douglass Found., Inc. v. D.C.*, 82 F.4th 1122, 1145 (D.C. Cir. 2023). The government's response—inventing formalistic requirements that are contrary to precedent and the purpose of the selective prosecution inquiry— fails.

**1.** The goal of the selective prosecution inquiry is to determine whether a prosecution "turns on unlawful favoritism, rather than lawful prosecutorial considerations." *Id.* at 1137. Asking whether "similarly situated individuals" "were not prosecuted" is simply an evidentiary tool to uncover those

20

considerations. *United States v. Armstrong*, 517 U.S. 456, 464-65 (1996). If the only discernible reason is an impermissible consideration—such as race or political affiliation—that strongly supports the inference that impermissible factors drove the disparate treatment.

With that goal in mind, the government's arguments fall flat. The government says the January 6 perpetrators were in fact "prosecuted" in the sense described in *Armstrong* and similar cases. GB34-35. But they were not prosecuted *by the Trump Administration*. To prove purposeful discrimination, the defendant "must prove that the decisionmakers in *his* case acted with discriminatory purpose." *McCleskey v. Kemp*, 481 U.S. 279, 292 (1986). In *McCleskey*, a statistical study did not show relevant disparate treatment in part because it considered "individualized" decisions by independent district attorneys elected across Georgia's many counties, and failed to focus on the particular district attorney who charged the defendant to identify disparities in his "own acts." *Id.* at 295 n.15, 296 n.17.

Here, by contrast, any "failure to prosecute" requirement, GB35, is amply met. On Day 1, the Trump Administration ordered dismissal of all pending January 6 prosecutions. 90 Fed. Reg. 8331 (Jan. 20, 2025). The fact that a *different* decisionmaker previously prosecuted them does not alter the

fact that the current prosecutorial authority dismissed them. Nor does it dim the light those dismissals shed on the Administration's motivations here. If anything, the previous Administration's prosecution of the January 6 defendants, and the overwhelming evidence it amassed against them, underscores that the Trump Administration only had one conceivable basis for dropping the prosecutions—and that shows why the government's selective enforcement justifications fail too. GB36.

The government's argument fails for a second reason: the constitutional question is simply whether there has been "disparate treatment" on impermissible grounds. *Frederick Douglass*, 82 F.4th at 1135; *see Wayte v. United States*, 470 U.S. 598, 608 (1985) ("ordinary equal protection standards" apply). Someone whose case is dismissed (even if prosecuted for a time) has experienced materially different treatment than someone whose case isn't dismissed. The government cites no case holding otherwise. *Contra* GB34-35. On the government's theory, the Executive could insulate all of its political prosecutions from judicial review simply by announcing an indictment of a political ally and then dismissing (or granting a pardon) the next day.

**2.** The government's pardon arguments are equally divorced from the purpose of the constitutional inquiry. Initially, although the government

22

repeats the district court's finding that "all" January 6 defendants were pardoned, GB35, it makes no effort to square that assertion with the text of the presidential proclamation, which states that the pardons applied to those "convicted," while pending cases would be dismissed. 90 Fed. Reg. 8331. This is a question of law; the court got it wrong. Neither of the cases the district court cited, A37, actually states that defendants whose cases were pending were pardoned.

Regardless, a presidential pardon based expressly on political considerations provides strong evidence that a subsequent prosecution of a political enemy for lesser conduct is politically motivated. That inquiry does not require courts to "question the basis" for the pardons. GB37. A President's pardon of a political supporter for the same (or worse) conduct than a political opponent simply demonstrates that the opponent wouldn't be prosecuted if he or she were a supporter. The pardon isn't being questioned; the subsequent prosecution is.

Nor does the government explain why the discretionary nature of a pardon distinguishes it from an ordinary non-prosecution decision, which the government admits is a proper comparator that can provide evidence of improper motive. Just as he has absolute discretion to grant a pardon, the

23

President has "absolute discretion" to decide not to prosecute someone in the first place, *Trump*, 603 U.S. at 620, even for a "crime he has committed," GB38. January 6 defendants are, of course, entitled to their pardons once the President acts and regardless of his motives. But that does not excuse the unconstitutional targeting of Congresswoman McIver.

