Nos. 25-3573, 26-1122

# In the United States Court of Appeals for the Third Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

*v.*

LAMONICA MCIVER,
*Defendant-Appellant*.

On Appeal from the United States District Court
for the District of New Jersey
No. 25-cr-0388-JKS (Hon. Jamel K. Semper)

## PETITION FOR REHEARING EN BANC

Samuel F. Callahan
Orion de Nevers
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Ave. N.W.
Washington, D.C. 20001

Amanda J. Raines
ARNOLD & PORTER
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019

Paul J. Fishman
Lee M. Cortes, Jr.
John M. Fietkiewicz
ARNOLD & PORTER
KAYE SCHOLER LLP
One Gateway Center, Ste. 1025
Newark, NJ 07102

*Counsel for Defendant-Appellant LaMonica McIver*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

INTRODUCTION AND RULE 40(b)(2) STATEMENT ........ 1

STATEMENT ........ 3

A. Factual Background ........ 3

B. Procedural Background ........ 6

REASONS FOR GRANTING REHEARING ........ 7

I. The *Menendez* Test Contradicts Supreme Court Precedent and Entrenches a Lopsided Circuit Split ........ 7

A. The Supreme Court and Every Other Circuit Apply a Consistent Approach ........ 7

B. This Court's Approach Conflicts With the Supreme Court's and Every Other Circuit's ........ 11

II. The Panel's Jurisdictional Holding Imperils the Separation of Powers ........ 18

CONCLUSION ........ 21

CERTIFICATE OF BAR MEMBERSHIP ........ 22

CERTIFICATE OF SERVICE ........ 23

CERTIFICATE OF COMPLIANCE ........ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bogan v. Scott-Harris*,
523 U.S. 44 (1998) ... 2, 9, 14, 15

*Eastland v. U.S. Servicemen's Fund*,
421 U.S. 491 (1975) ... 2, 7, 8, 9, 12

*Gov't of V.I. v. Lee*,
775 F.2d 514 (3d Cir. 1985) ... 11

*In re Grand Jury Subpoenas*,
571 F.3d 1200 (D.C. Cir. 2009) ... 14

*Gravel v. United States*,
408 U.S. 606 (1972) ... 9, 12

*McSurely v. McClellan*,
553 F.2d 1277 (D.C. Cir. 1976) (en banc) ... 11

*McSurely v. McClellan*,
753 F.2d 88 (D.C. Cir. 1985) ... 10, 11

*Stewart v. Ramczyk*,
578 P.3d 1100 (N.M. 2025) ... 11

*Supreme Ct. of Va. v. Consumers Union of U.S., Inc.*,
446 U.S. 719 (1980) ... 16

*Tenney v. Brandhove*,
341 U.S. 367 (1951) ... 8, 18

*United States v. Biaggi*,
853 F.2d 89 (2d Cir. 1988) ... 10, 11

*United States v. Dowdy*,
479 F.2d 213 (4th Cir. 1973) ... 1, 9, 10, 11

*United States v. Helstoski*,
442 U.S. 477 (1979)....................7

*United States v. Hollywood Motor Car Co.*,
458 U.S. 263 (1982)....................19, 20

*United States v. McDade*,
28 F.3d 283 (3d Cir. 1994)....................16

*United States v. Menendez*,
831 F.3d 155 (3d Cir. 2016)....................1, 6, 11, 12, 13, 15, 16, 17, 18

*United States v. Myers*,
635 F.2d 932 (2d Cir. 1980)....................18, 20

*United States v. Renzi*,
651 F.3d 1012 (9th Cir. 2011)....................10

**Statutes**

18 U.S.C. § 111(a)....................5

FCAA, Pub. L. No. 118-47, div. C, tit. V, § 527,
138 Stat. 460 (2024)....................3

## RULE 35.1 STATEMENT

I believe, based on a reasoned and studied professional judgment, that the panel decision is contrary to decisions of the United States Court of Appeals for the Third Circuit or the Supreme Court of the United States, and that consideration by the full court is necessary to secure and maintain uniformity of decisions in this court. In this instance, the panel's decision is contrary to this Court's decision in *United States v. McDade*, 28 F.3d 283 (3d Cir. 1994), and the decisions of the Supreme Court in *Bogan v. Scott-Harris*, 523 U.S. 44 (1998), *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491 (1975), and *Gravel v. United States*, 408 U.S. 606 (1972). I also believe that this appeal involves questions of exceptional importance—that is, whether Congresswoman McIver is immune from prosecution under the Speech or Debate Clause for events that transpired while she was undertaking a legislative oversight investigation, and whether this Court has jurisdiction to hear an interlocutory appeal from a Member of Congress who is raising a claim of selective and vindictive prosecution.

Dated: October 9, 2026

/s/ *Lee M. Cortes, Jr.*
Lee M. Cortes, Jr.

## INTRODUCTION AND RULE 40(b)(2) STATEMENT

On May 9, 2025, Congresswoman LaMonica McIver conducted an oversight investigation of an immigration detention facility in her District. After DHS took unlawful measures to interfere with that statutorily authorized oversight, the Justice Department brought assault charges based on incidental physical contact that occurred during the visit. The panel permitted that prosecution to continue because this Court's unique precedents require an approach to the Speech or Debate Clause that severs legislative context from the charged conduct. The result underscores how dramatically this Court's legislative immunity doctrine has strayed from Supreme Court precedent, the jurisprudence of three other circuits, and the principles underlying the Speech or Debate Clause.

In those other circuits, the panel would have evaluated Congresswoman McIver's conduct in "context," and granted immunity if it was plausibly legislative. *United States v. Dowdy*, 479 F.2d 213, 223, 226 (4th Cir. 1973). But this Circuit has "expressly rejected" that view, instead applying a unique two-step test. *United States v. Menendez*, 831 F.3d 155, 167 (3d Cir. 2016). Step One asks whether the "discrete" "actus reus" charged is "clearly legislative or non-legislative"—regardless of the broader setting. Op.15, 19, 23. If the

legislative character is ambiguous, Step Two scrutinizes "the content, purpose, and motive of the act to assess its legislative or non-legislative character." Op.15.

Each step is fundamentally flawed. Step One contradicts Supreme Court precedent by excluding "legislative context[]" and invites the Executive Branch to circumvent immunity by describing alleged conduct in the barebones, inherently nonlegislative terms of a criminal statute. *See Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 510 (1975). Compounding the problem, Step Two squarely contradicts the Supreme Court's instruction that a legislator's "motive or intent" cannot be questioned, even to determine whether their "acts were legislative." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998). The result: by the time the inquiry is complete, the Clause's protection has already been forfeited.

The panel also broke with other circuits by declining jurisdiction over Congresswoman McIver's selective and vindictive prosecution motion because her right to be free from a politically motivated prosecution could "be vindicated after trial." Op.11-12. But a prosecution that intentionally punishes legislative conduct or viewpoint inflicts constitutional injury through the proceeding itself. Dissent.15. The majority's rule permits the Executive to

accomplish its retaliation before appellate review, an especially troubling result here given "the analytical flaws in the District Court's" decision. Dissent.16.

This is an "extraordinary case." Dissent.14. The en banc Court should grant rehearing to accord legislators in this Circuit the independence they would enjoy elsewhere, and to guarantee "the independence of our legislative bodies." Dissent.2.

## STATEMENT

### A. Factual Background

Congresswoman LaMonica McIver represents New Jersey's Tenth District and serves on the House Committee on Homeland Security. Op.2. On May 9, 2025, she and two other Representatives visited Delaney Hall, an immigration detention facility in her District, for an unannounced oversight inspection. Op.2. Federal law expressly authorizes Members to conduct such investigations, and forbids DHS from interfering. FCAA § 527, 138 Stat. 460, 619 (2024). Congresswoman McIver's visit was undisputedly protected legislative oversight. Op.2, 16.

DHS nevertheless obstructed the investigation at every turn. Officials made the Members wait in the facility's administrative office for over an hour, a delay the district court called "inexplicable." Dissent.17. In the meantime,

facility personnel invited Newark Mayor Ras Baraka and his security detail into the facility through a security gate. Op.2-3. Nevertheless, the DHS Special Agent in Charge soon claimed the Mayor was trespassing and ordered him to leave. Op.3.

Moments after Mayor Baraka complied, the Agent announced that the Deputy Attorney General had ordered the Mayor's arrest. Op.3. Armed federal agents then charged through the security gate into a throng of peaceful protestors to execute that order. Op.3. The Members followed. Op.3. Predictably, this irresponsible deployment produced chaos, which included physical contact between the agents and the Members. Within the span of 68 seconds, those agents arrested the Mayor, and the Members returned inside the facility to complete their inspection.

The indictment excises those 68 seconds from the Members' two-and-a-half-hour investigation. Count One alleges that, as officers arrested the Mayor, Congresswoman McIver "slammed her forearm into the body of V-1" and "reached out and tried to restrain V-1 by forcibly grabbing him." Op.3-4. Count Two alleges that, seconds later, she "pushed past V-2 while using each of her forearms to forcibly strike V-2 as she returned inside of the secured area." Op.4. Count Three broadly charges the Congresswoman with "forcibly

assaulting, resisting, opposing, impeding, intimidating, and interfering with" unidentified federal officers. Op.4-5, 22-23. All three counts rely on 18 U.S.C. § 111(a).

These charges bear all the trappings of political retaliation. The government has "not identified a single other case" under § 111(a) based on "comparably minimal physical contact," and former federal prosecutors described this prosecution as a "disturbing departure" from Justice Department norms. Dissent.17-18; ECF 32 at 2. DHS "inexplicabl[y]" delayed the inspection; other Democratic officials investigating DHS were forcefully detained the same month; and DHS soon adopted restrictions on congressional access to detention facilities that a court later deemed unlawful. Dissent.17. Meanwhile, DHS repeatedly issued press releases falsely exaggerating the events and blaming them on Congresswoman McIver's politics. Dissent.17.

This backdrop makes the constitutional implications of this prosecution especially significant: this is the first Speech or Debate Clause case in which the alleged crime arose out of Executive Branch interference with a Member's exercise of her constitutional and statutory responsibilities.

### B. Procedural Background

Congresswoman McIver moved to dismiss based on the Speech or Debate Clause, litigating the motion under *Menendez* but preserving her challenge to its test. Dist.Ct.Dkt.19-1 at 19-20; Appellant's Br. 24 n.12. She separately moved to dismiss, or alternatively for discovery, because the government is selectively and vindictively prosecuting her based on her political affiliation and oversight.

The district court denied both motions. Applying *Menendez*, the court classified the charged conduct as "ambiguously legislative" and determined that its "predominant purpose" was nonlegislative. Op.5. The court separately rejected the selective and vindictive prosecution claims and denied discovery. Op.5-6.

A divided panel affirmed in part and vacated in part. On Count One, the panel held that "impeding" an arrest "through physical contact" is unambiguously "non-legislative." Op.16. On Count Two, the majority held that "pushing past and forcibly striking someone [is] unambiguously non-legislative." Op.19. On Count Three, the panel unanimously vacated because the charge did "not assert a specific actus reus." Op.23 & n.4. The majority

also declined to exercise jurisdiction over Congresswoman McIver's selective and vindictive prosecution, or "targeting," claims. Op.11.

Judge Ambro partially dissented. He agreed on Counts One and Three, but concluded that the physical contact charged in Count Two was ambiguously legislative because it was "inextricably connected" with Congresswoman McIver's return inside the facility. Dissent.9. He would have remanded for the district court to determine whether Congresswoman McIver contacted V-2 "gratuitously, intending to inflict harm," or "merely" incidentally while attempting to reenter the facility. Dissent.3, 13. He would also have reviewed the district court's "flawed reasoning" on Congresswoman McIver's targeting claims, and remanded for discovery into this "extraordinary" and "unusual prosecution." Dissent.13-18.

## REASONS FOR GRANTING REHEARING

### I. The *Menendez* Test Contradicts Supreme Court Precedent and Entrenches a Lopsided Circuit Split

#### A. The Supreme Court and Every Other Circuit Apply a Consistent Approach

1. The Supreme Court construes "the Speech or Debate Clause broadly," *Eastland*, 421 U.S. at 501, "to protect the integrity of the legislative process by insuring the independence of individual legislators," *United States v. Helstoski*, 442 U.S. 477, 491-93 (1979). The Clause therefore confers

"absolute" immunity on conduct that "fall[s] within the 'sphere of legitimate legislative activity.'" *Eastland*, 421 U.S. at 501.