Rejecting the government's position would not remotely "render[] § 111 a dead letter." *Contra* GB39. To the contrary, a prior administration's pardon would not shed any light on the motivations for a prosecution by the successor administration. And most § 111 charges will involve conduct that the Administration routinely prosecutes in cases having nothing to do with politics, undermining a selective prosecution claim.

**3.** The government does not directly defend the district court's erroneous holding that the January 6 defendants are not proper comparators because their conduct was *worse* than Congresswoman McIver's. For good reason: the question is whether the cases are alike in "relevant respects," *Harvard v. Cesnalis*, 973 F.3d 190, 205 (3d Cir. 2020), meaning relevant for purposes of illuminating whether differential treatment is motivated by proper or improper considerations. Nor does *Harvard* require a comparator to be "identical" whenever the comparator is involved in a different incident.

24

*Contra* GB34 n.3. This Court has "previously rejected this requirement," *Harvard*, 973 F.3d at 205, because the point of the inquiry is "isolating" the basis for the decision, *Frederick Douglass*, 82 F.4th at 1137-38 (finding selective prosecution based on comparison with more culpable protesters who were not prosecuted).

The government identifies no authority for its invented requirement that Congresswoman McIver identify "Republican Members of Congress" who were not prosecuted. GB34. In the 40-year-old district court case it cites, the defendant hadn't presented *any* comparator evidence. *Nixon v. United States*, 703 F. Supp. 538, 571 (S.D. Miss. 1988). The government's rule would make selective prosecution claims impossible.

The government next urges the Court to look to prosecutorial decisions about other Members involved in the Delaney Hall incident. GB34 & n.3, 40. As the government acknowledges, however, those two Representatives "didn't make any physical contact with the federal law enforcement agents." GB45; *see* GB34 n.3. But an Executive cannot insulate itself from a selective prosecution claim by not prosecuting every conceivable political opponent.

In any event, if the government insists on focusing on other actors at Delaney Hall, the most relevant comparator is *the ICE agent* who "forcefully

shoved" Congresswoman McIver as she was attempting to re-enter the facility—a plain violation of § 111 that the government did not prosecute even though she immediately complained to a senior DHS official. A50; A257 at 1:28:09-1:28:15; A270 at 2:24-2:34. That agent, unlike Congresswoman McIver, was executing the Administration's agenda at the behest of "the Deputy Attorney General," A8. That disparity only confirms the ideological bias motivating this prosecution.

**4.** The overwhelming *direct* evidence of discriminatory purpose in this case also counsels against a rigid application of the comparator test. The Supreme Court has reserved the question whether "direct admissions … of discriminatory purpose" would obviate the need to "satisfy the similarly situated requirement." *Armstrong*, 517 U.S. at 469 n.3. Here, Congresswoman McIver can easily demonstrate discriminatory intent and effect without regard to comparators because the President announced that she was being prosecuted for being "woke"; DHS issued a stream of press releases emphasizing her political affiliation; and the U.S. Attorney pledged to pursue prosecutions to "turn New Jersey red." DB52-53. This evidence surely shows that "the decisionmaker" acted "at least *in part* because of" politics. *Wayte*, 470 U.S. at 610.

The government says President Trump declared that he didn't know Congresswoman McIver. But the video shows that he was asked about her, knew immediately to whom the reporter was referring, discussed the video, and justified the prosecution because the "days of woke" are over. *Trump on Arrest of Dem Rep. McIver*, RealClear Politics (May 20, 2025), https://bit.ly/4dvYccJ. Likewise, it is irrelevant that U.S. Attorney Habba's statements were not "particularized" to Congresswoman McIver, GB47: prosecutors cannot announce a goal of using their office to disadvantage Democrats, choose to investigate and prosecute a prominent Democrat, and then argue that it's only actionable if they also publicly and preemptively name the Democrats they intend to charge.

## B.    The Prosecution Was Unconstitutionally Vindictive

Equally clear evidence shows that the government retaliated against Congresswoman McIver "for exercising a legal right." *United States v. Paramo*, 998 F.2d 1212, 1220 (3d Cir. 1993). Like the district court, the government does not dispute that DHS's extensive public statements and actions, DB52-53, 61-62, demonstrate animus toward Congresswoman McIver based on her protected oversight activities. Its sole argument is that DHS's animus is categorically irrelevant. GB45-47. But a DHS special agent swore

27

out the criminal complaint initiating the case, A65, A68, which the subsequent indictment mirrors nearly verbatim, A73-78. That evidence refutes the government's odd claim that DHS did not "influence" or "prompt[]" the charging decision. GB46-47.