In contrast to the panel's approach, the Supreme Court analyzes whether conduct takes place in the legislative sphere by assessing its context—not the indictment's isolated characterizations. The reason is clear: the Clause immunizes conduct that "would in itself be unconstitutional or otherwise contrary to criminal or civil statutes" when "performed in other than legislative contexts." *Eastland*, 421 U.S. at 510. In other words, conduct prosecutable outside the legislative sphere is not prosecutable within it. *Id.* The different treatment turns on the legislative setting, not the prosecution's narrow framing of "the actus reus" in the indictment. Op.23 n.4.

The Supreme Court has been equally emphatic that the immunity inquiry must be objective: it is "not consonant with our scheme of government for a court to inquire into the motives of legislators." *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951). Under Supreme Court precedent—unlike this Court's—whether conduct is protected turns on an objective inquiry into whether it could have been legislative, "rather than on the motive or intent of the official performing it": a legislator's "subjective intent" may not be

considered even "in resolving the logically prior question of whether their acts were legislative." *Bogan*, 523 U.S. at 54; *cf. Eastland*, 421 U.S. at 508-09.

*Gravel* illustrates these principles. Senator Gravel was immune for his disclosure of classified material at a Senate subcommittee hearing, regardless of his motives for convening that hearing last-minute in the dead of night. *Gravel v. United States*, 408 U.S. 606, 616 (1972). What would otherwise have been a serious criminal offense was off limits for prosecution because of the legislative setting; indeed, the Senator enjoyed no protection for arranging the same disclosure to a private publisher. *Id.* at 615-16, 624-26. Given those circumstances, the government could not have evaded the Clause's shield by labeling Senator Gravel's activity an illegal disclosure and pledging to strip its legislative context at trial.

2. The other circuits that have addressed the issue follow the Supreme Court's approach: considering the challenged conduct in context rather than based on the indictment's charging language; analyzing the activity objectively without regard to motive; and applying a deferential test that accords the Clause its necessarily "broad construction." *Eastland*, 421 U.S. at 510-11. The leading case, which the other circuits have uniformly followed, is *Dowdy*.

The other circuits evaluate challenged conduct based on its actual legislative context rather than letting the government define it. In *Dowdy*, the indictment alleged "the fact of the" Congressman's meetings with Executive Branch officials as overt acts in a bribery scheme, which could have been read as merely "charging that the defendant improperly attempted to influence the executive branch." 479 F.2d at 223. But it omitted that the meetings "were, at least arguably, the performance of defendant's legislative functions." *Id.* The court deemed it "necessary to go beyond the indictment to obtain the full meaning" of the allegations in "context," otherwise, "the validity of an indictment would depend solely on what the prosecutor elected to allege." *Id.* Because the meetings "might be interpreted as preparation for a subcommittee hearing," further inquiry was forbidden. *Id.* That is the prevailing approach. *McSurely v. McClellan*, 753 F.2d 88, 106 (D.C. Cir. 1985); *United States v. Biaggi*, 853 F.2d 89, 102-03 (2d Cir. 1988); *United States v. Renzi*, 651 F.3d 1012, 1028 (9th Cir. 2011) (collecting cases).

The other circuits similarly consider the Member's subjective motives off-limits. Take *Dowdy* again. It concluded that once a legislative function is "apparently being performed," both "the propriety and the motivation for the action taken" are immune from inquiry. *Dowdy*, 479 F.2d at 226. The Clause

"forbids" scrutinizing "apparently" legislative actions "*even to determine if they are legislative in fact*." *Id.* at 226 (emphasis added). The consensus is unanimous on this score too; indeed, in applying legislative immunity "[a]ll federal circuit courts have ruled similarly." *Stewart v. Ramczyk*, 578 P.3d 1100, 1106-07 & n.3 (N.M. 2025) (collecting cases); *see Biaggi*, 853 F.2d at 102-03; *McSurely v. McClellan*, 553 F.2d 1277, 1295-96 (D.C. Cir. 1976) (en banc).

These principles produce an appropriately accommodating test. The other circuits grant immunity when the charged conduct appears "arguably," "apparently," "purportedly," or "plausibly" legislative. *Dowdy*, 479 F.2d at 226; *Biaggi*, 853 F.2d at 103; *McSurely*, 553 F.2d at 1295-96; *McSurely*, 753 F.2d at 106. That approach provides legislators "elbowroom to pursue legislative activity" while preserving judicial authority over genuinely nonlegislative conduct. *McSurely*, 553 F.2d at 1295.

### B. This Court's Approach Conflicts With the Supreme Court's and Every Other Circuit's

Although the other circuits take a uniform approach, this Court has "expressly rejected" it. *Menendez*, 831 F.3d at 167; *see Gov't of V.I. v. Lee*, 775 F.2d 514, 524 (3d Cir. 1985). The result is a framework that is flatly contrary to Supreme Court precedent and fundamentally flawed on its own terms.

1. Step One asks whether the legislative character of the charged conduct is clear. The majority explained that this inquiry turns on "the government's decision to frame its indictment in [particular] terms," and considers only "the specific and limited conduct charged," *i.e.*, "the actus reus charged in each count." Op.17-18, 23 n.4. That narrow approach runs headlong into the rule that immunity turns on "legislative context[]." *Eastland*, 421 U.S. at 510. Even worse, by permitting the prosecution to exclude context from the inquiry, it allows the Executive Branch to unilaterally define the scope of the analysis.

The problem is obvious: criminal statutes inevitably describe their actus reus in inherently nonlegislative terms, and the government has independent discretion to define the charged conduct. So *Menendez* places the legislative branch at the mercy of the Executive, which can easily circumvent the Clause by isolating the actus reus of the charged crime from all surrounding context. That approach would have denied immunity to Senator Gravel if an indictment merely characterized his conduct as leaking classified information—surely an unambiguously nonlegislative act. *Gravel*, 408 U.S. at 615-16. Handing that level of control to prosecutors cannot be squared with the Clause's goal to "foreclose executive control of legislative" conduct. *Id.* at 620.

The majority's response to a hypothetical underscores the point. Congresswoman McIver explained that, under *Menendez*, an Executive Branch official could "restrain" a disfavored legislator delivering a floor speech, provoke a physical response, and the government could charge that legislator for "forcibly striking" the official. Op.22. Per the majority's rationale, the actus reus would be unambiguously nonlegislative and divest the legislator of immunity. The majority agreed that result would be "concerning," but dismissed the scenario without explaining how its rule could possibly avoid it. Op.22.

Beyond that inappropriate deference to charging language, Step One is also unworkable. The majority held the conduct alleged in Count Two unambiguously nonlegislative; the dissent deemed it ambiguously legislative and needing additional factfinding; the district court found it ambiguously legislative but lacking a predominantly legislative purpose. When four different judges reach three different results analyzing the purportedly "unambiguous" nature of the same conduct in the same case, the test for classifying that conduct is inadministrable.

That uncertainty is also irreconcilable with the Clause's prophylactic purpose. Legislative immunity "must be clear and predictable for the privilege

to serve its purpose." *In re Grand Jury Subpoenas*, 571 F.3d 1200, 1206 (D.C. Cir. 2009) (Kavanaugh, J., concurring). The Clause "would be virtually worthless if courts judging its applicability had to scrutinize very closely the acts ostensibly shielded, especially if" the "criteria of applicability are fuzzy or multifactored." *Id.* Yet Members engaged in legislative activity—such as field oversight of resistant Executive Branch officials—must now fear scrutiny by prosecutors who can slap a criminal label on acts taken during constitutionally and statutorily authorized legislative conduct.

Finally, Step One improperly construes uncertainty about whether conduct is legislative against the legislator. Where other circuits grant immunity when challenged conduct is plausibly legislative, this Court requires legislators to prove that their conduct was clearly legislative to avoid scrutiny of their legislative purposes. That burden is upside-down. The Clause prohibits scrutinizing a legislator's "motive or intent," *Bogan*, 523 U.S. at 54, and therefore requires immunizing arguably legislative conduct so that legislative motives are never questioned. When conduct is obviously non-legislative, the inquiry can proceed without jeopardizing legislative independence. But when conduct is reasonably characterized as legislative, the inquiry must end to guarantee the Clause's protection.

2. Step Two contradicts Supreme Court precedent even more explicitly. If the court deems the legislative character of the charged conduct ambiguous, *Menendez* directs it to "consider [] content, purpose, and motive." 831 F.3d at 166, 169. But the Supreme Court has unanimously rejected that approach: "subjective intent" may not be questioned even "in resolving the logically prior question of whether [the officials'] acts were legislative." *Bogan*, 523 U.S. at 54. Even the United States has distanced itself from *Menendez*'s "second step." Tr.39:7-12, ECF 61.

Step Two thus requires an inquiry that is itself prohibited. The Clause forbids questioning legislative motives, yet Step Two requires Members to submit their legislative motives to judicial scrutiny to show that such scrutiny was impermissible to begin with. If the Member loses, the prosecution proceeds because the court has rejected her account of her legislative purpose. If she prevails, the victory comes only after she has been forced to disclose and defend that purpose. Either way, the Executive Branch has obtained the inquiry the Clause forecloses, and accomplished the intimidation the Clause was intended to prevent.

*Bogan*'s approach to common-law immunity shows that these principles apply here with particular force. *Contra* Dissent.11-13 n.1. The Speech or

Debate Clause affords federal legislators a "broader privilege" than common-law immunity. *Supreme Court of Virginia v. Consumers Union of United States, Inc.*, 446 U.S. 719, 732-33 (1980). If scrutinizing motive is prohibited under the narrower immunity, it must be forbidden under the broader one. That approach does not narrow the Clause's protection; instead, it explains why in debatable contexts courts must grant immunity to plausibly legislative conduct and end the inquiry rather than trampling the Clause's protections by forging on.

3. Beyond highlighting the problems bedeviling *Menendez*, the majority created an intra-circuit conflict by nullifying a critical aspect of this Court's decision in *United States v. McDade*, 28 F.3d 283 (3d Cir. 1994). *McDade* addressed the Clause's evidentiary privilege, and distinguished a Member who "*chooses* to offer rebuttal evidence of legislative acts" (unprotected) from one who is "*forced* to refute charges that directly implicate legitimate legislative acts" (protected). *Id.* at 294-95 & n.14 (emphasis added).

The panel held that the compelled-defense protection was irrelevant here because the "conduct charged" was "unambiguously non-legislative." Op.18. That is backwards. The compelled-defense protection applies *only* when the indictment charges nonlegislative conduct; if the prosecution had

charged legislative action, it would already be barred outright. If *Menendez*'s indictment-oriented approach is permitted to stand, the compelled-defense privilege would become an especially necessary backstop to prevent the government's consistently charging its way around the Clause. Rehearing is warranted either way.

4. *Menendez*'s flawed approach was outcome determinative, and has continuing implications in this case because the panel unanimously remanded Count Three for further inquiry. The district court already found the charged conduct "ambiguously legislative," a finding that would have ended the inquiry in the other circuits. Op.5. Under the appropriate test, that result is even clearer.

As the panel acknowledged, Congresswoman McIver's "investigative" conduct "was legislative" whether it "took place inside Delaney Hall or directly outside of it." Op.16. Count One charges conduct that was part of that ongoing investigation, when the Members followed the agents undertaking a baseless arrest of the Mayor and further impairing the oversight inspection. Op.3. Count Two charges Congresswoman McIver for making "incidental" contact with agents "as she returned inside" the secured area "to further her legislative duties." Op.19-21; Dissent.7-10. Count Three extends to conduct

inside the security gate, but the panel could not resolve it because it did "not assert a specific actus reus." Op.23. Each count reaches plausibly legislative conduct. Indeed, Congresswoman McIver's conduct should have been immunized under any test, warranting rehearing whether the Court adheres to *Menendez* or not.

Ultimately, as 20 bipartisan former Members have explained, permitting this prosecution for minimal contact with agents who were obstructing an authorized oversight investigation will cast a dangerous chill over Congress's oversight authority, undercutting the touchstone of the Clause. ECF 36. The Court should grant rehearing to relieve legislators in Delaware, New Jersey, and Pennsylvania of this "deterrent[] to the uninhibited discharge of their legislative duty." *Tenney*, 341 U.S. at 377.

## II. The Panel's Jurisdictional Holding Imperils the Separation of Powers

Rehearing is independently warranted to ensure that the Executive Branch may not target a disfavored Member of Congress for prosecution free from appellate review. Departing from the Second Circuit, the majority held that a Member of Congress's right not to be placed on trial for her political beliefs "can be vindicated after trial." Op.11; *see United States v. Myers*, 635 F.2d 932, 935 (2d Cir. 1980). Judge Ambro dissented, recognizing that a

legislator cannot vindicate her freedom from political prosecutions post-trial, and that the majority's opinion "leave[s] uncorrected the analytical flaws in the District Court's denial of discovery" in this "extraordinary" case. Dissent.16.