The government also ignores the many cases explaining that courts evaluate the "conduct of the government as a whole," including the "officer" (here from DHS). *United States v. Meyer*, 810 F.2d 1242, 1248 (D.C. Cir. 1987); *see* DB62-63. As for the government's cases, *United States v. Monsoor* declined to impute a *state* agency's animus to the federal government, 77 F.3d 1031, 1034-35 (7th Cir. 1996), while the others don't address the issue, GB46-47. And while the DHS statements are themselves sufficient, the words of the President and U.S. Attorney confirm the point.

This evidence certainly reflects a "realistic likelihood of vindictiveness" sufficient to raise a presumption. DB60-63. The "pretrial" context does not change the analysis. *United States v. Schoolcraft*, 879 F.2d 64, 67-68 (3d Cir. 1989); *Meyer*, 810 F.2d at 1247-48. The rationale of the vindictive prosecution doctrine is to ensure that individuals are not chilled from exercising their constitutional and statutory rights by the threat of criminal prosecution. *Blackledge v. Perry*, 417 U.S. 21, 28 (1974). That concern is equally applicable

to the exercise of non-trial rights. Here in particular, the "fear of such vindictiveness," *North Carolina v. Pearce*, 395 U.S. 711, 725 (1969), may deter other Democratic members of Congress from exercising their constitutionally and statutorily guaranteed oversight roles, *see* Dkt.36 (congressional amicus brief), and the government's own policies, DB17, DB62, show it has a "strong incentive" to deter that conduct, *Meyer*, 810 F.2d at 1247.

Nor has the government rebutted the presumption by showing that the prosecution was based on the "usual determinative factors." *Schoolcraft*, 879 F.2d at 68 (quoting *United States v. Oliver*, 787 F.2d 124, 126 (3d Cir. 1986)). The government invokes the non-prosecution of the other Members at Delaney Hall, but acknowledges that they had no physical contact with federal agents. GB45. That prosecutors did not stretch even further to charge these members says nothing about whether Congresswoman McIver's prosecution was based on appropriate considerations. The government has not identified a single instance in which the Trump Administration (or any administration) has brought federal felony assault charges in a circumstance involving the minimal contact here. *See* Dkt.32.

## C.    At Minimum, Discovery is Warranted

At the very least, Congresswoman McIver has met the "some evidence" standard for discovery. *United States v. Washington*, 869 F.3d 193, 220-21 (3d Cir. 2017). The government emphasizes the district court's "discretion," GB48-50, but the only reasons the court cited for denying discovery were the same errors of law described above, A39-40.

## D.    The Court Has Jurisdiction to Resolve These Claims

Jurisdiction over Congresswoman McIver's selective and vindictive claims is proper on two independent bases.

1.    The Court has "pendent appellate jurisdiction" because Congresswoman McIver's claims raise First Amendment and "separation-of-powers" issues that imperil the same interests the Speech or Debate Clause protects, *Menendez*, 831 F.3d at 164, and they would be effectively "unreviewable and moot at the conclusion" of trial, *CTF Hotel Holdings, Inc. v. Marriott Int'l, Inc.*, 381 F.3d 131, 136 (3d Cir. 2004). Twenty former members of Congress have explained that this prosecution would have a "dangerous chilling effect on Congress's … Article I responsibilities," which cannot be remedied after the fact. Dkt.36 at 2. There is also a concrete risk that the discovery Congresswoman McIver sought will not be adequately

preserved during the pendency of any trial. D.Ct.Dkt.57 at 1-10. Meanwhile, "judicial economy" favors review to preempt duplicative litigation and because the Congresswoman's immunity claim will be reviewed either way. *CTF*, 381 F.3d at 136.