The majority held Congresswoman McIver's targeting claims unappealable based on a rote application of *United States v. Hollywood Motor Car Co.*, 458 U.S. 263 (1982). *Hollywood Motor Car* concluded that "prosecutorial vindictiveness" claims are not immediately appealable when the government adds charges after a defendant asserts a procedural right, because such violations can "normally" be remedied post-trial by dismissing the additional charges. 458 U.S. at 267-70. That treatment of the exercise of ordinary procedural rights served "the policy against piecemeal appeals in criminal cases"; it did not displace the rule that interlocutory appeals are available where the "practical value" of a right "would be destroyed" pre-trial. *Id.* at 266, 270.

Completing this prosecution undoubtedly would sap the value of Congresswoman McIver's rights. A prosecution instituted to punish a legislator for conducting oversight accomplishes its retaliatory purpose through the proceeding itself, regardless whether that Member is acquitted

or a conviction later vacated. Dissent.15; *Myers*, 635 F.2d at 936. By final judgment, the prosecution will have diverted the Member from her official responsibilities, imposed extraordinary political costs, deterred further oversight by her and other legislators, and impaired her constituents' representation. Dissent.15; *Myers*, 635 F.2d at 936. Unlike the addition of charges in *Hollywood Motor Car*, none of these injuries can be cured by dismissal or retrial: the constitutional harm is not the prospect of conviction alone, but the legislative interference that the prosecution imposes.

That straightforward conclusion is consistent with the policy against piecemeal appeals on which *Hollywood Motor Car* relied. There is no risk that the "extremely small class" of prosecutions involving Members of Congress will generate an onslaught of new piecemeal appeals, and many such prosecutions—like this one—will independently produce an interlocutory Speech or Debate Clause appeal anyway. *Myers*, 635 F.2d at 936.

But declining jurisdiction would impose significant risks. The government acknowledged at oral argument that under the majority's rule, the Executive Branch may initiate a prosecution solely to place a disfavored legislator under "financial" and "personal pressure," and "in the Court of Appeals there is no way" to stop such a prosecution. Tr.45:8-46:10. This case

illustrates the stakes: the district court's analysis was beset with "analytical flaws" and "untenable" reasoning, yet the majority cleared the path to trial while leaving those errors in place. Dissent.16-23. Meanwhile, the government has already failed to preserve relevant discovery; so Congresswoman McIver may never be able to obtain the evidence needed to prove her claims absent intervention. Dist.Ct.Dkt.57 at 8-11. The majority's refusal to cure these problems will inflict "[r]eal harm" on Congresswoman McIver and the "independence of our legislative bodies." Dissent.2, 16.

## CONCLUSION

The Court should grant rehearing en banc.

Date: October 9, 2026

Respectfully submitted,

/s/ *Lee M. Cortes, Jr.*

Paul J. Fishman
Lee M. Cortes, Jr.
John M. Fietkiewicz
ARNOLD & PORTER
KAYE SCHOLER LLP
One Gateway Center, Ste. 1025
Newark, NJ 07102
Tel: (973) 776-1901
paul.fishman@arnoldporter.com

*Counsel for Defendant-Appellant LaMonica McIver*

Samuel F. Callahan
Orion de Nevers
ARNOLD & PORTER
KAYE SCHOLER LLP
601 Massachusetts Ave. N.W.
Washington, D.C. 20001

Amanda J. Raines
ARNOLD & PORTER
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019

## CERTIFICATE OF BAR MEMBERSHIP

I certify that I am a member of the Bar of this Court.

Dated: October 9, 2026

/s/ *Lee M. Cortes, Jr.*
Lee M. Cortes, Jr.

## CERTIFICATE OF SERVICE

I certify that on October 9, 2026, I electronically filed this petition and accompanying materials with the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: October 9, 2026

/s/ *Lee M. Cortes, Jr.*
Lee M. Cortes, Jr.

## CERTIFICATE OF COMPLIANCE

1. This petition complies with the type-volume limitations of Fed. R. App. P. 40(d)(3)(A) because it contains 3,896 words.

2. The petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this petition has been prepared in a proportionally spaced typeface using Microsoft Office 365 in Century Expanded BT 14-point font.

3. In accordance with Third Circuit Local Appellate Rule 31.1(c), the text of Appellant's Petition for Rehearing, as electronically filed on October 9, 2026, is identical to the text of the Petition to be submitted in paper copy.

4. In accordance with Third Circuit Local Appellate Rule 31.1(c), Appellant's Petition for Rehearing, as electronically filed on October 9, 2026, was scanned with a virus detection program, namely Microsoft Defender (Version 1.399.35.0), and no virus was detected.

Dated: October 9, 2026

/s/ *Lee M. Cortes, Jr.*
Lee M. Cortes, Jr.

# ADDENDUM

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

Nos. 25-3573 & 26-1122

UNITED STATES OF AMERICA

v.

LAMONICA MCIVER
Appellant

---

On Appeal from the U.S. District Court, D.N.J.
Judge Jamel K. Semper, No. 2:25-cr-00388-001

Before: BIBAS, CHUNG, and AMBRO, *Circuit Judges*
Argued: June 24, 2026; Filed: Aug. 26, 2026

---

OPINION OF THE COURT

CHUNG, *Circuit Judge*. Congresswoman LaMonica McIver faces criminal charges for conduct that occurred during her oversight visit to Delaney Hall, a federal immigration detention facility. She moved to dismiss the Indictment on the grounds that the Speech or Debate Clause and the constitutional principle of separation of powers immunize her from this prosecution, and because the Government is selectively and vindictively prosecuting her in violation of her First and Fifth Amendment rights. The District Court denied the motions, and Congresswoman McIver appeals. We will affirm as to Counts

One and Two of the Indictment because prosecution of those charges will not require Congresswoman McIver to answer for any legislative acts, and we will vacate and remand for the District Court to further consider Congresswoman McIver's motion as to Count Three. We will dismiss the remainder of Congresswoman McIver's appeal for lack of jurisdiction.

## I. FACTS & PROCEDURAL HISTORY

Congresswoman McIver represents New Jersey's 10th Congressional District in the United States House of Representatives and serves on the Committee on Homeland Security.[1] On May 9, 2025, Congresswoman McIver and two other Representatives conducted an unannounced congressional oversight inspection of Delaney Hall Federal Immigration Facility, pursuant to statutory authority. **A6;** *See* Federal Consolidated Appropriations Act ("FCAA"), Pub. L. No. 118-47, div. C, tit. V § 527(a), 138 Stat. 360, 619 (2024). Delaney Hall is located in Newark and operated by the United States Immigration and Customs Enforcement ("ICE"), under the authority of the Department of Homeland Security ("DHS"). Upon arrival, Congresswoman McIver and the other Representatives entered through the security gate into the secured exterior area of the facility. They proceeded inside Delaney Hall and waited for over an hour in the facility's administrative office. During that time, Newark Mayor Ras

---

[1] We draw these facts from the Indictment, from evidence in the record, and as set forth by the District Court in its opinions. We accept as true the facts alleged in the Indictment for purposes of considering a motion to dismiss. *See United States v. Menendez*, 831 F.3d 155, 159 (3d Cir. 2016). Neither party challenges the facts as set forth by the District Court.

Baraka and his security detail arrived at Delaney Hall and they were allowed through the security gate into the secure exterior premises of the facility. Meanwhile, dozens of protestors and media members had amassed outside the security gate.

The Homeland Security Investigations ("HSI") Special Agent in Charge in New Jersey (referred to in the Indictment and by the District Court as "Victim-1" or "V-1") approached the Mayor inside the security gate and advised him that he was not allowed on the premises, ordered him to leave, and told him he would be arrested if he did not comply. At that time, Congresswoman McIver and the two other Representatives left the administrative office and walked toward the security gate, where the Mayor was speaking with Victim-1. Victim-1 directed the Mayor and his security detail outside of the Security Gate to the unsecured area outside the facility, and Congresswoman McIver and the two Representatives began to walk back towards the administrative office.

Moments later, Victim-1 informed a group of federal agents that the United States Deputy Attorney General had authorized the Mayor's arrest, and the agents exited the secured premises and approached the Mayor and his security detail. Upon observing this, the Congressional delegation also proceeded into the unsecured area. An unidentified member of the crowd yelled, "circle the Mayor," and some protesters, as well as Congresswoman McIver and the two Representatives, encircled the Mayor as Victim-1 and the other agents pushed their way through the crowd to apprehend him. A75; Def. Ex. I, 0:46-0:50. Video surveillance shows Congresswoman McIver placing herself between the Mayor and Victim-1. The Indictment states that Congresswoman McIver then "slammed her forearm into the body of V-1" and "reached out and tried

to restrain V-1 by forcibly grabbing him." A75.

Victim-1 then handcuffed the Mayor and led him toward the security gate through a dense group of protesters. In the meantime, Congresswoman McIver and one of the Representatives also moved towards Delaney Hall to reenter the secured area. The Indictment then describes Congresswoman McIver as "push[ing] past" an ICE Deportation Officer (referred to in the Indictment and by the District Court as "Victim-2" or "V-2") while "using each of her forearms to forcibly strike V-2." A77. Congresswoman McIver was able to reenter the secured area shortly thereafter, and she and the other two Representatives then entered the facility and conducted their oversight inspection.

The Government charged Congresswoman McIver in a federal indictment with three counts of violating 18 U.S.C. § 111(a). Each count incorporated the first 12 prefatory paragraphs of the Indictment as background and charged that Congresswoman McIver "did forcibly assault, resist, oppose, impede, intimidate, and interfere" with a federal official or officials while the official(s) were "engaged in and on account of the performance of their official duties." A78; *see* A73–78. The actus reus alleged in Count One was that Congresswoman McIver "slammed her forearm" into V-1 and tried to restrain him by "forcibly grabbing him." A75–76. The actus reus alleged in Count Two was that Congresswoman McIver "pushed past V-2 while using each of her forearms to forcibly strike V-2 as she returned inside of the secured area of Delaney Hall." A77. Count Three did not allege a separate actus reus committed by Congresswoman McIver against a specific victim; rather, Count Three relied upon the prefatory paragraphs and charged Congresswoman McIver with forcibly

assaulting, resisting, opposing, impeding, intimidating, and interfering with "HSI Special Agents and ICE Deportation Officers while said Special Agents and Officers were engaged in and on account of the performance of their official duties." A78. At Oral Argument, the Government stated that the charged conduct in Count Three encompassed "essentially all" of Congresswoman McIver's "efforts to hinder, impede the arrest of the Mayor," including those efforts that "started even inside the gate." Tr. Oral Arg. 43:5–9.

Congresswoman McIver moved to dismiss the Indictment, arguing that it violated the Speech or Debate Clause and the constitutional principle of separation of powers, and that it constituted selective enforcement and selective and vindictive prosecution in violation of the First and Fifth Amendments. The District Court denied the motions.

As to Congresswoman McIver's Speech or Debate Clause challenge, it held that the charged conduct was "ambiguously legislative" under the two-step framework we established in *United States v. Menendez*, 831 F.3d 155 (3d Cir. 2016), and, after analyzing "the content, purpose, and motive" of the charged acts "to assess [their] legislative or non-legislative character," *id*. at 166, it determined that Congresswoman McIver's "predominant purpose," *id.* at 173, in engaging in the conduct charged in each count of the Indictment was non-legislative, *see* A22; A55. It thus concluded that the Speech or Debate Clause did not cover Congresswoman McIver's conduct, and she was not entitled to legislative immunity from the Government's prosecution.

With respect to Congresswoman McIver's separation of powers argument, the District Court concluded that

Congresswoman McIver's case and the case on which Congresswoman McIver relied, *Trump v. United States*, 603 U.S. 593 (2024), involved "two separate immunities applicable to two separate branches of government, scrutinized under two separate legal standards." A25. Accordingly, it declined to dismiss the Indictment under Congresswoman McIver's separation of powers theory.

Last, the District Court held that Congresswoman McIver's selective prosecution and enforcement claims failed because Congresswoman McIver had not demonstrated a discriminatory effect. As to Congresswoman McIver's vindictive prosecution claim, the District Court denied her motion because she "ha[d] not demonstrated that her prosecution [was] a result of personal animus harbored by the prosecution," A40, nor had she shown that the presumption of vindictiveness should attach, *id.* at 41–42.[2] The District Court also denied Congresswoman McIver's requests for discovery on her selective prosecution and enforcement and vindictive prosecution claims.

Congresswoman McIver appealed.