The government disputes almost none of this, instead resorting to another categorical rule never raised in its motion and that this Court squarely rejected in *Menendez*: that "pendent appellate jurisdiction should never apply to a defendant's interlocutory appeal in a criminal case." GB28. In *Menendez*, Senator Menendez sought "pendent appellate jurisdiction … given the serious separation of powers issues" in question. Mot. 4-5, *Menendez*, No. 15-3459 (3d Cir. Oct. 28, 2015). The government advanced the same categorical response: the "only … exception" available was for "collateral orders." Mot. 4-5, *Menendez* (Oct. 30, 2015). The Court rejected that argument in a December 11, 2015, Order that *did* "discuss[] *Abney*," *contra* GB30, and reaffirmed it in a published opinion, *Menendez*, 831 F.3d at 164.

*Menendez*'s holding is well-grounded. "Since there will be very few defendants who can advance a colorable Speech or Debate Clause defense, and since there is a real need to protect separation of powers values by protecting members of Congress, more issues should be open on appeal than are

permitted on double jeopardy appeals." 15C Wright & Miller's Federal Practice & Procedure § 3918.5 (2d ed.); *see United States v. Myers*, 635 F.2d 932, 936 (2d Cir. 1980) (similar). Meanwhile, *McDade* addressed only appellate jurisdiction under "the collateral order doctrine," 28 F.3d at 289, not pendent appellate jurisdiction, so it cannot conflict with *Menendez*.

**2.** Jurisdiction is also proper under the collateral order doctrine because the First Amendment and separation-of-powers concerns underlying Congresswoman McIver's motion are "effectively unreviewable on appeal from a final judgment." *Sell v. United States*, 539 U.S. 166, 176 (2003). The Congresswoman's claim does not assert "a defense to liability"; it asserts "a right that would be irretrievably lost absent an immediate appeal." *Geo Grp., Inc. v. Menocal*, 146 S. Ct. 774, 781-83 (2026). The Supreme Court has "often" permitted interlocutory appeals to determine "the proper scope of First Amendment protections." *Fort Wayne Books v. Indiana*, 489 U.S. 46, 55 (1989). The government tries to narrow this doctrine, but it offers no substantive response explaining how the "act of going to trial" could avoid "a chilling effect on protected expression" in this case. *United States v. P.H.E., Inc.*, 965 F.2d 848, 856 (10th Cir. 1992).

**3.** Congresswoman McIver did not fail to adequately address jurisdiction in her principal brief. The Court ordered the parties to "address jurisdiction in their briefs" under "Fed. R. App. P. 28(a) & 28(b)." Dkt.17. Congresswoman McIver provided a jurisdictional statement under Rule 28(a) consistent with that direction, and also cross-referenced her more extensive arguments made in her opposition to the government's dismissal motion. DB1. Congresswoman McIver anticipated responding to any new jurisdictional arguments in her reply brief, which she has now done.

## CONCLUSION

The Court should reverse.

Date: May 21, 2026                    Respectfully submitted,

Samuel F. Callahan                    Paul J. Fishman
Orion de Nevers                       Lee M. Cortes, Jr.
ARNOLD & PORTER                       John M. Fietkiewicz
KAYE SCHOLER LLP                      ARNOLD & PORTER
601 Massachusetts Ave. N.W.           KAYE SCHOLER LLP
Washington, D.C. 20001                One Gateway Center, Ste. 1025
                                      Newark, NJ  07102
Amanda J. Raines                      Tel: (973) 776-1901
ARNOLD & PORTER                       paul.fishman@arnoldporter.com
KAYE SCHOLER LLP
250 West 55th Street                  *Counsel for Defendant-Appellant*
New York, NY 10019                    *LaMonica McIver*

## CERTIFICATE OF BAR MEMBERSHIP

I certify that I am a member of the Bar of this Court.

Dated: May 21, 2026

Paul J. Fishman

## CERTIFICATE OF SERVICE

I certify that on May 21, 2026, I electronically filed this brief and accompanying materials with the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: May 21, 2026

Paul J. Fishman

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7) because it contains 6,488 words.

2.      The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 in Century Expanded BT 14-point font.

3.      In accordance with Third Circuit Local Appellate Rule 31.1(c), the text of Appellant's Reply Brief, as electronically filed on May 21, 2026, is identical to the text of the Brief to be submitted in paper copy.

4.      In accordance with Third Circuit Local Appellate Rule 31.1(c), Appellant's Reply Brief, as electronically filed on May 21, 2026, was scanned with a virus detection program, namely Microsoft Defender (Version 1.399.35.0), and no virus was detected.

Dated: May 21, 2026

_____
Paul J. Fishman