## II. JURISDICTION

The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291 and the

---

[2] We refer to McIver's claims that her prosecution is a product of selective and vindictive prosecution and enforcement collectively as the "Targeting claims," and to the denial of the related motion to dismiss and for discovery as the "Targeting denial."

collateral order doctrine to review the District Court's order denying Congresswoman McIver's claims of immunity pursuant to the Speech or Debate Clause and separation of powers. *See Helstoski v. Meanor*, 442 U.S. 500, 506–07 (1979); *United States v. McDade*, 28 F.3d 283, 288 (3d Cir. 1994).

Congresswoman McIver argues that we have jurisdiction to review the Targeting denial either under the collateral order doctrine or through our exercise of pendent appellate jurisdiction. We disagree. Neither the collateral order doctrine nor pendent appellate jurisdiction provides a basis for review at this stage.

### A. The Collateral Order Doctrine Does Not Apply to the Targeting Denial.

The collateral order doctrine establishes that "a district court order entered prior to final judgment is immediately appealable if it (1) conclusively determines the disputed question, (2) resolves an important issue completely separate from the merits of the case, and (3) is effectively unreviewable on appeal from a final judgment." *McDade*, 28 F.3d at 288; *see Helstoski v. Meanor*, 442 U.S. at 506–07 (holding that a district court's dismissal of a Speech or Debate Clause claim constitutes a final decision for purposes of establishing appellate jurisdiction under 18 U.S.C. § 1291). Although the Targeting denial satisfies the first two requirements of that test, the underlying Targeting claims "fail[] the third part of the test … that the claim 'be effectively unreviewable on appeal from a final judgment.'" *United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 267 (1982) (per curiam) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978)).

“[T]he Court has interpreted the requirements of the collateral-order exception to the final judgment rule with the utmost strictness in criminal cases.” *Flanagan v. United States*, 465 U.S. 259, 265 (1984). In the criminal context, the Supreme Court has stated that the collateral order doctrine applies only when the defendant has asserted a right “the legal and practical value of which would be destroyed if it were not vindicated before trial.” *Id.* at 266 (citing *Hollywood Motor Car*, 458 U.S. at 266). Generally, that has involved a defendant’s right not to be tried, not a right to dismissal. *See Hollywood Motor Car*, 458 U.S. at 269. In *Hollywood Motor Car*, the Court held that the collateral order doctrine did not apply to the denial of a motion to dismiss an indictment based on prosecutorial vindictiveness. Recognizing a “crucial distinction between a right not to be tried and a right whose remedy requires the dismissal of charges,” the Court held that the right at issue could be adequately vindicated on appeal from a conviction—it was “not one that must be upheld prior to trial if it is to be enjoyed at all.” *Id.* at 269, 270. Since then, at least two other circuits have observed that the collateral order doctrine does not apply to selective prosecution claims. *See, e.g.*, *United States v. Butterworth*, 693 F.2d 99, 101 (9th Cir. 1982) (dismissing interlocutory appeal for lack of jurisdiction when “[t]he right defendants assert is merely the right to have the charges against them dismissed if they demonstrate that the government impermissibly targeted them for prosecution because they exercised their First Amendment rights”); *Jarkesy v. S.E.C.*, 803 F.3d 9, 26 (D.C. Cir. 2015) (“Th[e] general rule against interlocutory appeals encompasses selective-prosecution claims[.]”).

We agree and hold that the conclusion in *Hollywood Motor Car* applies to selective enforcement and prosecution claims. Like vindictive prosecution claims, these claims do not implicate a right not to be tried, but instead involve only a right to have charges dismissed if the court determines they were brought for an impermissible reason. *See Hollywood Motor Car*, 458 U.S. at 269; *Butterworth*, 693 F.2d at 101; *United States v. Armstrong,* 517 U.S. 456, 463 (1996) (a selective prosecution claim is an "assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution"). We thus do not have jurisdiction to review the Targeting denial.

Congresswoman McIver attempts to distinguish *Hollywood Motor Car* by arguing that the appellant there sought to secure a procedural right, not a First Amendment right. In contrast, she argues, the Targeting claims would be effectively unreviewable after trial because "the prosecution *itself* imposes the relevant constitutional harm—chilling protected expression, association, and oversight." Brief for Appellant in Opposition to Partial Motion to Dismiss Appeal at 16–17, *United States v. McIver*, No. 25-3563, Dkt. No. 15 (hereinafter "Opposition to Partial Motion to Dismiss").

Congresswoman McIver's emphasis on First Amendment harm has little impact on our analysis. First, the Supreme Court has recognized "only a narrow group of claims" to be unreviewable after judgment, *Hollywood Motor Car*, 458 U.S. at 270, only one of which—the right not to be tried—could possibly be at issue here, *see Flanagan*, 465 U.S. at 266; *see also Stack v. Boyle,* 342 U.S. 1 (1951) (bail); *Sell v. United States*, 539 U.S. 166 (2003) (involuntary medication). Constitutional harm itself does not establish a right not to be

tried; rather, that right must "rest[] upon an explicit statutory or constitutional guarantee that trial will not occur." *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 801 (1989); *see also United States v. Tucker*, 745 F.3d 1054, 1063 (10th Cir. 2014) ("[A] criminal defendant invoking the collateral order exception must assert a 'right not to be tried,' … resting upon 'an explicit statutory or constitutional guarantee that trial will not occur.'" (first quoting *United States v. Quaintance*, 523 F.3d 1144, 1146 (10th Cir. 2008), then quoting *Midland*, 489 U.S. at 801)); *United States v. Joseph*, 26 F.4th 528, 533 (1st Cir. 2022) ("[A] right not to be tried must be explicitly rooted in a statute or the Constitution."). The First Amendment does not explicitly confer a right not to be tried, nor does Congresswoman McIver cite any statute providing a right not to be tried.

Second, while we have recognized that the chilling effect of government action on protected speech may present an "irreparable harm" that allows for injunctive relief in the civil context, *see, e.g.*, *Anderson v. Davila*, 125 F.3d 148, 164 (3d Cir. 1997), we have not recognized that a criminal prosecution's chilling effect on speech renders a defendant's First Amendment claim "effectively unreviewable" after trial and therefore subject to interlocutory appeal. Although Congresswoman McIver's argument has "superficial plausibility," if it is adopted, "the policy against piecemeal appeals in criminal cases would be swallowed by ever-multiplying exceptions," *Hollywood Motor Car*, 458 U.S. at 270, as any defendant asserting a First Amendment right as a basis for dismissal could claim entitlement to immediate appellate review, *see also United States v. Hsia*, 176 F.3d 517, 526 (D.C. Cir. 1999) ("[A]ny rule allowing immediate appeals for defendants advancing some First Amendment reason why

an indictment should be dismissed would expose a vast array of criminal trials to interruption.").[3] In sum, the constitutional character of the asserted burden imposed by the Government's prosecution does not provide a basis to distinguish *Hollywood Motor Car.* Congresswoman McIver's First Amendment rights can be vindicated after trial, and we do not have collateral order jurisdiction over the Targeting denial.

Congresswoman McIver also contends that the Targeting denial is immediately appealable due to the separation of powers concerns raised, arguing that her prosecution "was a retaliatory effort against her protected legislative oversight." Opposition to Partial Motion to Dismiss at 14. Insofar as Congresswoman McIver argues that the constitutional separation of powers principle confers immunity and therefore a right not to be tried, we address that argument below. To the extent Congresswoman McIver seeks immediate review premised on the prosecution's chilling effect on her congressional oversight activities as a separation of powers

---

[3] McIver cites *United States v. P.H.E., Inc.*, 965 F.2d 848 (10th Cir. 1992), as support for interlocutory appeal here. In *P.H.E.*, the panel concluded the collateral order doctrine allowed it to review the denial of defendants' motion to dismiss on the grounds that the prosecution was "motivated by a bad faith desire to chill the exercise of First Amendment rights." *P.H.E.*, 965 F.2d at 854. Even in the Tenth Circuit, *P.H.E.*'s vitality is questionable given that the Tenth Circuit has repeatedly distinguished *P.H.E. See, e.g., United States v. Ambort*, 193 F.3d 1169, 1171–72 (10th Cir. 1999); *United States v. Wampler*, 624 F.3d 1330, 1340 (10th Cir. 2010). In any case, we decline to apply *P.H.E.* here.

interest not addressed by the First Amendment, that asserted chilling harm can be vindicated after trial for the same reasons set forth above. While Congresswoman McIver addresses the chilling effect on legislative activity as different in kind than a chilling of speech in general, only the legislature has the power to create jurisdiction to address this different, narrower concern. *See, e.g.*, 18 U.S.C. § 3731 (allowing government interlocutory appeal of certain district court orders in criminal cases); 18 U.S.C. APP. 3 § 7 (allowing interlocutory appeal by government of decisions involving classified information in criminal cases). We may only exercise jurisdiction where the Constitution or a statute provides it. *Cf. Midland Asphalt Corp.*, 489 U.S. at 801. Until such a statutory basis exists, we have no jurisdiction to immediately review the separation of powers arguments raised by the Targeting claims, as we are bound by the collateral order doctrine and final judgment rule.

**B. Pendent Appellate Jurisdiction Does Not Provide a Basis to Review the Targeting Claims.**

Congresswoman McIver argues in the alternative that we may exercise pendent appellate jurisdiction to review the Targeting denial. The Government counters that pendent appellate jurisdiction is unavailable in criminal matters. Resp. Br. at 28 (citing *Abney v. United States*, 431 U.S. 651, 663 (1977)). Even assuming that the criminal nature of this action does not foreclose the exercise of pendent appellant jurisdiction, however, Congresswoman McIver's argument for that jurisdiction still fails.

"[P]endent appellate jurisdiction is restricted to two circumstances: (1) inextricably intertwined orders or (2) review of a non-appealable order where it is necessary to

ensure meaningful review of an appealable order." *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 130 (3d Cir. 2018) (citation modified). "Issues are 'inextricably intertwined' only when the appealable issue 'cannot be resolved without reference to the otherwise unappealable issue.'" *Id.* (quoting *Invista S.Á.R.L. v. Rhodia, S.A.*, 625 F.3d 75, 88 (3d Cir. 2010)). Review of Congresswoman McIver's selective and vindictive prosecution claims is not necessary to the resolution or meaningful review of her immunity claims, so pendent appellate jurisdiction is unavailable.

## III. STANDARD OF REVIEW

When reviewing the denial of a motion to dismiss an indictment, "[w]e review the District Court's legal conclusions *de novo* and its factual determinations, including its findings about the contents and purposes of the acts alleged in the Indictment, for clear error." *Menendez*, 831 F.3d at 164. Although "review at this stage of a prosecution is ordinarily limited to the allegations in the Indictment," the Court "can consider extrinsic evidence to determine whether the Speech or Debate Clause applies." *Id.*

## IV. ANALYSIS

### A. The Speech or Debate Clause Does Not Protect Congresswoman McIver from Prosecution at Counts One and Two.

#### 1. The Speech or Debate Clause

The Speech or Debate Clause provides that "for any Speech or Debate in either House," Members of Congress "shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1.

The "central role" of the Speech or Debate Clause is "to prevent intimidation of legislators by the Executive and accountability before a possibly hostile judiciary." *Gravel v. United States,* 408 U.S. 606, 617 (1972) (citing *United States v. Johnson*, 383 U.S. 169, 181 (1966)). The Clause's protection extends beyond literal speech and debate on the floor to protect any "legislative activity" performed by a member of Congress. *Menendez*, 831 F.3d at 165 (citing *Gravel*, 408 U.S. at 625); *see also Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975) (explaining that the Speech or Debate clause immunizes actions falling "within the sphere of legitimate legislative activity"). The Clause also prohibits the Government from introducing "evidence of a legislative act" in a prosecution. *See United States v. Helstoski*, 442 U.S. 477, 487 (1979); *United States v. Brewster*, 408 U.S. 501, 512 (1972) ("[A] Member of Congress may be prosecuted under a criminal statute provided that the Government's case does not rely on legislative acts or the motivation for legislative acts.").

"Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998); *see also Brewster*, 408 U.S. at 525 ("It is beyond doubt that the Speech or Debate Clause protects against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts."); *Johnson*, 383 U.S. at 184–85 ("a prosecution under a general criminal statute dependent on such inquiries"—namely, the defendant Congress member's "motives underlying the making of the speech and upon its contents"—"necessarily contravenes the Speech or Debate Clause"). The key inquiry is whether the act is "'an integral part of the deliberative and communicative processes by which

Members participate in committee and House proceedings.'" *Eastland*, 421 U.S. at 504 (quoting *Gravel*, 408 U.S. at 625).

The Speech or Debate Clause does not provide a blanket protection over "all things in any way related to the legislative process." *Brewster*, 408 U.S. at 516. It does not extend to "political matters," for example, nor does it cover activities like "'errands' performed for constituents [and] the making of appointments with Government agencies." *Id.* at 512. "[I]llegitimate activities such as accepting bribes in exchange for taking official action" also fall outside the scope of the Clause's protection, "[e]ven if these non-legislative acts involve policy or relate to protected legislative activity." *Menendez*, 831 F.3d at 166. On the other hand, "investigative activities by lawmakers are protected by legislative immunity," *Gov't of V.I. v. Lee*, 775 F.2d 514, 521 (3d Cir. 1985), because "legislative fact-finding" and the "power to investigate" are "integral part[s] of the legislative process," *id.* (citing *Eastland*, 421 U.S. at 504–05).

The first step of our Speech or Debate Clause analysis involves "look[ing] to the form of the act to determine whether it is inherently legislative or non-legislative." *Menendez*, 831 F.3d at 166. For acts that are clearly legislative or non-legislative, "no inquiry into their content or underlying motivation or purpose is needed to classify them." *Id*. For "ambiguously legislative" acts, or those that are "neither manifestly legislative nor clearly non-legislative, … we proceed to the second step of the Speech or Debate analysis," where "we consider the content, purpose, and motive of the act to assess its legislative or non-legislative character." *Id.*

2. <u>Count One</u>

Count One charges Congresswoman McIver with impeding, through physical contact, Victim-1's arrest of the Mayor. In evaluating Congresswoman McIver's legislative immunity claim, the District Court determined that Congresswoman McIver's inspection of Delaney Hall constituted legislative fact-finding, a legislative activity. *See Lee*, 775 F.2d at 517. The District Court concluded, however, that Congresswoman McIver's "alleged intervention into the Mayor's questionable arrest had no cognizable connection to any legislative function protected by the Speech or Debate Clause." A19. The District Court supported this conclusion by noting that the charged conduct "took place during a brief time frame before the oversight inspection began, not on the facility's premises but in the parking lot outside the Security Gate." A19–20.

We agree with the District Court's conclusion, though we make an important clarification. To the extent the District Court based its decision on whether Congresswoman McIver was physically within the immigration facility's property or directly outside of it, we note that her location is not dispositive. Instead, to determine whether her conduct was legislative, we focus "on the nature of the act." *Bogan*, 523 U.S. at 54. Any conduct Congresswoman McIver took that was investigative in nature was legislative, whether that conduct took place inside Delaney Hall or directly outside of it.

Still, the nature of the conduct charged in Count One is non-legislative. Congresswoman McIver's physical contact with Victim-1 was not "integral" to the "deliberative and communicative processes by which Members participate in committee and House proceedings," *Gravel*, 408 U.S. at 625—

namely, to her inspection of Delaney Hall. This conclusion would hold regardless of whether Congresswoman McIver had physical contact with Victim-1 inside Delaney Hall or outside of it, just as the Speech or Debate Clause protects Congresswoman McIver's legitimate legislative fact-finding, whether such fact-finding occurs on or off the facility's property. *See Eastland*, 421 U.S. at 504–05; *Lee*, 775 F.2d at 517.

Relying on *Lee*, Congresswoman McIver argues that her contact with Victim-1 was legislative because it was part of her visit to Delaney Hall, which we must consider "as a whole." *Lee*, 775 F.2d at 524–25. We made clear in *Lee*, however, that "[t]he inquiry into the [purportedly legislative] trip as a whole is a function of the government's decision to frame its indictment in those terms." *Id.* at 525 n.12. In contrast, Count One charges Congresswoman McIver not for conduct relating to her entire visit to Delaney Hall, but for conduct during a specific interaction between her and Victim-1. A75–76. Accordingly, we disagree that *Lee* calls for evaluating Congresswoman McIver's trip to Delaney Hall "as a whole" in determining whether Count One charges Congresswoman McIver for engaging in conduct that was legislative in nature.

Congresswoman McIver next argues that dismissal is warranted because the Government would need to prove a legislative act "to make out [its] prima facie case" against her. *Brewster*, 408 U.S. at 525. She contends that the Government's prosecution "would *necessarily* involve evidence of [her] … reasons for being at Delaney Hall." Opening Br. 4–5. That argument is unavailing. Count One charges that Congresswoman McIver interfered with Victim-1's arrest of the Mayor through physical contact. "[N]othing

in [that Count] requires the Government to prove any legislative acts at trial." *United States v. James*, 888 F.3d 42, 49 (3d Cir. 2018). To the extent Congresswoman McIver's membership on the Committee on Homeland Security arises at trial, we have explained that "proof of legislative status, including status as a member or ranking member of a committee, is not prohibited by the Speech or Debate Clause." *McDade*, 28 F.3d at 289. Moreover, Congresswoman McIver may file motions in limine to exclude evidence of any legislative action, and if the government presents any excluded evidence, Congresswoman McIver may move for any remedies that may be appropriate. *See, e.g.*, *United States v. Liburd*, 607 F.3d 339, 343 (3d Cir. 2010) (reversing conviction and remanding "because the government breached an unambiguous promise not to use 'any' statement [the defendant] made," impacting the fairness of trial); *United States v. Morena*, 547 F.3d 191, 194–97 (3d Cir. 2008) (reversing conviction and remanding when prosecutor repeatedly offered unduly prejudicial evidence of prior bad acts).

Congresswoman McIver also argues that, in defending the charges, she will be forced to discuss her motives for engaging in the charged conduct, thus triggering legislative immunity. She contends that when a prosecution *necessitates* that a defendant offer evidence of legislative acts and motive in defending herself against the charges, the prosecution violates the Speech and Debate Clause. Tr. Oral Arg. 29:10–15 (citing *McDade*, 28 F.3d at 295 n.14). We need not address that question here, because we have concluded that the specific and limited conduct charged in Count One is unambiguously non-legislative. Therefore, even if Congresswoman McIver chooses to offer evidence addressing why she engaged in the

offense conduct, such evidence will not implicate her motive in taking a *legislative* action. And, if Congresswoman McIver chooses to offer evidence that *does* discuss her purpose in taking legislative action, the Clause is still not implicated, because it "protects a member of Congress from being 'questioned,' and a member is not 'questioned' when he or she chooses to offer rebuttal evidence of legislative acts." *McDade*, 28 F.3d at 294.

In sum, Count One neither charges Congresswoman McIver for an act that is legislative in nature nor requires that she answer for any legislative act. Accordingly, we will affirm.

3. Count Two

Count Two incorporates prefatory paragraphs 1 through 12 of the Indictment and alleges that Congresswoman McIver "pushed past" and "us[ed] each of her forearms to forcibly strike V-2 as she returned inside of the secured area of Delaney Hall." A77. Like the acts charged in Count One, the acts of pushing past and forcibly striking someone are unambiguously non-legislative: they are not integral to the legislative process. Congresswoman McIver again contends that we should evaluate the nature of her entire visit to Delaney Hall, not just the nature of the discrete act charged, in determining whether Count Two charges her for engaging in legislative conduct. She reiterates her other arguments as well. These arguments all fail for the same reasons as above.

Congresswoman McIver also asserts that the government violated Section 527 of the appropriations statute for DHS by interfering with her legislative oversight, triggering legislative immunity and requiring dismissal of Count Two.

Section 527(a), she contends, "confers a specific right on Members of Congress to enter DHS facilities 'without delay' to conduct oversight." Opening Br. 42 (citing FCCA § 527). Whether government actors' conduct violated Section 527 is a wholly different question than whether Congresswoman McIver's charged conduct is legislative and protected by the Clause. Not every separation of powers concern implicates a Speech or Debate Clause remedy. *See, e.g.*, *Neguse v. U.S. Immigr. & Customs Enf't*, 822 F. Supp. 3d 86, 117 (D.D.C. 2026) (granting members' motion to stay DHS policy that likely violated Section 527).

Congresswoman McIver further asserts that, per Section 527, the act of entering a DHS facility "for the purpose of conducting oversight" is legislative in nature. Opening Br. 42 (quoting FCCA § 527). Section 527 states in relevant part that "[n]one of the funds appropriated or otherwise made available to the Department of Homeland Security by this Act may be used to prevent any [member of Congress] from *entering*, for the purpose of conducting oversight, any [detention] facility operated by or for the Department of Homeland Security." FCAA § 527(a) (emphasis added). Count Two does not charge Congresswoman McIver for entering Delaney Hall, however; it charges her for pushing past Victim-2 and using her forearms to forcibly strike him—conduct distinct from, though occurring during the process of, "return[ing] inside of the secured area of Delaney Hall." A77. We have considered the "nature" of the charged conduct and concluded it is unambiguously non-legislative. *See Bogan*, 523 U.S. at 54.

Our dissenting colleague takes a different view. Even if Count Two does charge Congresswoman McIver for the act of entering the facility, though, we would again consider the

"nature" of that act. *Id*. Section 527 certainly supports the conclusion that Congresswoman McIver undertook the act of entering Delaney Hall to further her legislative duties. But the Clause does not immunize "all things in any way related to the legislative process." *Brewster*, 408 U.S. at 516. Our inquiry focuses on whether entering is "an integral part" of Congresswoman McIver's oversight activities. *Eastland*, 421 U.S. at 504 (quoting *Gravel*, 408 U.S. at 625).

In addressing this question, our reasoning in *McDade* is instructive. *McDade*, 28 F.3d at 298. There, we noted that Article I, Section 6 of the Constitution provides qualified protection to legislators during travel to and from Congress by providing them "freedom from civil arrest" during transit. *id.* at 299 (discussing U.S. Const. Art. I, § 6, cl. 1). We further noted that travel, "although a necessary precondition for the performance of [legislative] acts, is not an integral part of Congress's deliberative and communicative processes." *Id.* (citing *Gravel*, 408 U.S. at 625). Thus, we concluded that "travel by a member of Congress to or from a location where the member performs legislative acts is not itself protected by the Speech or Debate Clause." *Id.* at 298.

Here, nothing in the record indicates that Congresswoman McIver's entry into the secured area of the facility was an act of inspection, rather than simply a "necessary precondition" to her oversight. *Id.* at 299. Whether McIver's legislative and non-legislative actions are "intertwined," as our dissenting colleague contends, might be a closer call if, for example, Congresswoman McIver asserted that she was observing Victim-2's conduct as part of her inspection and contacted Victim-2 incidentally upon re-entry into the facility as she leaned forward to read his nametag. Given what she does

contend, though, the nature of her conduct in entering the secured area is analogous to the travel we discussed in *McDade*, and not subject to the Clause's protections. Section 527's reference to "entering" a detention facility does not change our analysis. FCAA § 527. Section 527 sets forth limitations on spending and does not prescribe content for legislative duties. Its text therefore cannot transform the act of entering Delaney Hall from a "precondition" to an "integral part" of Congresswoman McIver's inspection that day.

Finally, Congresswoman McIver offers a hypothetical to demonstrate why we should adopt her position. She argues that without the protection of legislative immunity for acts like those charged in the Indictment, individuals could "aggressively restrain" a Congress member from giving a speech while on the floor, provoke a physical response from that member in an effort to finish her speech, and then the Executive could prosecute her without the Speech or Debate Clause providing any safeguard. Reply Br. 6 (citation modified). This hypothetical is concerning, but it presents a heavily fact-bound scenario that is not before us. We are limited to the facts of Count Two, which charges conduct that is "clearly non-legislative." *Menendez*, 831 F.3d at 166.

The acts alleged in Count Two fall outside the "sphere of legitimate legislative activity," so we will affirm. *Eastland*, 421 U.S. at 501 (quoting *Doe v. McMillan*, 412 U.S. 306, 312 (1973)).

4. Count Three

Count Three also incorporates the first 12 paragraphs of the Indictment, which describe conduct both inside and outside the

security gate that allegedly prevented the Mayor's arrest. It charges Congresswoman McIver with forcibly assaulting, resisting, opposing, impeding, intimidating, and interfering with "HSI Special Agents and ICE Deportation Officers while said Special Agents and Officers were engaged in and on account of the performance of their official duties." A78. Count Three differs from the other two counts, however, in that it does not assert a specific actus reus. Instead, Count Three charges Congresswoman McIver for engaging in a range of conduct covering a broad timeframe and involving numerous unidentified victims. Indeed, the Government stated at oral argument that Count Three was intended to charge "essentially all" of Congresswoman McIver's "efforts to hinder … the arrest of the Mayor," including those efforts that "started even inside the gate." Tr. Oral. Arg. 43:5–9.

The District Court did not consider these factual differences when it analyzed Counts One and Three. Rather, it grouped Counts One and Three together and focused on the narrower timeframe when Congresswoman McIver was outside the security gate. Based on the description at oral argument, though, Count Three implicates a larger range of conduct and, at a minimum, paragraphs 10-12 of the Indictment.[4] Because the District Court did not separately assess the nature of the conduct charged at Count Three, we will remand for the District Court to consider whether the charged conduct includes legislative acts and, if so, whether Count Three can stand when eliminating such protected conduct.

---

[4] Our analysis of Counts One and Two is limited to the actus reus charged in each count and, like the District Court, does not address the conduct alleged in the prefatory paragraphs.

**B. Dismissal Is Not Warranted under the Separation of Powers Principle.**

Congresswoman McIver also argues that the Indictment violates the principle of separation of powers embodied in the Constitution. She urges us to extend the Court's reasoning in *Trump v. United States*, relying on its statement that "the President is absolutely immune from criminal prosecution for conduct within his exclusive sphere of constitutional authority," and that he has "presumptive immunity from criminal prosecution for … acts within the outer perimeter of his official responsibility." Opening Br. 45 (quoting *Trump*, 603 U.S. at 609, 614). Congresswoman McIver argues that this reasoning should "appl[y] with equal, if not greater, force to legislators," as "legislators, unlike the President, face ongoing threats of prosecution *during* their term in office." Opening Br. 46.

The Court's reasoning in *Trump* was specific to the unique role of the President and the absence of a constitutional provision explicitly addressing Presidential immunity. The Court clarified that, "[l]ike everyone else, the President is subject to prosecution in his unofficial capacity, … [b]ut unlike anyone else, the President is a branch of government, and the Constitution vests in him sweeping powers and duties." *Trump*, 603 U.S. at 639–40. Because criminal prosecution of the President poses the specific danger of chilling presidential action, *id.* at 613–15, the Court explained it has "long recognized" the separation of powers doctrine "as mandating certain Presidential privileges and immunities, even though the Constitution contains no explicit provision for [Presidential] immunity," *id.* at 638 (internal quotations marks omitted). In

contrast, the Constitution *does* contain an explicit provision protecting against the danger of chilling legislative action, namely the Speech or Debate Clause. *Trump* does not support extending further protection to legislators in light of this explicit provision.

Congresswoman McIver's separation of powers argument fails for another reason: it overlooks the limitations on immunity the Court affirmed in *Trump* itself. The Court stated that "[t]he President enjoys no immunity for his unofficial acts, and not everything the President does is official." *Id.* at 642; *see also Clinton v. Jones*, 520 U.S. 681, 695 (1997) ("Petitioner's effort to construct an immunity from suit for unofficial acts grounded purely in the identity of his office is unsupported by precedent."). Likewise, the Speech or Debate Clause immunizes legislative acts only. Expanding legislative immunity to cover a broader scope of conduct would exceed even the Presidential immunity recognized in *Trump.* There is nothing in that case, nor any of the other separation of powers cases upon which Congresswoman McIver relies, to support the conclusion that the separation of powers principle calls for such additional protection to members of Congress. *See Supreme Ct. of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 731–33 (1980); *Nixon v. Fitzgerald*, 457 U.S. 731 (1982). We decline to adopt Congresswoman McIver's reasoning and hold that the constitutional principle of separation of powers does not afford legislative immunity beyond the protection of the Speech or Debate Clause.

* * * * *

For these reasons, we will AFFIRM the District Court's denial of legislative immunity for Counts One and Two, VACATE IN PART and REMAND to the District Court for further

proceedings as to legislative immunity for Count Three, and DISMISS the appeal in part for lack of jurisdiction of the District Court's order denying dismissal and rejecting the selective and enforcement prosecution and vindictive prosecution claims.

*Counsel for Appellant*

Samuel Callahan
Lee M. Cortes, Jr.
John M. Fietkiewicz
Paul J. Fishman [ARGUED]
Amanda J. Raines
Orion de Nevers
Arnold & Porter Kaye Scholer

*Counsel for Appellee*

Mark E. Coyne [ARGUED]
Office of United States Attorney

AMBRO, *Circuit Judge*, concurring in part and dissenting in part.

Members of Congress are not above the law. That is why I join my colleagues in holding that the separation-of-powers principles the Supreme Court articulated in *Trump v. United States* do not extend so far as to protect presumptively even those acts "within the outer perimeter" of Congresswoman McIver's official responsibilities. 603 U.S. 593, 614 (2024).

Members of the Executive Branch are bound by law too. And the Constitution does not permit the Executive to wield its considerable discretion over criminal prosecutions in retaliation against disfavored legislators. Congresswoman McIver invokes two protections following from that principle.

The first is immunity under the Speech or Debate Clause. This privilege exists not to shield Members of Congress from criminal liability. Rather, it prevents "a criminal action . . . instituted by the Executive Branch" from "imperil[ling]" legislative independence by questioning a Member's motivation when exercising her core legislative duties. *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503 (1975). The duty Congresswoman McIver sought to perform when she visited Delaney Hall on May 9, 2025 strikes at the heart of the Clause's purpose: to oversee the Executive Branch. I agree with my colleagues that Count One—"slamm[ing] her forearm" into Victim-1 ("V-1") and "forcibly grabbing him," App. 75, in an effort to stop the arrest of Mayor Baraka—does not implicate that protected activity. And I agree that a remand is necessary to sort out whether Count Three does so. But I part with the majority's treatment of Count Two. I would vacate the District Court's denial of Congresswoman McIver's motion to dismiss that Count and remand for factual findings

critical to determining whether legislative immunity attaches to the act the Count targets.

The second protection is freedom from fear that the Executive will use criminal prosecution to punish legislators for their oversight and political opposition. My colleagues believe vindication of this right is beyond our jurisdiction. I disagree. And where, as here, a legislator has presented evidence that her prosecution was brought as an act of political retaliation, I would allow her discovery into the truth of the matter—not only for her own sake but to safeguard the independence of our legislative bodies.

## I. We should vacate the District Court's denial of Congresswoman McIver's motion to dismiss Count Two on legislative privilege grounds and remand for additional factual findings.

Count Two charges that Congresswoman McIver "pushed past" Victim-2 ("V-2") and "us[ed] each of her forearms to forcibly strike [him] as she returned inside of the secured area of Delaney Hall." App. 77. After lifting that characterization of her conduct from the allegations in the indictment, my colleagues conclude that the acts defined in those terms are unambiguously non-legislative. They reach that result without grappling with the extrinsic evidence that Congresswoman McIver's contact with V-2 was incidental to re-entering Delaney Hall to inspect the facility, an act of legislative fact-finding covered by the Speech or Debate Clause and authorized by federal law. Their result is incompatible with our Court's ruling in *United States v. Menendez,* 831 F.3d 155 (3d Cir. 2016). When a Member claims legislative privilege by proffering an "ambiguously legislative" act, as the Congresswoman does here, courts must

consider the "content, motive, and purpose" of the act to determine whether immunity attaches. *Id*. at 166.

Because I believe the context surrounding the contact between Congresswoman McIver and V-2 demands closer scrutiny than the majority's analysis affords, I part from its treatment of Count Two. I believe the District Court determined correctly that her acts were ambiguously legislative under *Menendez*. It was thus correct to zoom in and consider the content, purpose, and motive of her activities. But the Court conducted that analysis by focusing on *V-2's* motives rather than *the Congresswoman's* intent in making contact with him. As a result, I would vacate its denial of her motion to dismiss Count Two and remand for additional fact-finding to determine whether she shoved him gratuitously, intending to inflict harm, or merely made incidental contact with V-2 in an effort to re-enter the facility that federal law authorizes her to inspect.

### I.A. The Speech or Debate Clause covers activity essential to legislating.

The Speech or Debate Clause states that "Senators and Representatives shall . . . be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. The text of the Clause is "deceptively simple." *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 415 (D.C. Cir. 1995). Far from applying only to words spoken in a debate, it confers immunity to Members of Congress for any conduct "within the 'sphere of legitimate legislative activity.'" *Gravel v. United States*, 408 U.S. 606, 624 (1972) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)).

Some acts entitled to immunity will be easy to identify because they are "so clearly legislative in nature that no further examination has to be made to determine their appropriate status." *Government of Virgin Islands v. Lee*, 775 F.2d 514, 522 (3d Cir. 1985). We call these "manifestly legislative acts." *Id*. Examples include "introducing and voting on proposed resolutions and legislation, introducing evidence and interrogating witnesses during committee hearings, subpoenaing records for committee hearings, [and] inserting material into the Congressional Record." *Menendez*, 831 F.3d at 166. Courts can identify a manifestly legislative act simply by "look[ing] to the form of the act." *Id*. If its form has the requisite trappings of Congressional procedure, then the immunity analysis effectively ends there. I agree with my colleagues that none of Congresswoman McIver's charged conduct fits this category. So the immunity analysis must go further.

"On the other side of the spectrum," there is another category of easy cases: acts "so clearly non-legislative that no inquiry into their content or underlying motivation or purpose is needed to classify them." *Id*. Acts with little to no link to the legislative process fit here. "Taking a bribe," for example, is "obviously" non-legislative because "[i]t is not, by any conceivable interpretation, an act performed as a part of or even incidental to the role of a legislator." *United States v. Brewster*, 408 U.S. 501, 526 (1972). And even some acts "peripherally related" to a Member's office will fall into this category. *Id*. at 520. Many acts legislators perform routinely, such as constituent services, are not entitled to legislative immunity because, though they are "entirely legitimate activities, they are political in nature rather than legislative." *Id*. at 512.

The hard cases are the ones that do not fall into either category—those acts that (A) lack the trappings of Congressional procedure, but (B) are closely connected to the functioning of the legislative process. We call these "ambiguously legislative" acts. *Menendez*, 831 F.3d at 166. The category derives from the Supreme Court's teaching that legislative immunity "reach[es]" all activities "integral" to the "deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625. In a shorter formulation of the same rule, *Gravel* explained that courts should generally "extend[] the privilege to matters beyond pure speech or debate in either House[] . . . 'when necessary to prevent indirect impairment of such deliberations.'" *Id*. (quoting *United States v. Doe*, 455 F.2d 753, 760 (1st Cir. 1972)). These formulations drive at the same point: that immunity attaches to activities "essential" to the legislative process, where denial of the privilege would "threaten the integrity or independence" of the legislature. *See id*.

### I.B. Count Two charges ambiguously legislative activity.

Applying those standards, I believe that Count Two charges ambiguously legislative activity. We held in *Lee* that "fact-finding, information gathering, and investigative activities are essential prerequisites to the drafting of bills and the enlightened debate over proposed legislation." 775 F.2d at 521. Accordingly, the Speech or Debate Clause does not tolerate an attempt by the Executive Branch to try or punish a Member for an act "involv[ing] legislative fact-finding." *Id*. at

522. The extrinsic evidence in this case raises alarm bells that is happening here.

Congresswoman McIver introduced evidence establishing that she went to Delaney Hall on May 9 to investigate reports of abusive conditions there. Congress has oversight responsibility over the Department of Homeland Security ("DHS"), the agency that operates the facility. In order to fulfill that role and consider meaningfully legislation aimed at curbing abusive conditions, Members of Congress need the means to discover whether and to what extent those conditions exist. *See Eastland*, 421 U.S. at 504 ("[T]he power to investigate is inherent in the power to make laws because a legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change." (cleaned up)).

The Supreme Court in *Eastland* explained that the "[i]ssuance of subpoenas . . . has long been held to be a legitimate use by Congress of its power to investigate," and accordingly held that legislative immunity covers that act. *Id.* at 504—05. Subpoena power is not the only investigative tool covered by the privilege, however. Legislative immunity extends to acts taken in the course of "field investigations" because "[t]he acquisition of knowledge through informal sources is a necessary concomitant of legislative conduct and thus should be within the ambit of the privilege so that [legislators] are able to discharge their constitutional duties properly." *McSurely v. McClellan*, 553 F.2d 1277, 1286—87 (D.C. Cir. 1976); *see also Lee*, 775 F.2d at 522 (holding that a legislator's "conversations" and "meetings" with officials qualify for immunity whenever they "involve[] legislative fact-finding").

Congress supplied its Members with a hands-on investigative tool in the context of overseeing DHS's operation of immigration detention facilities: authorization to conduct unannounced, in-person inspections. *See* Further Consolidated Appropriations Act, Pub. L. No. 118—47, div. C, tit. V § 527(a), 138 Stat. 360, 619 (2024) ("Section 527"). The provision prohibits DHS from using any funds "to prevent" a Member of Congress "from entering, for the purpose of conducting oversight, any facility operated by or for [DHS] used to detain or otherwise house aliens." *Id*. And it also prohibits using funds "to make any temporary modification at any such facility that in any way alters what is observed by a visiting Member of Congress . . . compared to what would be observed in the absence of such modification." *Id*.

From the moment Congresswoman McIver arrived at Delaney Hall, she had reason to fear that DHS was violating Section 527 and thus depriving her of the ability to conduct fact-finding in the manner Congress contemplated. Instead of letting her in immediately to inspect the conditions at the facility, the guards directed her to an administrative office. She had already been waiting there for over an hour before Mayor Baraka arrived at the facility gate, a scuffle ensued, and she went outside to aid the Mayor. In that context, video evidence shows Congresswoman McIver making plausibly incidental contact with V-2 as she tried to return to the secure area. *See* Def. Ex. CC, 00:50. The indictment on its face concedes as much, alleging that she "pushed past V-2 . . . *as she returned* inside of the secured area of Delaney Hall." App. 77 (emphasis added). And video evidence shows that V-2 was standing at the threshold of the facility, physically obstructing Congresswoman McIver's ability to return to the secure area in the moment she "pushed past" him. *Id*. The act Congresswoman McIver proffers—circumventing an

Executive Branch official who stands at the threshold of a facility that federal law authorizes Members to enter for fact-finding purposes—is an ambiguously legislative act because it is integral to exercising her "power to investigate," and by extension, her "power to make laws." *Eastland*, 421 U.S. at 504.

The majority concludes that the act of entering a DHS facility under Section 527 is unambiguously non-legislative by comparing it to the act of transit. True, the act of "[t]ravel to and from the Capitol," "although a necessary precondition" to performing certain legislative acts, "is not an integral part" of the legislative process. *United States v. McDade*, 28 F.3d 283, 299 (3d Cir. 1994). Accordingly, if Congresswoman McIver struck a pedestrian with her car on the way to Delaney Hall, I have no doubt that act would be unambiguously non-legislative.

But the majority's comparison misses a step. When an Executive Branch official prevents a Member from entering a DHS facility, she is denied effective access to an oversight inspection, the investigative tool federal law supplies Members in this context. My colleagues reason that the act of "entry into the secured area" is not itself the "act of inspection," so immunity does not attach to it even though access to a facility is an obvious precondition to inspecting it. Maj. Op. 21. Under their reasoning, House Members should not enjoy immunity for issuing subpoenas either, because the act of mailing a letter to the target is not itself the act of gathering the response, which is what conveys the information of legislative importance. That approach guts privilege claims over acts "involv[ing] legislative fact-finding." *Lee*, 775 F.2d at 522.

The majority also reasons that legislative immunity cannot protect Congresswoman McIver because Count Two

only charges her for "pushing past Victim-2 and using her forearms to forcibly strike him," conduct it says is "distinct from" the act of entering Delaney Hall for the purpose of conducting an oversight inspection. Maj. Op. 20. That approach defies common sense because Congresswoman McIver's access to the facility and her contact with V-2 were inextricably connected. On Congresswoman McIver's telling, the contact was calculated to get around V-2 for her to access the facility, and her access to the facility depended on circumventing him somehow. That proffer, along with the extrinsic evidence supporting it, demand that we analyze the acts as one.

And there is an additional reason not to separate the two acts. A prosecution is impermissible if trying the Member for the putative crime would require so much as a "mention" of a legislative act as part of the Government's proof, not merely where the words used in the indictment target the legislative act in so many words. *United States v. Helstoski*, 442 U.S. 477, 490 (1979). Congresswoman McIver contends that her contact with V-2 was incidental to her attempt to reenter Delaney Hall—contact reasonably calculated to allow her to inspect the facility before temporary modifications could be made—and certainly was not a criminal instance of "forcibly assault[ing], resist[ing], oppos[ing], imped[ing], intimidat[ing], or interfer[ing] with" him in the manner proscribed by 18 U.S.C. § 111(a). The District Court should scrutinize closely the veracity of that proffer at *Menendez's* second step when it considers the purpose and motive behind her contact with V-2. But by separating the contact from the act of re-entering the facility to perform her legislative oversight function, my colleagues risk permitting a prosecution to proceed that will target her for re-entering, sapping the Speech or Debate Clause of the "prophylactic" effect it is supposed to have when we are

"scrutinizing [a] criminal prosecution." *United States v. Johnson*, 383 U.S. 169, 182 (1966).

As a result, the majority glosses over the unique separation-of-powers concerns this case presents. Against the backdrop of Congresswoman McIver's claim, this case pits a generally applicable criminal statute designed to protect certain Executive Branch officials from interference with their duties, 18 U.S.C. § 111(a), against Section 527, a statute giving Members of Congress a right of access to the very facility Congresswoman McIver was attempting to enter and prohibiting those officials from preventing her from doing just that. The task before us now is not to work out how those two statutes interact. We must, instead, contend with the possibility that permitting the Government to prosecute Congresswoman McIver for making incidental contact with an Executive Branch official in these circumstances fails to "reinforce[] the separation of powers" principles the Speech or Debate Clause serves. *Johnson*, 383 U.S. at 178. Because these concerns loom large in this case, and for the reasons I explained above, I would hold that Count Two charges ambiguously legislative activity. The majority's contrary result fails to construe the Clause "broadly" to effect its "prophylactic purposes," chief among them "to prevent intimidation by the executive and accountability before a possibly hostile judiciary." *Id*. at 180–82.

### I.C. The District Court incorrectly analyzed Congresswoman McIver's ambiguously legislative activity.

The District Court concluded, as I do, that the charged conduct was ambiguously legislative. Accordingly, it should have proceeded to consider the "purpose[] and motive" of her acts to determine whether immunity attaches to them.

*Menendez*, 831 F.3d at 166. As a matter of form, it purported to do so. As a matter of substance, however, the factual findings the Court made—and those it failed to make—do not assure me that it applied that test correctly.

Start with its November 2025 opinion denying Congresswoman McIver's motion to dismiss Counts One and Three. Even though it did not reach a conclusion as to Count Two, the District Court stated in a footnote that "it is axiomatic that [Congresswoman McIver's] statutory right to enter and inspect the facility could not be infringed, even if mistakenly, by V-2." App. 27. Despite making that statement, it proceeded to consider *V-2's* intent when resolving the Count Two immunity issue in its January 2026 opinion. Specifically, it found that "V-2 was not facing [Congresswoman McIver] or *purposely* impeding her when the physical contact occurred." App. 54 (emphasis added).

The import of that finding is unclear. Did the District Court find that V-2 was not physically positioned between Congresswoman McIver and the entrance to the facility? If so, then video evidence belies its conclusion. Did the Court mean merely to find that V-2 did not intend to interfere with Congresswoman McIver's ability to access Delaney Hall? If so, then its finding is beside the point and contradicts the Court's November 2025 statement that V-2's intent is irrelevant. In any event, the statement fails to consider Congresswoman McIver's intent—the touchstone of the analysis of her ambiguously legislative activity.[1] When she

[1] The Supreme Court's statement in *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998), that "[w]hether an act is legislative turns on the nature of the act, rather than on the

motive or intent of the official performing it," does not control in this context for two reasons.

First, that case dealt with a common law legislative immunity claim asserted by "local officials performing legislative functions," *id*. at 46, whereas Congresswoman McIver invokes immunity under the Speech or Debate Clause. While the two forms of immunity are "similar in origin and rationale," the Supreme Court teaches that the Speech or Debate Clause confers "a broader privilege" to federal legislators in the context of criminal prosecutions. *Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 732–33 (1980). That makes sense. The Clause's "predominate thrust" is to protect "disfavored legislators" from the "instigation of criminal charges . . . by the executive." *Johnson*, 383 U.S. at 182. Because some legislative acts that may put a Member at risk of retaliation are not identifiable merely by the trappings of Congressional procedure, the Speech or Debate Clause covers a federal legislator's ambiguously legislative activity in addition to her manifestly legislative acts. But if we close our eyes to the extrinsic evidence revealing a legislator's intent when she engages in ambiguously legislative activity, then we lose the means of distinguishing factually between acts integral to the legislative process and those "misrepresented as legislative." *Lee*, 775 F.2d at 524. That is why, nearly two decades after *Bogan*, our Court rejected Senator Robert Menendez's argument that immunity attaches to ambiguously legislative activity merely because the act "viewed objectively . . . appears legislative." *Menendez*, 831 F.3d at 167. Accordingly, "we consider a legislator's purpose and motive to the extent they bear on whether 'certain legislative acts were in fact taken.'" *Id*. (quoting *Lee*, 775 F.2d at 524);

pushed past V-2, was her "predominant purpose," *Menendez*, 831 F.3d at 173, to circumvent him in order to enter the facility and conduct the oversight inspection or to inflict harm on him? That is the question the District Court needed to answer in this context. It did not, so I would remand with instructions to do so.

## II. When faced with vindictive or selective prosecution claims alleging political retaliation against sitting Members of Congress, we should exercise jurisdiction under the collateral order doctrine.

In addition to the Speech or Debate Clause, Congresswoman McIver also invokes a second protection: the Constitution's due-process guarantee that defendants will not be prosecuted vindictively (that is, as punishment for exercising their rights) or selectively (that is, as a result of

---

*accord United States v. James*, 888 F.3d 42, 48—49 (3d Cir. 2018) (examining a legislator's motives to determine whether his ambiguously legislative acts were entitled to immunity under the *Menendez* framework).

Second, the local officials claiming immunity in *Bogan* proffered they engaged in a manifestly legislative act: "introducing, voting for, and signing an ordinance." 523 U.S. at 46. In that context, the Supreme Court explained that "[w]e need not determine whether the formally legislative character of petitioners' actions is alone sufficient to entitle petitioners to legislative immunity." *Id*. at 55. But the Court had no occasion to consider whether it would be appropriate to consider motive in a context where a legislator claims immunity for engaging in an ambiguously legislative act, such as the act at issue here.

illegitimate discrimination). The District Court denied her motion to dismiss the indictment on those grounds. And, on the basis of flawed reasoning, it denied her even the opportunity to conduct discovery. Because this ruling was not a "final decision" that concluded the proceedings, we ordinarily would not have jurisdiction over it. *See* 28 U.S.C. § 1291. The majority takes that way out. But in certain extraordinary cases, we make exceptions to that rule under the "collateral order doctrine." And this is an extraordinary case.

When "the legal and practical value" of a right "would be destroyed if it were not vindicated before trial," the collateral order doctrine gives appellate courts the power to vindicate that right while their review still matters. *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799 (1989) (quoting *United States v. MacDonald*, 435 U.S. 850, 860 (1978)). These atypical cases arise when "the issue presented is in 'danger of becoming moot upon conviction and sentence.'" *United States v. Mitchell*, 652 F.3d 387, 397 (3d Cir. 2011) (quoting *Flanagan v. United States*, 465 U.S. 259, 266 (1984)).

As the Government acknowledges, "this is not a typical case." Transcript of Oral Argument at 33. Despite a surface-level resemblance, the Supreme Court's reasoning in *United States v. Hollywood Motor Car Co.*, 458 U.S. 263 (1982), is far removed from cases involving potentially retaliatory criminal prosecutions against Members of Congress. In *Hollywood Motor Car*, the defendants sought vindication only of a statutory procedural right to move for a change of venue. *Id.* at 263–64. On one side of the ledger, the Supreme Court noted that vacating the conviction and retrial "normally are adequate means of vindicating the constitutional rights of the accused." *Id.* at 268. On the other side, it worried about

expanding the collateral order doctrine to cover "numerous other questions" that would cause "the policy against piecemeal appeals in criminal cases" to "be swallowed by ever-multiplying exceptions." *Id.* at 270.

Both sides of the ledger are quite different in this case. By the time the retaliatory prosecution of a legislator reaches final judgment, she and likeminded lawmakers will have been irreparably deterred from fulfilling their constitutional roles as checks on executive power. Indeed, the Executive can successfully intimidate its coequal branch—Members of which are not permitted to solicit *pro bono* legal counsel—without ever reaching final judgment at all. These prosecutions also inflict ongoing injuries to our representative government by "inevitably impair[ing]" the Member's ability to represent constituents. *United States v. Myers*, 635 F.2d 932, 936 (2d Cir. 1980).

"Against these weighty concerns is only the traditional interest in judicial efficiency that normally precludes piecemeal appeals." *Id.* But there is no real risk that the usual rule will be swallowed up by excepting "the extremely small class of criminal cases brought against Members of Congress." *Id.* Moreover, "it seems likely that when such cases arise," many of them will—as here—also raise "appeals grounded on the Speech or Debate Clause," which we would have to hear anyway. *Id.*; *see, e.g.*, *United States v. Rose*, 28 F.3d 181, 182 (D.C. Cir. 1994); *United States v. Rostenkowski*, 59 F.3d 1291, 1294 (D.C. Cir. 1995).

Potentially retaliatory prosecutions of sitting Members of Congress are exceedingly rare. But when they do occur, the constitutional foundation of our government is at risk. Cases

of such exceptional importance and rarity fit squarely within the collateral order doctrine.[2]

The majority chooses not to recognize these cases as extraordinary. Real harm results from that choice. We are now forced to leave uncorrected the analytical flaws in the District Court's denial of discovery. They include the following.

**II.A. On vindictive prosecution, we should remand for discovery regarding the decision to prosecute.**

"[W]hile an individual certainly may be penalized for violating the law, [s]he just as certainly may not be punished for exercising a protected statutory or constitutional right." *United States v. Goodwin*, 457 U.S. 368, 372 (1982). To prove vindictiveness, "a defendant may use evidence of a prosecutor's retaliatory motive." *United States v. Paramo*, 998 F.2d 1212, 1220 (3d Cir. 1993). Based on evidence of animus against her, Congresswoman McIver claims a story of vengefulness behind her prosecution. I believe she has the right to find out whether it is true.

The Government's stated justification for prosecuting Congresswoman McIver is that she physically assaulted DHS agents. She contends this is a pretext for its actual goal: to

---

[2] Moreover, these cases are readily identifiable. Courts need only ask three questions: (1) Is this a criminal case against a sitting Member of Congress? (2) Is the appealed order a denial of a motion to dismiss the indictment on grounds of selective or vindictive prosecution? And (3) do the selective or vindictive prosecution claims allege political retaliation? Only if all three answers are "yes" would the case fit this category.

retaliate against her for exercising her oversight authority over DHS and to chill legislative oversight in the future. The Government has not identified a single other case where a defendant was charged under 18 U.S.C. § 111(a) for comparably minimal physical contact. And Congresswoman McIver cites evidence of DHS's opposition to oversight, including its "'inexplicable delay'" of her inspection of Delaney Hall. App. 19. She notes that, in the same month, two other Democratic officials were also forcefully detained while investigating DHS activities. The following month, DHS implemented policies restricting congressional access to immigration detention facilities. A district court has since issued a temporary restraining order preventing the policies from going into effect, determining they were likely unlawful. *Neguse v. U.S. Immigr. & Customs Enf't*, 822 F. Supp. 3d 86, 112–15, 118 (D.D.C. 2026). Finally, Congresswoman McIver presents DHS press releases repeatedly disseminating falsehoods about the incident here, including untrue claims that, "as a bus of detainees was entering the security gate," Members of Congress and protestors "stormed the gate and broke into the detention facility" in a "bizarre political stunt" and that two Members had "holed up in a guard shack." *Members of Congress Break into Delaney Hall Detention Center*, DHS (May 9, 2025), https://perma.cc/G6MH-2KXF. *See also DHS Debunks Fake News Narratives About Law Enforcement During Police Week*, DHS (May 16, 2025), https://perma.cc/9XKE-3K3U; *DHS Announces ICE Law Enforcement are Now Facing an 830 Percent Increase in Assaults*, DHS (July 15, 2025), https://perma.cc/7YZP-PGWS.

The District Court did not consider any of this evidence. It decided that "DHS statements and actions are irrelevant" because they do not "'involve anyone making prosecutorial decisions and [are] thus not a proper consideration for a

vindictive prosecution motion.'" *United States v. McIver*, 809 F. Supp. 3d 221, 252 (D.N.J. 2025) (quoting Gov't's Opp'n to Mot. to Dismiss, 41).

That reasoning is untenable. There is no basis for a categorical rule blinding courts to all non-prosecutor statements. Instead, the key question is whether "ill will, whoever its bearer, actually motivated [the] prosecution." *United States v. Monsoor*, 77 F.3d 1031, 1035 (7th Cir. 1996). For example, the Sixth Circuit has granted discovery into whether the Equal Employment Opportunity Commission caused a criminal tax investigation of an employee who had sued the agency. *United States v. Adams*, 870 F.2d 1140, 1145–46 (6th Cir. 1989).

This case, like *Adams*, turns on whether the animus of another agency may be imputed to the Department of Justice ("DOJ"). If not, most of Congresswoman McIver's evidence is irrelevant. If so, however, she has a colorable claim that this prosecution arose "solely to penalize [her] for exercising [her statutory] right" to oversight inspections of DHS facilities. *See Paramo*, 998 F.2d at 1221. As in *Adams*, the Government has failed to show that comparable conduct has "heretofore been subjected to prosecution." 870 F.2d at 1145. Congresswoman McIver has provided evidence of resistance to her legislative oversight, repeated falsehoods attempting to portray that oversight as criminal wrongdoing, and potentially unlawful policy changes aimed at stymying oversight. And an *amicus* brief filed by former federal prosecutors describes this prosecution as a "disturbing departure" from longstanding DOJ norms. No. 25-2573, Dkt. 32 at 2. "It may well be that no fire will be discovered under all the smoke, but there is enough smoke here . . . to warrant the unusual step of letting the defendant[] find out how this unusual prosecution came

about." *Adams*, 870 F.2d at 1146. Therefore, on her vindictive prosecution claim, I would permit Congresswoman McIver discovery aimed at ascertaining DHS's role in the decision to prosecute her.

### II.B. On selective prosecution, we should remand for discovery regarding discriminatory purpose.

"[O]rdinary equal protection standards" apply to claims of selective prosecution—namely, the defendant must demonstrate both that the prosecution decision "had a discriminatory effect" and that it "was motivated by a discriminatory purpose." *United States v. Armstrong*, 517 U.S. 456, 465 (1996) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). To establish a discriminatory effect, a defendant may show that "similarly situated individuals" were treated more favorably. *Id.* Several circuits have adopted the Fourth Circuit's definition of "similarly situated" individuals: those whose "circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. Olvis*, 97 F.3d 739, 744 (4th Cir. 1996); *see, e.g.*, *United States v. Lewis*, 517 F.3d 20, 27 (1st Cir. 2008); *United States v. DeChristopher*, 695 F.3d 1082, 1097 (10th Cir. 2012); *Branch Ministries v. Rossotti*, 211 F.3d 137, 145 (D.C. Cir. 2000).

Congresswoman McIver identifies as similarly situated comparators the defendants who stormed the United States Capitol on January 6, 2021, and were, like her, charged under § 111(a)—but whose pending charges were dismissed. When assessed against legitimate factors, they were far more culpable than she is: many of them were armed, and she was not; they were unlawfully present, and she was not; many of them had

criminal records, and she did not; many of them caused injuries, and she did not.

But the District Court concluded these differences disqualified those defendants from comparison. It analogized to *United States v. Judd*, 579 F. Supp. 3d 1 (D.D.C. 2021), which rejected a January 6 defendant's argument that he was similarly situated to rioters in Oregon who had their charges dismissed. *Judd* pointed out that the defendant endangered many people, whereas the Oregon rioters attacked a largely vacant building. *Id.* at 7–8. Citing this analysis, the District Court reasoned that "[i]f the January 6 defendants can be distinguished from another group of civilian protestors, Defendant, a Congresswoman with statutory authority to be present at Delaney Hall, is certainly not similarly situated." *United States v. McIver*, 809 F. Supp. 221, 251 (D.N.J. 2025).

That reasoning fails. In *Judd*, the defendant was more criminally culpable than the comparators, so there was a legitimate reason to dismiss their charges but not his. But Congresswoman McIver is *less* criminally culpable than her comparators. That means there was no legitimate reason to dismiss their charges but not hers. The differences between Congresswoman McIver and the comparators make it more likely, not less, that she was prosecuted selectively.

The District Court also determined that the January 6 defendants were not appropriate comparators because they did not escape prosecution. It noted that they "were in fact prosecuted by DOJ before receiving pardons for their crimes" and that "DOJ had no discretion when dismissing [their] criminal cases—the Presidential pardon required their dismissal." *Id.* at 249–50.

But the President's proclamation clearly distinguished between those already convicted (who received pardons) and those with pending indictments (which were dismissed). Proclamation No. 10887, 90 Fed. Reg. 8331, 8331 (Jan. 20, 2025). The proclamation contains four operative paragraphs. In the first, the President "commute[d] the sentences" of certain defendants. *Id.* In the second, he "grant[ed] a full, complete[,] and unconditional pardon to all other individuals convicted of offenses related to [January 6]." *Id.* The third instructs the Attorney General to secure for those "described in [the paragraph] above" certificates of pardon and release from prison. *Id.* Only then does the last paragraph "further direct the Attorney General to pursue dismissal with prejudice to the government of all pending indictments against individuals for their conduct related to [January 6]." *Id.*

The text is unambiguous. The directive regarding dismissals comes two paragraphs after the grant of pardons. It is a "further" directive, not a component of the pardoning directive. *Id.* The intervening third paragraph expressly contemplates issuing certificates of pardon only to those "described in section (b) above"—*i.e.*, those "convicted of offenses." *Id.* Aside from the pardon and dismissal directives' appearance in the same document, there is no textual support for the District Court's conclusion that those with pending charges were also pardoned.[3]

---

[3] The District Court cited two circumstantial factors in support of its position. First, the Government reported that the Office of the Pardon Attorney issued some certificates of pardon to defendants with pending cases, considering them "included in the universe of defendants who received pardons."

Because it decided she had failed to show discriminatory effect, the District Court did not consider Congresswoman McIver's evidence of discriminatory purpose. Without recounting here each item of evidence in her briefing, I believe she presented enough to obtain discovery on whether this prosecution "was intended to prevent [her] exercise of a fundamental right"—that is, whether it punishes her for doing her job as a Member of Congress with specific oversight

---

*McIver*, 809 F. Supp. 3d at 250 (quoting Gov't's Opp'n to Mot. to Dismiss, 16). Second, at least one court has referred to a January 6 defendant's "pardon" when dismissing his case. *See United States v. Banuelos*, 763 F. Supp. 3d 1, at *1–2 (D.D.C. 2025).

But neither of these bodies has the authority to alter the plain text of the Presidential proclamation. Even setting that aside, those circumstances do not squarely support the District Court's conclusion. First, "a pardon by its mere issue has [no] automatic effect." *Burdick v. United States*, 236 U.S. 79, 90–91 (1915). Rather, "[a] pardon is a deed, to the validity of which delivery is essential, and delivery is not complete without acceptance." *Id.* (internal quotation marks omitted). At minimum, therefore, the comparators who did not receive certificates of pardon are not pardoned. Second, even if courts' characterizations were relevant, some have dismissed cases without prejudice. *See, e.g.*, *United States v. Amos*, 763 F. Supp. 3d 2, 5–6 (D.D.C. 2025); *United States v. GossJankowski*, 348 F.R.D. 140, 145–46 (D.D.C. 2025); *United States v. Jovanovic*, No. 25-cr-15, 2025 WL 266551, at *3 (D.D.C. Jan. 22, 2205). That contemplates the possibility of future prosecution for the same acts, which would be impossible if the defendants had been pardoned.

responsibilities. *United States v. Schoolcraft*, 879 F.2d 64, 68 (3d Cir. 1989) (*per curiam*).

* * * * *

For the reasons above, I respectfully concur in part and dissent in part.

Case: 26-1122 Document: 71-1 Page: 1 Date Filed: 08/26/2026

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

Nos. 25-3573 & 26-1122

UNITED STATES OF AMERICA

v.

LAMONICA MCIVER,
Appellant

---

On Appeal from the U.S. District Court, D.N.J.
Judge Jamel K. Semper, No. 2:25-cr-00388-001

Before: BIBAS, CHUNG, and AMBRO, *Circuit Judges*
Argued: June 24, 2026

---

JUDGMENT

This cause came to be considered on the record from the U.S. District Court, D.N.J. and was argued on June 24, 2026.

On consideration whereof, it is now **ORDERED** and **ADJUDGED** that the District Court's order entered on January 5, 2026, is **AFFIRMED**. The District Court's order entered on November 13, 2025, is hereby **AFFIRMED IN PART, VACATED IN PART, AND REMANDED**. The appeal of the District Court's order entered November 13, 2025, is **DISMISSED** in part for lack of jurisdiction. Costs will not be taxed. All of the above in accordance with the Opinion of this Court.

ATTEST:

s/Patricia S. Dodszuweit
Clerk

Dated: August 26, 2026